**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ADRIAN SINGLETON<br>6024 New Forest Court #4<br>Waldorf, MD 20603<br>(Charles County)<br><br>and<br><br>JUSTIN D'HEILLY<br>1938 Munster Avenue<br>St. Paul, MN 55116<br>(Ramsey County),<br><br>individually and as representatives of the classes,<br><br>     Plaintiffs,<br><br>v.<br><br>DOMINO'S PIZZA, LLC<br>30 Frank Lloyd Wright Drive<br>Ann Arbor, MI 48106<br><br>     Defendant. | Case No.:   8:11-cv-01823-DKC<br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT<br>(JURY TRIAL DEMANDED)** |

Pursuant to Fed. R. Civ. P. 15(a)(1)(B), Plaintiffs Adrian Singleton and Justin D'Heilly ("Plaintiffs"), by and through their attorneys, and on behalf of themselves, the Putative Classes set forth below, and in the public interest, bring the following First Amended Class Action Complaint as of right against Defendant Domino's Pizza, LLC ("Defendant" or "Domino's"), pursuant to the Fair Credit Reporting Act ("FCRA").

## PRELIMINARY STATEMENT

1.    Domino's routinely obtains and uses information in consumer reports to conduct background checks on prospective employees and existing employees, and frequently relies on such information, in whole or in part, as a basis for adverse

1

employment action, such as termination, reduction of hours, change in position, failure to hire, and failure to promote.

2.      While the use of consumer report information for employment purposes is not *per se* unlawful, it is subject to strict disclosure and authorization requirements under the FCRA.

3.      Domino's has willfully violated these requirements in multiple ways, in systematic violation of Plaintiffs' rights and the rights of other putative class members.

4.      Domino's violated 15 U.S.C. § 1681b(b)(3)(A) by taking adverse employment action against Plaintiffs and other putative class members based on undisclosed consumer report information, without first providing Plaintiffs and other affected class members with a copy of the pertinent consumer report and without providing them a reasonable opportunity to respond to the information in the report and discuss it with Domino's.

5.      Domino's also violated 15 U.S.C. § 1681b(b)(2)(A)(i) by procuring consumer reports on Plaintiffs and other putative class members for employment purposes, without first making proper disclosures in the format required by the statute. Under this subsection of the FCRA, Domino's is required to disclose to its employees – *in a document that consists solely of the disclosure* – that it may obtain a consumer report on them for employment purposes, prior to obtaining a copy of their consumer report. *Id.*  Domino's willfully violated this requirement in at least two respects: (1) Domino's buried these disclosures on the fifth page of a multi-page job application; and (2) Domino's inserted a liability release and other extraneous information into the portion of its job application that purports to grant Domino's the authority to obtain and use

consumer report information.  *See Exhibit 3 at 5.*  Both of these practices violate longstanding regulatory guidance from the Federal Trade Commission ("FTC").

6.     Finally, Domino's violated 15 U.S.C. § 1681b(b)(2)(A)(ii) by obtaining consumer reports on Plaintiffs and other putative class members without proper authorization, due to the fact that its disclosure forms fail to comply with the requirements of the FCRA.

7.     Based on the foregoing violations, Plaintiffs assert FCRA claims against Domino's on behalf of themselves and two separate classes of Domino's employees and prospective employees.

8.     In Count One, Plaintiffs assert a FCRA claim under 15 U.S.C. § 1681b(b)(3)(A) on behalf of an "Adverse Action Class" consisting of all employees or prospective employees of Domino's in the United States who received notice on or after July 1, 2009 that Domino's was taking adverse employment action against them based, in whole or in part, on information contained in a consumer report, and who were not provided a copy of such report in advance.

9.     In Counts Two and Three, Plaintiffs also assert a pair of FCRA claims under 15 U.S.C. §§ 1681b(b)(2)(A)(i)-(ii) on behalf of a "Background Check Class" consisting of all employees or prospective employees of Domino's in the United States who were the subject of a consumer report that was procured by Domino's (or that Domino's caused to be procured) on or after July 1, 2009.

10.     On behalf of themselves and the Putative Classes, Plaintiffs seek statutory damages, costs and attorneys' fees, equitable relief, and other appropriate relief pursuant to the FCRA.

## THE PARTIES

11.     Individual and representative Plaintiff Adrian Singleton ("Singleton") lives and works in this judicial district, and is a resident of Waldorf, Maryland (Charles County).  Singleton is a former employee of Domino's, and is a member of each of the Putative Classes defined below.

12.     Individual and representative Plaintiff Justin D'Heilly in a resident of St. Paul, Minnesota.  D'Heilly formerly worked for Domino's in St. Paul, Minnesota, and is a member of each of the Putative Classes defined below.

13.     Defendant Domino's is headquartered in Ann Arbor, Michigan and does business in Maryland and throughout the United States.   According to its website, Domino's is the "world leader in pizza delivery[,]" and has approximately 9,000 stores and 170,000 employees worldwide.

## JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction over Plaintiffs' FCRA claims pursuant to 28 U.S.C. § 1331.

15.     Venue is proper in the United States District Court, District of Maryland, pursuant to 28 U.S.C. § 1391.  Plaintiff Singleton resides in Maryland, worked for Domino's in Maryland, and his claims arise, in substantial part, in Maryland.  Domino's regularly conducts business in Maryland and is subject to personal jurisdiction in this district.

## ALLEGATIONS REGARDING DOMINO'S BUSINESS PRACTICES

*Automatic Background Checks*

16.     Domino's "automatically" conducts background checks on all of its job applicants as part of a standard screening process.  *See Exhibit 1 at 3*.  In addition,

4

Domino's also conducts background checks on existing employees from time-to-time during the course of their employment.

17.     Domino's does not perform these background checks in-house.  Rather, Domino's relies on outside consumer reporting firms to obtain this information and report it to Domino's.  These reports constitute "consumer reports" for purposes of the FCRA.

18.     In 2008, Domino's hired Taleo Corporation ("Taleo") to assist it with the background check process.  *See Exhibit 1 at 2.*  Taleo provides Domino's with a background check assessment that divides individuals into three color-coded categories – green, yellow, and red.  *Id. at 3.*  According to Taleo, "[t]hirteen percent of people applying for jobs are getting 'red' assessments [based on available consumer report information] and are being taken out of consideration for employment."  *Id.*

19.     The consumer report information that is used for purposes of these background check assessments comes from Taleo's background screening partner, HireRight, Inc. ("HireRight").  *See Exhibit 2.* Together, Taleo and HireRight provide an "integrated" package of screening services that provides Domino's with a "single source for all candidate and employment information."  *Id.*

***FCRA Violations Relating to Background Check Class***

20.     Domino's has procured this consumer report information in violation of the FCRA.

21.     Under the FCRA, it is unlawful to procure a consumer report or cause a consumer report to be procured for employment purposes, unless:

> (i)     a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, ***in a document that consists solely of the disclosure***, that a consumer report may be obtained for employment purposes; and

(ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report.

15 U.S.C. §§ 1681b(b)(2)(A)(i)-(ii) (emphasis added).

22.    Domino's has not satisfied these disclosure and authorization requirements.

23.    On page 5 of Domino's' standard job application,[1] it purports to include a "Background Investigation Information and Consent" ("BIIC").  *See Exhibit 3 at 5.* However, Domino's does not have a stand-alone FCRA disclosure or authorization form.

24.    This practice violates the plain language of the statute, and flies in the face of unambiguous case law and regulatory guidance from the FTC.  *See, e.g., E.E.O.C. v. Video Only, Inc.*, No. 06-1362, 2008 WL 2433841, at *11 (D.Or. June 11, 2008) ("I grant summary judgment of liability that Video Only violated . . . 15 § 1681b(b)(2)(A)(I).  This section provides that at any time before the report is procured, a disclosure is made in a document that consists solely of the disclosure that a consumer report may be obtained for employment purposes. Video Only disclosed this possibility as part of its job application, which is not a document consisting solely of the disclosure."); *Exhibit 4* ("The disclosure may not be part of an employment application . . . .  A disclosure that is combined with many items in an employment application -- no matter how 'prominently' it appears -- is not 'in a document that consists solely of the disclosure' as required by

---

[1] Domino's standard job application is posted on its website, at http://www.Dominos.com/careers/pdf/APPL01F.application_2007.pdf (last visited Sept. 2, 2011).  On information and belief, Domino's has used this standard job application since at least 2007.

[1681b(b)(2)(A)]."); *Exhibit 5 at 51* ("The disclosure cannot be part of a printed employment application.").

25.    By burying its disclosures on the fifth page of a multi-page job application, Domino's willfully disregarded this case law and regulatory guidance, and willfully violated 15 U.S.C. §§ 1681b(b)(2)(A) by procuring consumer report information on employees without complying with the disclosure and authorization requirements of the statute.

26.    Moreover, the BIIC does not consist solely of a disclosure and authorization to obtain consumer report information.  In addition, the BIIC contains the following release and acknowledgement:

> I release, without reservation, you and any person or entity which provides information pursuant to this authorization, from any and all liabilities, claims or causes of action in regards to the information obtained from any and all of the above reference [sic] sources used.  I acknowledge that this is a stand-alone customer notification informing me that a report will be requested and that the information obtained shall be used solely for the purpose of evaluating me for employment, promotion, reassignment, or retention as an employee.

27.    The insertion of this release and acknowledgement into the BIIC also is contrary to the plain language of the statute and longstanding regulatory guidance.  The FTC has warned that "the form should not include any extraneous information." *Exhibit 6.*  In fact, the FTC has specifically warned that "[t]he inclusion of such a waiver [of liability] in a disclosure form will violate Section 604(b)(2)(A) of the FCRA [15 U.S.C. §§ 1681b(b)(2)(A)], which requires that a disclosure consist 'solely' of the disclosure that a consumer report may be obtained for employment purposes." *Id.*

28.    By including an extraneous release and acknowledgement in the BIIC, Domino's willfully disregarded this regulatory guidance, and willfully violated 15 U.S.C.

§§ 1681b(b)(2)(A) by procuring consumer report information on employees without complying with the disclosure and authorization requirements of the statute.[2]

***FCRA Violations Relating to Adverse Action Class***

29.     The FCRA also provides that "in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates . . . a copy of the report[.]"  15 U.S.C. § 1681b(b)(3)(A)(i).

30.     Domino's typically does not provide job applicants or employees with a copy of their consumer reports when it takes adverse action against them based on the information in such reports.

31.     This practice violates one of the most fundamental protections afforded to employees under the FCRA, and also runs counter to longstanding regulatory guidance. *See Exhibit 7* ("[15 U.S.C. § 1681b(b)(3)(A)] requires that all employers who use consumer reports provide a copy of the report to the affected consumer before any adverse action is taken. Employers must comply with this provision even where the information contained in the report (such as a criminal record) would automatically disqualify the individual from employment or lead to an adverse employment action. Indeed, this is precisely the situation where it is important that the consumer be informed of the negative information . . . .").

32.     By failing to provide Plaintiffs and other Putative Class members with copies of their consumer reports prior to taking adverse employment action against them

---

[2] The fact that the BIIC asked employees to acknowledge that "this is a stand-alone customer notification" clearly demonstrates that Domino's was aware that the required FCRA disclosure and authorization must be set forth in a stand-alone document.

based on such reports, Domino's willfully disregarded this regulatory guidance and the plain language of the statute in violation of 15 U.S.C. §§ 1681b(b)(2)(A).

## ALLEGATIONS RELATING TO PLAINTIFF SINGLETON

33.     Plaintiff Singleton applied for work at Domino's in the spring of 2009.

34.     In connection with his employment application, Singleton completed Domino's' standard employment application.

35.     Following completion of his employment application, Singleton was hired to work at the Domino's store location at 2256 Crain Highway in Waldorf, Maryland.

36.     Singleton worked for Domino's at this location for several weeks. However, after returning to work following the Independence Day holiday on July 4, 2009, Singleton discovered that he had not been scheduled for additional hours.

37.     When Singleton inquired why his name did not appear on the work schedule, he was directed to contact his General Manager, and did so.

38.     The General Manager indicated that there was a potential issue with Singleton's employment application, but did not indicate the specific nature of this issue. Accordingly, Singleton filled out a second application for employment with Domino's, in an effort to resolve any potential issue with his earlier application.

39.     Singleton did not receive any additional work upon completing this second application.   Instead, Singleton received a letter from Domino's dated July 9, 2009, which stated:

> This is to advise you that our offer of employment is being withdrawn and your application for employment is being denied.   In evaluating your application, the consumer reporting agency listed below [HireRight, Inc.] provided us with information which, in whole or in part, influenced our employment decision.

*Exhibit 8.*

40.     The letter falsely stated that Singleton previously "should have received" a copy of his consumer report.  However, Domino's never furnished Singleton a copy, and suggested in the same letter that Singleton should "contact[] the consumer reporting agency directly" in order to obtain a copy of his report.

41.     Because Domino's did not provide Singleton with a copy of the consumer report that it relied upon and did not provide Singleton with an explanation for its termination decision, Singleton did not know why he was terminated (until Domino's responded to his original Complaint in this action).  As a result, Singleton was deprived of any opportunity to review the information in the report and discuss it with his employer before he was terminated.

42.     It was unlawful for Domino's to terminate Singleton's employment and deny his employment applications on the basis of information contained a consumer report that was never shared with him.

43.     It also was unlawful for Domino's to procure a consumer report on Singleton without making the disclosures required by the FCRA.

## ALLEGATIONS RELATING TO PLAINTIFF D'HEILLY

*Employment with Domino's*

44.     Plaintiff D'Heilly worked at the Domino's store on Grand Avenue in St. Paul, Minnesota on two separate occasions.

45.     D'Heilly initially worked for Domino's from November of 2004 until March of 2008.  During this time period, D'Heilly was promoted from a delivery driver to an assistant manager at the Grand Avenue store.  As an assistant manager, D'Heilly had access to employment screening information from Domino's screening system, but

does not recall any person ever being provided with a copy of their consumer report by Domino's if they were deemed ineligible for employment.

46.     After briefly accepting employment with a different company, D'Heilly re-applied to work at Domino's in December of 2008.   As part of the application process, D'Heilly was required to complete Domino's' standard job application, and upon being hired, he was required to go through the job orientation process a second time.

47.     D'Heilly worked for Domino's through August of 2009.  However, he was not scheduled for any hours in September of 2009, and was eventually terminated in October of 2009.

48.     D'Heilly was advised by his General Manager that he could not continue to work as a delivery driver because something had come up on a background check relating to his motor vehicle history.  However, his General Manager was unable to provide him with any further information, and Domino's did not provide D'Heilly with a copy of his consumer report.

49.     Feeling left in the dark, D'Heilly contacted the St. Paul Police Department to inquire whether his license had been revoked without his knowledge.  He was advised that his license remained valid, and his driving record was clean with the exception of approximately two speeding tickets.  However, it was impossible for D'Heilly to determine what driving information was contained in his consumer report (or discuss that information with Domino's) because Domino's never shared that information with him.

50.     It was unlawful for Domino's to terminate D'Heilly's employment on the basis of information contained a consumer report that was never shared with him by either Domino's or HireRight.

51.     It also was unlawful for Domino's to procure a consumer report on D'Heilly without making the disclosures required by the FCRA.

## CLASS ACTION ALLEGATIONS

52.     Plaintiffs assert their claim in Count 1 on behalf of a Putative Adverse Action Class defined as follows:

> **Proposed Adverse Action Class:**   All employees or prospective employees of Domino's in the United States who received notice on or after July 1, 2009 that Domino's was taking adverse employment action against them based, in whole or in part, on information contained in a consumer report, and who were not provided a copy of such report in advance.

53.     Plaintiffs assert their claims in Counts 2 and 3 on behalf of a Putative Background Check Class defined as follows:

> **Proposed Background Check Class:**   All employees or prospective employees of Domino's in the United States who were the subject of a consumer report that was procured by Domino's (or that Domino's caused to be procured) on or after July 1, 2009.

54.     <u>Numerosity</u>:   The Putative Classes are so numerous that joinder of all Class members is impracticable.  Domino's regularly obtains and uses information in consumer reports to conduct background checks on prospective employees and existing employees, and frequently relies on such information, in whole or in part, as a basis for adverse employment action.  Plaintiffs are informed and believe that during the relevant time period, thousands of Domino's employees and prospective employees satisfy the definition of the Putative Classes.

55.     <u>Typicality</u>:    Plaintiffs' claims are typical of the members of the Putative Classes.  Domino's typically uses consumer reports to conduct background checks on employees and prospective employees.  Domino's typically requires job applicants to sign a BIIC that that is part of a multi-page job application and includes a liability release.  Domino's typically does not provide copies of consumer reports to employees or

prospective employees before taking adverse action based on information contained in such reports.  The FCRA violations suffered by Plaintiffs are typical of those suffered by other Putative Class members, and Domino's treated Plaintiffs consistent with other Putative Class members in accordance with its standard policies and practices.

56.     <u>Adequacy</u>:     Plaintiffs will fairly and adequately protect the interests of the Putative Classes, and have retained counsel experienced in complex class action litigation.

57.     <u>Commonality</u>:  Common questions of law and fact exist as to all members of the Putative Classes and predominate over any questions solely affecting individual members of the Putative Classes, including but not limited to:

    a.   Whether Domino's uses consumer report information to conduct background checks on employees and prospective employees;

    b.   Whether Domino's requires its employees to sign a BIIC;

    c.   Whether Domino's' BIIC complies with the FCRA;

    d.   Whether it was proper under the FCRA for Domino's to include the BIIC in a multi-page job application;

    e.   Whether it was proper under the FCRA for Domino's to include a liability release and acknowledgement in the BIIC;

    f.   Whether Domino's violated the FCRA by procuring consumer report information without making proper disclosures in the format required by the statute;

    g.   Whether Domino's violated the FCRA by procuring consumer report information based on invalid authorizations;

    h.   Whether Domino's violated the FCRA by taking adverse action against Plaintiffs and other members of the Adverse Action Class on the basis of information in a consumer report, without first furnishing a copy of the report to the affected persons;

    i.   Whether Domino's' violations of the FCRA were willful;

  j. The proper measure of statutory damages damages; and

  k. The proper form of injunctive and declaratory relief.

  58. This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(1) because prosecution of actions by or against individual members of the Putative Classes would result in inconsistent or varying adjudications and create the risk of incompatible standards of conduct for Defendant.  Further, adjudication of each individual Class member's claim as separate action would potentially be dispositive of the interest of other individuals not a party to such action, impeding their ability to protect their interests.

  59. This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Domino's has acted or refused to act on grounds that apply generally to the Putative Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

  60. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Putative Classes predominate over any questions affecting only individual members of the Putative Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the FCRA.  Members of the Putative Classes do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claims is small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendant by any members of the Putative Classes on an individual basis.  Class certification also will obviate the need for unduly duplicative

litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Putative Class members' claims in a single forum.

61.     Plaintiffs intend to send notice to all members of the Putative Classes to the extent required by Rule 23.  The names and addresses of the Putative Class members are available from Defendant's records.

### FIRST CLAIM FOR RELIEF

**Failure to Provide Copy of Consumer Report in Violation of FCRA**

**15  U.S.C. § 1681b(b)(3)(A)**

62.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

63.     Domino's used a "consumer report," as defined by the FCRA, to take adverse employment action against Plaintiffs and other members of the Adverse Action Class.

64.     Domino's violated the FCRA by failing to provide Plaintiffs and other Adverse Action Class members with a copy of the consumer report that was used to take adverse employment action against them.  *See*  15 U.S.C. § 1681b(b)(3)(A).

65.     The foregoing violations were willful.  Domino's acted in deliberate or reckless disregard of its obligations and the rights of Plaintiffs and other Adverse Action Class members under 15 U.S.C. § 1681b(b)(3)(A).   Domino's' willful conduct is reflected by, among other things, the following facts:

      a.   Domino's is a large corporation with access to legal advice through its own general counsel's office and outside employment counsel, and there is no contemporaneous evidence that it determined that its conduct was lawful;

b. Domino's knew or had reason to know that its conduct was inconsistent with published FTC guidance interpreting the FCRA and the plain language of the statute;

c. Domino's voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless;

d. The consumer reporting agency that provided Plaintiffs' consumer report information to Domino's (HireRight) has published a FCRA Primer for U.S. Employers, which states: "When an employer intends to take an adverse action based in whole or in part on information contained in the applicant's background report, the employer first must provide the applicant with a 'pre-adverse action' notice that includes a copy of the background report." *Exhibit 9 at 4-5*;

e. Domino's' BIIC does not state that a consumer report automatically will be provided to employees or prospective employees if Domino's intends to take adverse action against them based on information in a consumer report. Rather, Domino's places the burden on the affected individual to request a copy of his or her report;

f. The Domino's "Case Study" published online by Taleo does not give any indication that consumer reports are provided to employees or prospective employees who are coded "red" and flagged as ineligible for employment. *Exhibit 1*;

g. D'Heilly does not recall anyone who was deemed ineligible for employment at his store ever being provided with a copy of their consumer report;

h. Domino's' repeatedly violated the statute and its failure to provide Plaintiffs and other Adverse Action Class Members with copies of their consumer reports was not accidental.[3]

---

[3] A recent study reported that many large employers are "routinely" failing to provide background checks to their employees. *See Exhibit 10 at 12*. Although the study does not identify these employers by name, it indicates that Defendant's consumer reporting partner, HireRight, has been the subject of multiple lawsuits regarding failure to comply with FCRA requirements. *Id.* HireRight was the consumer reporting agency for First Transit, Inc. and First Student, Inc., two companies that have entered into a $5.9 million settlement to resolve claims that they failed to provide copies of consumer reports to employees who had adverse action taken against them. *See* http://www.workplaceclassaction.com/First%20transit%20settlement%20agrement.pdf

66.     Plaintiffs and the Adverse Action Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, pursuant to 15 U.S.C. § 1681n(a)(1)(A).

67.     Plaintiffs and the Adverse Action Class are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3).

## SECOND CLAIM FOR RELIEF
### Failure to Make Proper Disclosure in Violation of FCRA
### 15 U.S.C. § 1681b(b)(2)(A)(i)

68.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

69.     The BIIC that Plaintiffs and other members of the Background Check Class were required to complete as a condition of their employment with Domino's does not satisfy the disclosure requirements of 15 U.S.C. § 1681b(b)(2)(A)(i) because (1) the BIIC is not a stand-alone document; (2) the BIIC is buried in a multi-page job application; and (3) the BIIC includes an extraneous release and acknowledgement.[4]

70.     Domino's violated the FCRA by procuring consumer reports relating to Plaintiffs and other Background Check Class members without first making proper disclosures in the format required by 15 U.S.C. § 1681b(b)(2)(A)(i).

71.     The foregoing violations were willful.  Domino's knew that the BIIC must be a stand-alone form (separate from the employment application), and should not include items not strictly required by the FCRA.  Dominos acted in deliberate or reckless disregard of its obligations and the rights of Plaintiffs and other Background Check Class

---

[4] The BIIC also falsely states that the information in the BIIC is "required for identification purposes only."

members under 15 U.S.C. § 1681b(b)(2)(A)(i).  Domino's' willful conduct is reflected

by, among other things, the following facts:

    a.  Domino's is a large corporation with access to legal advice through its own general counsel's office and outside employment counsel, and there is no contemporaneous evidence that it determined that its conduct was lawful;

    b.  Domino's knew or had reason to know that its conduct was inconsistent with published FTC guidance and case law interpreting the FCRA and the plain language of the statute;

    c.  Domino's voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless;

    d.  HireRight's Primer for U.S. Employers acknowledges that the disclosure and authorization form required by the FCRA "must be a stand-alone document[.]" *Exhibit 4 at 3.*

    e.  Domino's BIIC also references this stand-alone document requirement, and improperly asks the person filling out the form to "acknowledge that this is a stand-alone consumer notification[.]"

    f.  Domino's has not changed its business practices in response to the filing of this action.  Domino's continues to insert the BIIC in its multi-page employment application, and continues to include extraneous release and acknowledgement language in the BIIC as of the filing of this First Amended Complaint.

72.    Plaintiffs and the Background Check Class are entitled to statutory

damages of not less than $100 and not more than $1,000 for each and every one of these

violations, pursuant to 15 U.S.C. § 1681n(a)(1)(A).

73.    Plaintiffs and the Background Check Class are further entitled to recover

their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3).

### THIRD CLAIM FOR RELIEF

**Failure to Obtain Proper Authorization in Violation of FCRA**

**15 U.S.C. § 1681b(b)(2)(A)(ii)**

74.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

75.     Domino's violated the FCRA by procuring consumer reports relating to Plaintiffs and other Background Check Class members without proper authorization.  *See* 15 U.S.C. § 1681b(b)(2)(A)(ii).

76.     The foregoing violations were willful.  Domino's acted in deliberate or reckless disregard of its obligations and the rights of Plaintiffs and other Background Check Class members under 15 U.S.C. § 1681b(b)(2)(A)(ii).  Domino's' willful conduct is reflected by, among other things, the facts set forth in Count Two above.

77.     Plaintiffs and Background Check Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, pursuant to 15 U.S.C. § 1681n(a)(1)(A).

78.     Plaintiffs and the Background Check Class are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3).

### PRAYER FOR RELIEF

79.     WHEREFORE, Plaintiffs, on behalf of themselves and the Putative Classes, prays for relief as follows:

      A.    Determining that this action may proceed as a class action under Rule 23(b)(1), (2) and (3) of the Federal Rules of Civil Procedure;

      B.    Designating Plaintiffs as class representatives and designating Plaintiffs' counsel as counsel for the Putative Classes;

C.   Issuing proper notice to the Putative Classes at Domino's' expense;

D.   Declaring that Domino's committed multiple, separate violations of the FCRA;

E.   Declaring that Domino's acted willfully in deliberate or reckless disregard of Plaintiffs' rights and its obligations under the FCRA;

F.   Awarding statutory damages as provided by the FCRA;

G.   Awarding reasonable attorneys' fees and costs as provided by the FCRA;

H.   Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

80.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Putative Class demand a trial by jury.

Respectfully submitted,

Dated: September 2, 2011            /s/Kai Richter
                                    NICHOLS KASTER, PLLP
                                    Kai Richter, MN Bar No. 0296545*
                                       *(Admitted *pro hac vice*)
                                    Rebekah L. Bailey, MN Bar No. 0389599*
                                       *(Admitted *pro hac vice*)
                                    4600 IDS Center
                                    80 South Eighth Street
                                    Minneapolis, MN 55402
                                    Telephone: (612) 256-3200
                                    Fax: (612) 215-6870

                                    SULLIVAN, TALBOTT & BATT
                                    Alane Tempchin, MD Fed. Bar No. 14780
                                    77 South Washington Street, Suite 304
                                    Rockville, Maryland 20850
                                    Telephone: (301) 340-2450
                                    Fax: (301) 424-8280

                                    ATTORNEYS FOR PLAINTIFFS AND
                                    THE PUTATIVE CLASSES

20

EXHIBIT 1



# Domino's Pizza Case Study



"The number one benefit we've seen since implementing Taleo is the standardization of the screening and hiring process across 500 stores."

Jeffrey Mayer
Director of Systems and Decision Support
Domino's Pizza

**Domino's Pizza Delivers Faster Recruiting Topped with Cost Savings and Process Improvements**

Founded in 1960, Domino's Pizza is the recognized world leader in pizza delivery. Today, Domino's Pizza has 500 company-owned stores in the United States and over 8,000 franchise-owned stores in more than 60 different countries. The Domino's Pizza brand had global retail sales of over $5.4 billion in 2007, comprised of $3.2 billion domestically and $2.2 billion internationally.

Headquartered in Ann Arbor, Michigan, Domino's Pizza employs more than 10,000 employees; 9,000 of whom are hourly-based employees. The Domino's Pizza vision, to be the best pizza delivery company in the world, relies on employing a staff of exceptional people. Given that the turnover rate for hourly employees is typically in excess of 50% across any retailer, the challenge to attract and retain exceptional staff for Domino's was significant.

**Managing a High Volume of Applications Consistently, While Streamlining Paperwork**

Prior to implementing Taleo, Domino's Pizza had neither a centralized hiring process nor an automated system in place to manage the large number of job applications received at each of its local stores. The hiring process was completely decentralized. Each of its 500 corporate stores had paper stock of interview guides and followed its own sourcing practices such as local print advertising and job fairs.

Further complicating the issue, all hiring paperwork had to be sent to a central location where it was first scanned and then entered into the PeopleSoft system. Only after this was done, could Domino's report on any of the information. Because of this, the human resources department had little to no visibility into the application process and had difficulty enforcing standards for its hiring process. It experienced paperwork compliance issues and struggled to hold the different stores accountable.

For example, if a store was understaffed in comparison to sales volumes there was no central system to help determine if the store needed more qualified candidates or if they were not executing the sourcing/interviewing steps effectively and timely.

Domino's Pizza needed a system that could provide a common automated process and eliminate the need for paperwork and scanning for its corporate locations. It also needed a system that could support franchise deployments, both domestic and international, in the future. Taleo provided Domino's with the technology it needed to accomplish its goals today and into the future.

Taleo Case Study: Domino's Pizza

**Finding Deep Functionality behind an Intuitive Interface**

To help find the right software solution, in 2008 Domino's Pizza looked at several talent management vendors.  It found Taleo had a simple intuitive user interface and all the future functionality it would need.  "Taleo had more functionality than what we needed at the time, but as we grow, Taleo will be there for us, and we won't need to develop something else," says Jeffrey Mayer, Director of Systems and Decision Support at Domino's Pizza.  Taleo's strong client list and large international customer base were also key to the decision.

Domino's Pizza focused on Taleo's simple Manager WebTop for ease of use.  It only took a few clicks with very little navigation from page to page to hire someone.  In a way, the system was self-training and easy to learn.  Managers just needed to follow the pop-up prompts that guided them through the hiring process.

**Streamlining Process Integration with PeopleSoft HRMS**

To ensure store adoption, Domino's Pizza developed a unique approach to keep its Taleo system simple to use.  Using Taleo Client Connect to integrate with its PeopleSoft system, Domino's Pizza built a central repository to cross-check that all candidates hired had all the necessary paper work and completed every step in the process, including assessments and background checks.

Domino's Pizza was able to strike a balance between simplicity and enforcement of the application process without configuring the solution in a format that would be too cumbersome for the average store manager.  "With the help of Taleo, we've been able to solve our paperwork compliance problem without sacrificing functionality or a simple user interface.  There are no more excuses of lost paperwork and we can now quickly see which applicants are missing documents, therefore reducing liability," says Mayer.

**Passing Information Directly to Timekeeping System**

With the help of Taleo, Domino's Pizza also eliminated the need for the manager to enter application information into the point of sale system which is also used as the timekeeping system in the stores.  Taleo passes basic human resource information for each new employee directly to the timekeeping system within two hours after hiring.  Because this eliminates manual data entry and typos, data integrity improved dramatically.

**Increasing Sourcing and Talent Pipeline Visibility**

Since implementing Taleo, Domino's Pizza has seen improvements in several areas within its recruiting process.  First it improved decision support.  Using Taleo, managers can drill down into sourcing data and applicant flow.  With its staffing report by store, the HR team can see how many employees each store needs and how many qualified applicants are in their talent queue.  This report can also be used to hold each store accountable and ensure they are meeting their individual store staffing goals.

Taleo Case Study: Domino's Pizza

"With the help of Taleo, we've been able to solve our paperwork compliance problem.  There are no more excuses of lost paperwork and we can now see which applicants are missing documents, therefore reducing liability."

Jeffrey Mayer
Director of Systems and Decision Support
Domino's Pizza

**Reducing Turnover with Automated Assessments and Screening**

Using Taleo Assessment™ for all hourly applicants, Domino's Pizza has not only lowered its overall turnover, but has also lowered its terminations due to gross misconduct reasons.   Effective screening of candidates by using Disqualifying Questions, Pre-Screening Questions, Assessments and integrated Background Checking are some of the features of Taleo which provide the hiring manager with a queue of only those candidates that meet the minimum criteria.  Domino's Pizza divides assessment scores into three different bands—green, yellow and red.  The hiring manager sees a color and can quickly make a determination of whether or not they should interview the candidate.  Thirteen percent of people applying for jobs are getting "red" assessments and are being taken out of consideration for employment.

A consistent background check process has also helped lower turnover for gross misconduct reasons.  Before Taleo, it was difficult to do background checks manually on all applicants.  Now, background checks are automatically being done on all team members.  "The number one benefit we've seen since implementing Taleo is the standardization of the screening and hiring process across 500 stores," says Mayer.

**Cutting Recruiting Costs**

Domino's Pizza has also seen cost savings since implementing Taleo.  Because local HR managers are spending less on sourcing expenses like career fairs and advertising, field recruitment spending is down.  Domino's Pizza has also cut hard costs associated with scanning and shipping paper documents by collecting most applicant information online.  Certain documents still need to be scanned, but overall they are spending approximately 75 percent less on scanning and shipping documents.

**Doubling Applicant Flow While Reducing Turnover**

Since implementing Taleo, Domino's Pizza corporate store turnover is down 28 percent compared to the previous year.  It's also seen increased applicant flow. In some markets, applicant flow doubled. In the first five months of being live on Taleo, over 50,000 people applied and Domino's Pizza hired more than 5,000 of these applicants.  Increased applicant flow allows Domino's to maintain ideal staffing rates which in turn lead to improved customer service and improved store performance.  One way this was achieved was through Taleo's ability to pool candidates.  If a candidate applies to one store, the applicant can easily be recommended to another store, ensuring that qualified candidates are not overlooked solely based on the location where they submitted their application.

With the help of Taleo, Domino's Pizza was also able to reduce the time it spent on interviews by automatically asking for more information during the pre-screening process and assessments which are required steps in the application process.

Taleo Case Study: Domino's Pizza

**Making More Dough by Extending the Employment Brand**

In addition to all these benefits, Domino's Pizza experienced something a little unexpected. By adding one question to its prescreening questions—"Would you like to receive promotional emails from Domino's Pizza?"—the HR department has been able to provide the marketing department with more than 20,000 names of people interested in receiving promotional information.

Domino's Pizza is also able to use its Taleo system to enhance its employment and sales brand during the application process. Everyone who applies receives an email with a link to their ordering page and a promotional offer for a free order of a popular dessert. In addition to this, each person who is hired at Domino's Pizza receives a similar email with a promotional offer for a free pizza.

Domino's Pizza has future goals for the use of its Taleo system. It hopes to implement Taleo for its largest franchise which has more than 160 stores. It also wants to increase the awareness of the Taleo solution in its international franchises. By the end of 2009, Domino's Pizza hopes to have a corporate rollout of the system and also use Taleo in all of its distribution centers.

## Taleo Case Study: Domino's Pizza

### WORLDWIDE OFFICES

### NORTH AMERICA

**DUBLIN — HEADQUARTERS**
4140 Dublin Boulevard
Suite 400
Dublin, CA 94568, United States
Tel.: 925.452.3000
Fax: 925.452.3001

**CHICAGO**
One Energy Center
40 Shuman Boulevard
Naperville, IL 60563, United States
Tel.: 630.983.9609
Fax: 630.983.9509

**JACKSONVILLE**
7660 Centurion Parkway, Suite 100
Jacksonville, FL 32256, United States
Tel: 877.394.5644
Tel.: 904.493.8800
Fax: 904.493.9146

**QUÉBEC**
R&D Facility
330, rue St-Vallier Est, Bureau 400
Québec (Québec) G1K 9C5, Canada
Tel.: 418.524.5665
Fax: 418.524.8899

### EUROPE

**EMEA — HEADQUARTERS**
10 Barley Mow Passage
Chiswick
London W4 4PH
United Kingdom
Tel.: +44 (0) 20.8400.6166
Fax: +44 (0) 20.8400.6167

**PARIS**
19, Boulevard Malesherbes
75008 Paris
France
Tel.: +33(0) 1 55.27.36.62
Fax: +33(0) 1 55.27.37.00

**AMSTERDAM**
Poortgebouw
Beech Avenue 54 - 80
1119 PW Schiphol - Rijk
The Netherlands
Tel.: +31 (0)20 658.6699
Fax: +31 (0)20 658.6111

### ASIA PACIFIC

**SYDNEY**
Suite 601, Level 6
491 Kent Street
Sydney, 2000
Australia
Tel.: +612.9356.1900
Fax: +612.9457.1099

**MELBOURNE**
Level 3, IBM Towers
60 City Road
Southbank VIC 3006
Australia
Tel.: +613.9626.2413
Fax: +613.9626.2455

**SINGAPORE**
3 Temasek Avenue
Level 21 Centennial Tower
Singapore 039190
Tel.: +65.6549.7006
Fax: +65.6549.7001



**Talent Drives Performance**

**CONTACT**
www.taleo.com – info@taleo.com
1.888.836.3669 – U.S.
1.888.922.5665 – International
1.888.561.5665 – Customer Service

**ABOUT TALEO**

Leading organizations worldwide use Taleo on demand talent management solutions to assess, acquire, develop, and align their workforce for improved business performance.

Copyright © 2007 Taleo Corporation. All rights reserved. No portion of this document may be reproduced in any form without the prior written permission of Taleo Corporation.

Taleo and all Taleo product and service names mentioned herein are trademarks or registered trademarks of Taleo in the United States, France, The Netherlands, U.K., Canada, Australia, and several other countries. All other product and company names mentioned herein may be the trademarks of their respective owners.

EXHIBIT 2

Case 8:11-cv-01823-DKC    Document 19    Filed 09/02/11    Page 28 of 99

 



**HireRight Pre-Integrated Solution for Taleo**

Easily manage your background and drug screening program - all from Taleo Business Edition.

---

**HireRight and Taleo Integrations Leveraged by More Than 45 Taleo Customers Today**

As Taleo's original background screening partner, HireRight supports more live applicant tracking system integrations with Taleo than any other background screening company, combined. Through the HireRight Pre-integrated Solution for Taleo Business Edition (TBE), TBE users can order and manage HireRight's background checking, drug testing and electronic I-9 services from within Taleo Business Edition. Ordering a background check or drug test is just a few clicks away—and once your order is submitted, results begin appearing immediately without ever exiting Taleo Business Edition. For those instances where you need to make a hiring decision prior to receiving the completed report, real-time updates are provided that allow you to instantly view results from each individual search (including package searches) as it is completed.

**Integrated Order Process Made Simple**



The single interface brings an unprecedented level of process efficiency to the recruitment and hiring process. Candidate information from Taleo Business Edition's recruiting software pre-populates the appropriate fields once you initiate a HireRight background check or drug test—eliminating duplicate data entry and saving you time and money. With HireRight's employment screening services integrated into the hiring process, your Taleo Business Edition acts as a single source for all candidate and employment information.

**Get Started with HireRight and Taleo Business Edition today**



**KEY INTEGRATION FEATURES**

- Single Interface And Sign-On
- Automatic Information Mapping
- Screening Management Dashboard
- Real-Time Status With Live Updates

**KEY INTEGRATION BENEFITS**

- Convenient E-Forms & E-Signatures
- Makes Screening Tasks Fast And Easy
- Automates Manual Screening Process
- Accelerates Hiring Decision
- Positive User & Applicant Experience

**VIEW TBE INTEGRATION DEMO**



**VIEW TBE I-9 INTEGRATION DEMO**



About HireRight    |    Contact Us

Copyright © 2011 HireRight, Inc. All Rights Reserved

An Altegrity Company

EXHIBIT 3



| To apply, print and fill out pp. 1–5 and bring to your local Domino's Pizza store. |
| --- |

# Delivering Opportunities

Domino's Pizza Application

## Tell us about yourself

**Name:** First:                                    Middle:                          Last:

**Address:** Street:                              City:                            State:          Zip:

**How long?** _____Years _____Months **E-mail address:**

**Phone:** Home: (      )                         Cell: (      )                    Best time to call:

**Emergency Contact:** _____ Phone (      )_____

Are you legally allowed to work in the U.S.? Yes ☐   No ☐

If there are any restrictions on your eligibility or right to work in the U.S. or in the state where you are applying, please fully explain below or attach a written explanation. A restriction on an applicant's eligibility or right to work does not automatically disqualify an applicant for further consideration for employment, nor does it impact the at will nature of a prospective employee's position.

Are you 18 years or older?   Yes ☐   No ☐

How did you hear about the job?

☐ Newspaper Ad          ☐ Store Signage          ☐ Box Topper/Door Hanger   ☐ College/University      ☐ Employee Referral
☐ Former Employee       ☐ Store Flyer            ☐ Franchise Transfer        ☐ *You Impressed Me* Card ☐ Job Fair
☐ Internet   dominos.com ☐ Internet   other web site ☐ Store Acquisition      ☐ Unsolicited/Walk In     ☐ Other Source

## What job do you want?

Position applying for?                                   Date you can start?

Type of position desired:  Part Time ☐   Full Time ☐   Temporary ☐

## When can you work?

Are you currently employed? Yes ☐  No ☐      Do you plan to keep working there if you work for Domino's? Yes ☐   No ☐

| Availability | SUN | MON | TUE | WED | THU | FRI | SAT |
| --- | --- | --- | --- | --- | --- | --- | --- |
| From |  |  |  |  |  |  |  |
| To |  |  |  |  |  |  |  |

Domino's Pizza is an equal opportunity employer, committed to creating a unified and inclusive environment where our exceptional people are respected and celebrated for their time, talents, and energies while striving to make our company the best pizza delivery company in the world.

©2011 Domino's IP Holder LLC

## Education (last attended)

High School                                              Location

Did you graduate? Yes ☐   No ☐                If no, earned GED?  Yes ☐   No ☐

College                                                   Location

Did you graduate? Yes ☐   No ☐                Degree

Are you in school now? Yes ☐   No ☐        Do you plan on returning to school? Yes ☐   No ☐

                                                          If yes, when?

## Other talents

List any special skills that may help you at Domino's.
(You may exclude talents, skills or affiliations which might indicate race, color, religion, genetic information, ancestry, sex, sex orientation, pregnancy, child birth or related medical conditions, national origin, age, disability, veterans status, marital status, medical condition, or any other protected classification.)

Please list the name and phone number of anyone else you know who may be interested in working for Domino's Pizza.

A good attendance record is important at Domino's. Is there anything that would force you to be consistently late?

Yes ☐   No ☐          If yes, please explain:

Have you previously worked for Domino's Pizza or a Domino's Pizza franchisee?   Yes ☐   No ☐

If yes, where?                          Supervisor:

Why did you leave?

Please list all previous employers, starting with the most recent. If you've previously worked for Domino's, please write the store number or supply chain center and indicate if it was corporate or franchise.

| Employer: | | | Phone: |
|---|---|---|---|
| Address: | | | Supervisor: |
| Employment: | From: | To: | Responsibilities: |
| Pay Rate: | Start: | End: | Reasons for leaving: |

| Employer: | | | Phone: |
|---|---|---|---|
| Address: | | | Supervisor: |
| Employment: | From: | To: | Responsibilities: |
| Pay Rate: | Start: | End: | Reasons for leaving: |

| Employer: | | | Phone: |
|---|---|---|---|
| Address: | | | Supervisor: |
| Employment: | From: | To: | Responsibilities: |
| Pay Rate: | Start: | End: | Reasons for leaving: |

©2011 Domino's IP Holder LLC

| Employer: | | | Phone: |
|---|---|---|---|
| Address: | | | Supervisor: |
| Employment: | From: | To: | Responsibilities: |
| Pay Rate: | Start: | End: | Reasons for leaving: |

| Employer: | | | Phone: |
|---|---|---|---|
| Address: | | | Supervisor: |
| Employment: | From: | To: | Responsibilities: |
| Pay Rate: | Start: | End: | Reasons for leaving: |

## Driving History

My state of residence is:_____ How long?_____Years _____Months I have held a valid driver's license since:_____

My auto insurance company: _____ Policy #: _____ Exp. date: _____

Have you held a driver's license in another state or country? Yes ☐ No ☐
If yes, list below:
#: _____ State/Country: _____ #: _____ State/Country: _____

Is your driver's license subject to any restrictions that would impair your ability to drive for Domino's Pizza? Yes ☐ No ☐
If yes, please explain:_____

Have you been involved in any auto accidents in the past three (3) years? Yes ☐ No ☐
If yes, list accident(s) and dates: _____

If you are a resident of the state of Massachusetts, it is not necessary for you to answer the **crime question** below at this time. However, you may be asked these questions later in the selection process.

**Have you every been convicted of, pled guilty or pled no contest to a felony crime?** NOTE: Do not identify convictions that have been sealed, expunged, dismissed, or otherwise eradicated by statue or court order; any conviction for a marijuana offense if the conviction is more than two years old; or any information pertaining to an arrest or detention which did not result in conviction as a result of referral to and participation in any pre-trial or post-trial diversion program.

Yes ☐ No ☐ NOTE: A conviction may be relevant if job-related, but does not necessarily bar you                     from employment.
If yes, please explain: _____

**Have you been convicted of, pled guilty or pled no contest to any traffic offenses in the last three years?** NOTE: Do not identify convictions that have been sealed, expunged, dismissed, or otherwise eradicated by statue or court order; any conviction for a marijuana offense if the conviction is more than two years old; or any information pertaining to an arrest or detention which did not result in conviction as a result of referral to and participation in any pre-trial or post-trial diversion program.

Yes ☐ No ☐ NOTE: A conviction may be relevant if job-related, but does not necessarily bar you from employment.
If yes, list offense(s) and dates: _____

**Have you ever been convicted of, pled guilty or pled no contest to any of these offenses?** NOTE: Do not identify convictions that have been sealed, expunged, dismissed, or otherwise eradicated by statue or court order; any conviction for a marijuana offense if the conviction is more than two years old; or any information pertaining to an arrest or detention which did not result in conviction as a result of referral to and participation in any pre-trial or post-trial diversion program.

| | | |
|---|---|---|
| Leaving the scene of an accident. | Yes ☐ | No ☐ |
| Participating in an illegal speed contest. | Yes ☐ | No ☐ |
| Any drug or alcohol motor vehicle related violation. | Yes ☐ | No ☐ |
| Hit and run or leaving the scene of an accident. | Yes ☐ | No ☐ |
| Reckless driving. | Yes ☐ | No ☐ |
| Vehicular homicide or assault. | Yes ☐ | No ☐ |
| Eluding or attempting to elude police. | Yes ☐ | No ☐ |

NOTE: A conviction may be relevant if job-related, but does not necessarily bar you from employment.

©2011 Domino's IP Holder LLC

## Car Details

All personnel involved in product delivery for Domino's Pizza must have their driving records reviewed before beginning employment and periodically thereafter. In addition, all team members must meet the following requirements:

- No team member will be allowed to drive any vehicle for Domino's Pizza without a valid driver's license from the state of their primary residence. License must be in good standing (i.e. not suspended, revoked or restricted).
- Individuals 18 years old must have at least a two-year driving history. Individuals 19 years old and older must have at least one year driving history. This must be the year immediately preceding the date of the evaluation. Up to five years of driving history may be evaluated for all applicants and team members.
- Individuals must show proof of and maintain auto liability insurance.
- A vehicle safety inspection at the time of hire and periodically thereafter.
- No one may be hired into a position which requires driving unless their driving record meets Domino's Standards.

## Signature

I certify the facts contained in this application are true and complete. I understand that, if employed, false statements or omissions on this application are grounds for dismissal. I understand and agree that, if hired, my employment is for no definite period of time and either I or the company can terminate employment at any time, with or without cause and with or without notice. This *at-will* employment relationship exists regardless of any other statements and/or policies to the contrary. My signature below indicates that I understand and agree that this *at-will* employment relationship may not be modified or amended unless in writing by a document that is signed by an authorized representative of my employer. Any other attempted form of modification is null and void, whether oral, written, expressed or implied. I give my authorization to verify all information provided in this application.

Signature _____ Date _____

We comply with the Immigration Reform and Control Act of 1986 which requires you to furnish documentation showing your identity and legal authorization to work in the United States once you have been offered employment.

For more information on Domino's Pizza, check out our web sites:

www.dominos.com

www.dominosbiz.com

careers.dominos.com

©2011 Domino's IP Holder LLC

## Background Investigation Information and Consent

I understand that you intend to make an independent investigation of my background which may include references, character, past employment, education, credit and consumer information, driving history, criminal or police records, or insurance claim records, including those maintained by both public and private organizations and all public records for the purpose of confirming the information contained on my application and/or obtaining other information which may be material to my qualifications for employment (a *background investigation*).

CONSENT. I hereby authorize you, as part of the application process, and from time to time during my employment, to the extent permitted by applicable law, to conduct a Background Investigation, which may include a consumer report and/or a Motor Vehicle Report. I authorize the release of all such information to you.

I release, without reservation, you and any person or entity which provides information pursuant to this authorization, from any and all liabilities, claims or causes of action in regards to the information obtained from any and all of the above reference sources used. I acknowledge that this is a stand-alone consumer notification informing me that a report will be requested and that the information obtained shall be used solely for the purpose of evaluating me for employment, promotion, reassignment, or retention as an employee.

The following is my true and complete legal name and all information is true and correct to the best of my knowledge.

| | |
|---|---|
| Full Legal Name: | Maiden or Other Names Used: |
| Present Address: | City/State/ |

Zip:

How Long?

Former Address:                          City/State/Zip:

How Long?

Live in Utah? Wait to provide this info until a background check is requested.

Date of Birth:                          Social Security #:

Driver's License Number/State:                          Driver's License Expiration Date:

Signature:                                              Date:

Note: The above information is required for identification purposes only. We are an Equal Opportunity Employer, and do not discriminate on the basis of sex, race, color, religion, creed, national origin, veteran status, age, disability or on the basis of any other classification or characteristic protected by federal, state, or local law.

In addition, this form is subject to revision without notice in the event of a change in federal, state or local law.

If you are under the age of 18, your parent or guardian must complete the following section and sign the form on your behalf.

Name of Parent or Guardian:                          Present Address:

City/State/Zip:

Signature:                                              Date:

| |
|---|
| For California, Minnesota, Oklahoma applicants and where required by applicable state law: |
| Please check this box below if you wish to receive a copy of any consumer report. |
| Yes ☐  Please send me a copy of any consumer report obtained. |

©2011 Domino's IP Holder LLC

## State Notices (additional material required by state regulation)

### California
**Public Records Disclosure Statement**

I acknowledge that in connection with my application for employment or subsequent employment, Domino's Pizza may collect, assemble, evaluate, compile, report, transmit, transfer, or communicate information on my character, general reputation, personal characteristics or mode of living which are matters of public record without using a third party investigative consumer reporting agency. Matters of public record are defined as records documenting an arrest, indictment, conviction, civil judicial action, tax lien, or outstanding judgment.

I understand that such public record information generally must be disclosed to me within seven days of the date the information was received, regardless of whether it was received orally or in writing. I understand that I may waive my right to receive such information.

☐ By checking this box, I hereby waive my right to any such disclosure.

## Viewing Records and Employment File

### California
Pursuant to section 1786.22 of the California Civil Code, you may view the file maintained on you by Domino's Pizza during normal business hours. You may also obtain a copy of this file, upon submitting proper identification and paying the costs of duplication services, by appearing at Domino's offices in person, during normal business hours and on reasonable notice, or by mail. You may also receive a summary of the file by telephone, upon submitting proper identification.

You have the right to inspect all files that relate to you and are maintained by an investigative consumer reporting agency ("Agency") at the time of your request. You may inspect all items in the file, except that the sources of information, other than public records and records from data bases available for sale, that are acquired solely for use in preparation of an investigative consumer report and are actually used for no other purpose, need not be disclosed. The Agency must supply these files to you during normal business hours and on reasonable notice.

All files must be made available for your visual inspection, as follows:

- In person, if you appear and furnish proper identification. A copy of the file will also be available to you for a fee not to exceed the actual costs of copying.
- By certified mail, if you make a written request, with proper identification, for copies to be sent to a specified address. However, an Agency complying with such a request will not be liable for disclosures to third parties caused by mishandling of mail after it leaves the Agency.
- A summary of all information contained in your file may be provided to you by telephone, if you have made a written request, with proper identification for telephone disclosure, and the toll charge, if any, for the telephone call is prepaid by or charged directly to you.

"Proper identification" includes documents such as a valid driver's license, social security account number, military identification card, and credit cards. Only if you cannot identify yourself with such information may the Agency require additional information concerning your employment and personal or family history in order to verify your identity.     OR

- When using this system to make your request, your login and the personal data captured with the electronic application stored within this system will be considered "proper identification."
- The Agency will provide trained personnel to explain any information furnished to you.
- The Agency will provide a written explanation of any coded information contained in your file. This written explanation will be provided whenever a file is provided for visual inspection.
- You may be accompanied by one other person of your choice when you come to inspect your file. This person must furnish reasonable identification. The Agency may require you to furnish a written statement granting permission to the Agency to discuss your file in your companion's presence.

### Maine
You have the right, upon request, to be informed of whether an investigative consumer report was requested, and if one was requested, the name and address of the consumer reporting agency furnishing the report. You may request and receive from the company, within five business days of our receipt of your request, the name, address and telephone number of the nearest unit designated to handle inquiries for the consumer reporting agency issuing an investigative consumer report concerning you. You also have the right, under Maine law, to request and promptly receive from all such agencies copies of any such reports.

### Massachusetts
If we request an investigative consumer report, you have the right, upon written request, to a copy of the report.

### New York
You have the right, upon request, to be informed of whether or not a consumer report was requested. If a consumer report is requested, you will be provided with the name and address of the consumer reporting agency furnishing the report. You may inspect and receive a copy of the report by contacting that agency.

### Washington State
If the company requests an investigative consumer report, you have the right, upon written request made within a reasonable period of time after your receipt of this disclosure, to receive from the Company a complete and accurate disclosure of the nature and scope of the investigation requested by the Company. You also have the right to request from the consumer reporting agency a written summary of your rights and remedies under the Washington Fair Credit Reporting Act.



©2011 Domino's IP Holder LLC

**New York**

NEW YORK CORRECTION LAW, ARTICLE 23-A: LICENSURE AND EMPLOYMENT OF PERSONS PREVIOUSLY CONVICTED OF ONE OR MORE CRIMINAL OFFENSES

Section 750.  Definitions.
      751.  Applicability.
      752.  Unfair discrimination against persons previously convicted of one or more criminal offenses prohibited.
      753.  Factors to be considered concerning a previous criminal conviction; presumption.
      754.  Written statement upon denial of license or employment.
      755.  Enforcement.

**§750. Definitions.** For the purposes of this article, the following terms shall have the following meanings:

1. "Public agency" means the state or any local subdivision thereof, or any state or local department, agency, board or commission.

2. "Private employer" means any person, company, corporation, labor organization or association which employs ten or more persons.

3. "Direct relationship" means that the nature of criminal conduct for which the person was convicted has a direct bearing on his fitness or ability to perform one or more of the duties or responsibilities necessarily related to the license, opportunity, or job in question.

4. "License" means any certificate, license, permit or grant of permission required by the laws of this state, its political subdivisions or instrumentalities as a condition for the lawful practice of any occupation, employment, trade, vocation, business, or profession. Provided, however, that "license" shall not, for the purposes of this article, include any license or permit to own, possess, carry, or fire any explosive, pistol, handgun, rifle, shotgun, or other firearm.

5. "Employment" means any occupation, vocation or employment, or any form of vocational or educational training. Provided, however, that "employment" shall not, for the purposes of this article, include membership in any law enforcement agency.

**§751. Applicability.** The provisions of this article shall apply to any application by any person for a license or employment at any public or private employer, who has previously been convicted of one or more criminal offenses in this state or in any other jurisdiction, and to any license or employment held by any person whose conviction of one or more criminal offenses in this state or in any other jurisdiction preceded such employment or granting of a license, except where a mandatory forfeiture, disability or bar to employment is imposed by law, and has not been removed by an executive pardon, certificate of relief from disabilities or certificate of good conduct. Nothing in this article shall be construed to affect any right an employer may have with respect to an intentional misrepresentation in connection with an application for employment made by a prospective employee or previously made by a current employee.

**§752. Unfair discrimination against persons previously convicted of one or more criminal offenses prohibited.** No application for any license or employment, and no employment or license held by an individual, to which the provisions of this article are applicable, shall be denied or acted upon adversely by reason of the individual's having been previously convicted of one or more criminal offenses, or by reason of a finding of lack of "good moral character" when such finding is based upon the fact that the individual has previously been convicted of one or more criminal offenses, unless:

1. There is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought or held by the individual; or

2. the issuance or continuation of the license or the granting or continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

**§753. Factors to be considered concerning a previous criminal conviction; presumption.**

1. In making a determination pursuant to section seven hundred fifty-two of this chapter, the public agency or private employer shall consider the following factors:

   a. The public policy of this state, as expressed in this act, to encourage the licensure and employment of persons previously convicted of one or more criminal offenses.

   b. The specific duties and responsibilities necessarily related to the license or employment sought or held by the person.

   c. The bearing, if any, the criminal offense or offenses for which the person was previously convicted will have on his fitness or ability to perform one or more such duties or responsibilities.

   d. The time which has elapsed since the occurrence of the criminal offense or offenses.

   e. The age of the person at the time of occurrence of the criminal offense or offenses.

   f. The seriousness of the offense or offenses.

   g. Any information produced by the person, or produced on his behalf, in regard to his rehabilitation and good conduct.

   h. The legitimate interest of the public agency or private employer in protecting property, and the safety and welfare of specific individuals or the general public.

2. In making a determination pursuant to section seven hundred fifty-two of this chapter, the public agency or private employer shall also give consideration to a certificate of relief from disabilities or a certificate of good conduct issued to the applicant, which certificate shall create a presumption of rehabilitation in regard to the offense or offenses specified therein.

**§754. Written statement upon denial of license or employment.** At the request of any person previously convicted of one or more criminal offenses who has been denied a license or employment, a public agency or private employer shall provide, within thirty days of a request, a written statement setting forth the reasons for such denial.

**§755. Enforcement.**

1. In relation to actions by public agencies, the provisions of this article shall be enforceable by a proceeding brought pursuant to article seventy-eight of the civil practice law and rules.

2. In relation to actions by private employers, the provisions of this article shall be enforceable by the division of human rights pursuant to the powers and procedures set forth in article fifteen of the executive law, and, concurrently, by the New York city commission on human rights.

©2011 Domino's IP Holder LLC

EXHIBIT 4

Case 8:11-cv-01823-DKC   Document 19   Filed 09/02/11   Page 39 of 99



**Federal Trade Commission**
Protecting America's Consumers

---

### UNITED STATES OF AMERICA
### FEDERAL TRADE COMMISSION
### WASHINGTON, D.C. 20580

Division of Credit Practices
Bureau of Consumer Protection
Clarke W. Brinckerhoff
Attorney

September 9, 1998

H. Rowan Leathers, III, Esq.
MANIER & HEROD
First Union Tower - Suite 2200
150 Fourth Avenue North
Nashville, Tennessee 37219

Re: Sections 603(d), 603(f), and 604(b) of the Fair Credit Reporting Act

Dear Mr. Leathers:

This responds to your letter dated concerning the application of the Fair Credit Reporting Act ("FCRA") to Employment Trac ("ET"), your client. ET provides information to prospective employers about the prior work experience of applicants, primarily in the fast food industry. ET provides the information telephonically (i.e., without a written report) on a specific applicant upon request from a subscriber to this service.

You ask three questions, which we report verbatim preceding our analysis of each.

*1. Is ET's provision of this type of information subject to the FCRA?*

Yes. ET is a "consumer reporting agency" ("CRA") because Section 603(f) defines that term to include any party that "for monetary fees . . . regularly engages in . . . assembling . . . information on consumers for the purpose of furnishing consumer reports to third parties" in interstate commerce. Each report on an employment applicant is a "consumer report" because Section 603(d) defines that term very broadly to include any information bearing on a consumer's credit standing, "character, general reputation, personal characteristics, or mode of living" which is used (among other things) to make employment decisions. An individual's employment history, based on data in ET's files, unquestionably bears on his or her character, reputation, and other listed characteristics.

*2. Section 604(b)(2)(A) of the FCRA seems to require that the consumer disclosure be "in a document that consists solely of the disclosure." With regard to this requirement, is it sufficient that the disclosure be prominently set forth within an application for employment, or must it truly be included on a separate document?*

The disclosure may not be part of an employment application, because the language you quote is intended to ensure that it appears conspicuously in a document not encumbered by any other information. The reason for requiring that the disclosure be in a stand-alone document is to prevent consumers from being distracted by other information side-by-side with the disclosure. A disclosure that is combined with many items in an employment application -- no matter how "prominently" it appears -- is not "in a document that consists solely of the disclosure" as required by Section 604(b)(2)(A).

*3. Section 604(b)(3)(A) of the FCRA requires that a copy of the "report" be provided by the user to the consumer prior to adverse employment action being taken based in whole or in part on the report. In this instance, the report provided to the user is a verbal report, and not a written report. We would appreciate some guidance concerning how to provide a "copy of the report" within the context of this transaction.*

The purpose of this section, which was added in the 1996 amendments to the FCRA, is to provide the consumer with knowledge of information the CRA has reported about him or her that is going to result in adverse action in an employment context, affording the individual an opportunity to respond to it.(1) Where a written report exists, as in the case of a traditional

consumer report, Section 604(b)(3)(A) requires that the actual unexpurgated report must be provided to the applicant.(2) Where the employer possesses no written report because the information is provided verbally, as in ET's business, we believe it the employer may comply with Section 604(b)(3)(A) by telling the applicant orally what is in the report before taking adverse action. Because the report itself is oral, an oral "copy" seems the proper method of compliance. An employer that verbally provides to the applicant the report it receives (and informs him or her that ET is the source of the report), before rejecting the application, complies with the provision by conveying information that Congress intended the consumer to know prior to suffering adverse action.

The opinions set forth in this informal staff letter are not binding on the Commission.

Sincerely yours,

Clarke W. Brinckerhoff

1. S. Rept. 104-184, 104th Cong., 1st Sess. 35.

2. The enclosed staff opinion letter (Hahn, 7/8/98) discusses this subsection in that regard.

_____
Last Modified: Friday, June 24, 2011

EXHIBIT 5

# 40 YEARS OF EXPERIENCE

## WITH THE FAIR CREDIT REPORTING ACT

### AN FTC STAFF REPORT WITH SUMMARY OF INTERPRETATIONS



July 2011
Federal Trade Commission

B. <u>Employment reports with public record data</u>. An employer must comply with the disclosure and consumer authorization requirements of section 604(b)(2), even where the consumer report is comprised of public records and the CRA has already made the disclosure required by section 613, which specifically covers reports of public record information for employment purposes.[154]

## 2.   WRITTEN DISCLOSURE AND CONSENT REQUIRED

Section 604(b)(2)(A) imposes an obligation on employers. It requires that, before obtaining consumer reports for employment purposes, employers must disclose this fact to each affected consumer in writing and obtain the consumer's written authorization.[155]

## 3.   "IN A DOCUMENT THAT CONSISTS SOLELY OF THE DISCLOSURE"

A. <u>May include brief description of the nature of consumer reports</u>. The document that sets forth the disclosure to the consumer that a consumer report may be obtained for employment purposes may contain only minor additional items. The document may include a brief description of the nature of the consumer reports covered if the description does not confuse the consumer or detract from the mandated disclosure.[156]

B. <u>May include consumer authorization</u>. The disclosure document may include the required request for consumer authorization for procurement of a report for employment purposes.[157] If the disclosure notice and the consumer authorization are combined, certain identifying information may be included in the form; however, the notice may not include extraneous or contradictory information, such as a request for a consumer's waiver of his or her rights under the FCRA.[158]

C. <u>May include investigative consumer report disclosure</u>. If an employer intends to do an investigative consumer report on an employee or prospective employee, it must provide a disclosure under both this section and section 606.[159] An employer may include, with the disclosure required by section 604(b)(2)(A), a very limited notice of intent to procure an investigative consumer report required by section 606(a). However, the employer may not meet its obligation under section 606(b) to describe the nature and scope of the investigation in the same notice, because it would likely overshadow the disclosure required by this section.[160]

D. <u>May not be included in employment application</u>. The disclosure cannot be part of a printed employment application.[161]

## 4.   TIMING AND EFFECTIVENESS OF DISCLOSURE AND AUTHORIZATION

The required disclosure may be made, and the authorization obtained, when the consumer applies for or commences employment.[162] An employer may use a one-time blanket disclosure, and obtain permission from applicants or current employees to procure consumer reports, at any time during the application process or during the employee's tenure.[163] The disclosure must state "clearly and conspicuously" that the employer intends for the disclosure and authorization to cover both the application for employment and, if the consumer is hired, any additional consumer reports obtained while the individual is an employee.[164] A valid disclosure and consent remain effective throughout the duration of employment.

EXHIBIT 6



**Federal Trade Commission**
Protecting America's Consumers

## UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
## WASHINGTON, D.C. 20580

Bureau of Consumer Protection

**June 12, 1998**

Richard W. Hauxwell, CEO
Accufax Div., Southwest
P.O. Box 35563
Tulsa, OK 74153-0563

Dear Mr. Hauxwell:

### Re: Sections 604 and 606 of the Fair Credit Reporting Act

This is in response to your letter asking for clarification of sections 604 and 606 of the Fair Credit Reporting Act ("FCRA"). You note that your company is a consumer reporting agency and that you are asking these questions on behalf of your clients. Your questions are addressed below in the order in which you presented them.

#### 1. Is it safe for us to assume, based on your opinion letter to Mr. Richard Steer, that we can combine the disclosure and release form, which includes applicant identifiers, in one form such as the enclosed sample?

Section 604(b) of the FCRA requires any employer who intends to obtain a consumer report for employment purposes to disclose this to the applicant or employee (in a document that consists solely of the disclosure) and to obtain the applicant or employee's written permission. As noted in the letter you cited (Steer, 10/21/97), it is our position that the disclosure notice and the authorization may be combined. If they are combined, identifying information (such as date of birth, Social Security number, driver's license number, and current and former addresses) may be included in the form. However, the form should not contain any extraneous information.

While we believe that you may combine the disclosure and authorization (and include identifying information) as you have in the draft form that you included with your letter, we note that your draft disclosure includes a waiver by the consumer of his or her rights under the FCRA. The inclusion of such a waiver in a disclosure form will violate Section 604(b)(2)(A) of the FCRA, which requires that a disclosure consist "solely" of the disclosure that a consumer report may be obtained for employment purposes. Moreover, it is a general principle of law that benefits provided to citizens by federal statute generally may not be waived by private agreement unless Congress intended such a result. Brooklyn Savings Bank v. O'Neill, 324 U.S. 697 (1945). We note that no authorization for a waiver is contained in the FCRA; nor does the legislative history show that Congress intended that consumers should be able to sign away their legal rights under the Act.(1) Accordingly, employers and other users of information covered by the FCRA may not require consumers to waive their rights under the law.

#### 2. Our members would also like further clarification with regard to Section 606 as to when a Summary of Rights should be provided to the applicant. The language of the law is confusing.

Section 606 of the FCRA mandates that specific procedures be followed when an investi-gative consumer report is requested by an employer or other user who has a permissible purpose to obtain the report. First, Section 606(a)(1)(A) requires any person procuring an investigative consumer report to disclose this fact to the affected consumer not later than three days after the date on which the report was first requested. Second, Section 606(a)(1)(B) requires that the dis-closure include a statement of the consumer's right to obtain additional information and a copy of the summary of consumer rights prescribed by the Commission. Finally, Section 606(b) sets out the information that must be disclosed when the consumer requests a disclosure pursuant to Section 606(a)(1)(B).

The issue that you raise concerns exactly at what point the Commission's summary of rights must be sent. The language of Section 606(a)(1)(B) is not entirely clear in mandating that the disclosure "includes a statement informing the consumer of his right to request the additional disclosures provided for under subsection (b) of this section [the nature and scope of the inves-

tigation] and the written summary of the rights of the consumer prepared pursuant to section 609(c)." As you can see, the reference to the summary of rights comes after a reference to sub-part 606(b), but in a general discussion of the content of the sub-part 606(a)(1)(A) notice.

There are two possible interpretations of this ambiguous language: (1) that Congress in-tended for the summary to be sent with the initial Section 606(a)(1)(A) notice (that an investiga-tive consumer report has been or may be procured); or (2) that Congress intended that the sum-mary be provided with the subsequent Section 606(b) disclosure of the "nature and scope" of the investigation. The Commission's "Notice to Users of Consumer Reports: Obligations of Users Under the FCRA,"(2) states that the summary of rights should be provided with the Section 606(a) notice that an investigative consumer report has been or may be obtained. However, because the statutory language may be interpreted to require that the summary be sent with the subsequent Section 606(b) disclosure, it is unlikely that the Commission's staff would recommend any en-forcement action if the notice is sent with the Section 606(b) notice instead of the Section 606(a) notice.

*3. We would like your opinion regarding end-user organizations which procure criminal and other public record information for employment purposes directly from a federal, state, or county record repository. Would the government repository (agency) providing the information directly to the end-user organization ... requesting the information be considered a consumer reporting agency and subject to the same laws as a privately held consumer reporting agency?*

In general, information that is obtained by an employer directly from a federal, state or county record repository is not a "consumer report" because the repository (such as a courthouse or a state law enforcement agency) is not normally a "consumer reporting agency" and is itself not covered by the FCRA. The attached staff letters (Copple, 6/10/98; Goeke, 6/9/98) discuss this issue in more detail. Therefore, an employer who obtains information directly from a public record source is not subject to the FCRA as to that information. However, because of the fact that information in public record sources may be inaccurate or incomplete, we believe that em-ployers who use this type of information should voluntarily disclose to consumers the nature and substance of any public record information that they rely upon in taking any adverse action. If the information is, in fact, inaccurate or incomplete, the consumer may then take steps to correct the problem.

I hope that this information is helpful to you. The views that are expressed above are those of the Commission's staff and not the views of the Commission itself.

Sincerely,

William Haynes
Attorney
Division of Credit Practices

1. The FCRA is part of the Consumer Credit Protection Act, 15 U.S.C. § 1601. We note that the Truth In Lending Act, which is Subchapter I of the Consumer Credit Protection Act, does permit consumers to waive certain rights.

2. The Commission's notice may be found at 16 C.F.R. § 601, Appendix C (1997).

Last Modified: Friday, June 24, 2011

EXHIBIT 7



# Federal Trade Commission
## Protecting America's Consumers

### UNITED STATES OF AMERICA
### FEDERAL TRADE COMMISSION
### WASHINGTON, D.C. 20580

June 9, 1998

A. Michael Rosen, Esq.
Senior Vice President and General Counsel
Background America Inc.
1900 Church Street, S-400
Nashville, TN 37203

Re: Section 604(b), Section 605, and Section 607 of the Fair Credit Reporting Act

Dear Mr. Rosen:

This is in response to your letter requesting the views of the Commission's staff on issues raised by the amendments to the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, that went into effect on September 30, 1997. A number of the questions that you pose involve either legal or policy issues that are outside of the Commission staff's authority. The questions that we are able to respond to are summarized in italics below. The staff's views follow.

*1. Is a consumer reporting agency prohibited from issuing a consumer report in which reports of convictions for child molestation and rape that are older than seven years are included?*

Section 605(a)(5) of the FCRA specifies that no consumer reporting agency (CRA) may make a consumer report containing information about "[r]ecords of arrest, indictment, or conviction of crime which, from the date of disposition, release, or parole, antedate the report by more than seven years." Unfortunately, as presently written, the FCRA does not in most cases permit employers to obtain from a CRA information about a conviction that is more than seven years old. We note, however, that employers may obtain this type of information directly from a non-CRA source, such as the court in which the individual was convicted.

*2. How does the requirement that a copy of a consumer report used by an employer be provided to an applicant/employee before an adverse action is taken apply in a situation where the report contains information about a criminal conviction that will automatically disqualify the consumer?*

Section 604(b) requires that all employers who use consumer reports provide a copy of the report to the affected consumer before any adverse action is taken. Employers must comply with this provision even where the information contained in the report (such as a criminal record) would automatically disqualify the individual from employment or lead to an adverse employment action. Indeed, this is precisely the situation where it is important that the consumer be informed of the negative information in case the report is inaccurate or incomplete. If the report is in error, the employer may reconsider his or her tentative decision to take adverse action.

*3. May an employer provide copies of consumer reports to applicants as soon as the reports are received (i.e., before the employer reviews the report for possible negative information)?*

Nothing in the FCRA prohibits this. An employer may choose to send a copy of each consumer report obtained for employment purposes to the affected consumer as soon as it is prepared by the CRA or received by the employer. In this case, the pre-adverse action disclosure required by Section 604(b)(3) need only reference the fact that the report has already been provided to the consumer and include the summary of consumer rights prescribed by the Commission.

*4. May a consumer reporting agency fulfill the duties that the FCRA imposes upon its employer clients?*

An employer or any other user of consumer report information obtained from a CRA may have the CRA fulfill the user's ministerial obligations under the FCRA. For example, an employer may arrange for the CRA to provide any pre-adverse action

disclosures required by Section 604(b). However, the employer or other user remains responsible for any duty imposed by the FCRA and may be subject to liability if the duties are not performed by the CRA.

*5. Is a county courthouse that is required to make its records available to the public considered a CRA? Is a CRA that purchases information from such a public record source a reseller in relation to that source?*

We believe that a public entity such as a court which is required by law to make its records available for inspection and copying by the public should not be considered a CRA, and that information provided by the courthouse does not constitute a "consumer report." Because a CRA that obtains information from such a source is not "procur[ing] a consumer report" from the courthouse, the provisions of Section 607(e) that concern resellers of consumer reports do not ap-ply. I enclose a copy of a staff opinion letter that discusses these issues in detail (*Goeke*, 6/9/98).

*6. Is it mandatory for a CRA that obtains a consumer report from another CRA to provide to the selling CRA the name of the end-user of a consumer report as required by Section 607(e), even when the selling CRA does not request the information?*

Section 607(e) of the FCRA imposes special obligations upon entities that purchase consumer reports for resale from a CRA, including a requirement that the reseller must provide the selling CRA with the identity of the reseller's user. This obligation exists regardless of whether the selling CRA requests the information.

*7. Would a CRA/reseller be in compliance with Section 607(e) if it provides as the "name" of the end-user some description of the company (such as "national staffing company") rather than the actual name of the end-user?*

The reseller must provide the actual identity of the person or entity that is receiving the report. In the example you have provided, the CRA or reseller must provide the identity of the national staffing company. This is important because it enables a credit bureau or other CRA that is the source of the information to comply with Section 609(a)(3) of the FCRA, which requires CRAs to disclose to consumers the identities (trade name, where applicable) of all recipients of their reports for employment purposes for the previous two years.

*8. If a CRA (that is in the business of making investigative consumer reports) is hired by an employer to conduct only a public record search, is it required to comply with the FCRA?*

The CRA would have to comply with all relevant provisions of the FCRA. The fact that information is obtained by a CRA from public record sources has no effect upon the status of the information as "consumer report" information once it is obtained and sold by a CRA.

*9. Does a CRA need authorization from a consumer in an employment situation if the CRA is hired only to copy public records?*

Since the CRA would create a "consumer report" (the results of its inquiry), the information is covered by the FCRA and permission would be needed from the consumer in an employment situation. However, if the employer does not use a CRA but rather goes directly to a courthouse or other public record depository and checks the records, it would not be obtaining a "consumer report" under the FCRA and thus would not have to obtain the employee's permission.

*10. Is a CRA permitted to report what it learns when it checks specific statements on a consumer's employment application that refer to events which occurred more than seven years ago (such as a statement that the consumer graduated from college in 1965)?*

The CRA may verify the accuracy of application information so long as no provision of Section 605 prohibits this. I am enclosing a copy of a staff opinion letter that discusses this specific issue in greater detail (*Seham*, 4/17/98). The date that a consumer graduated from college is not an "adverse item of information" covered by Section 605. Accordingly, the CRA is permitted to report this information even if the consumer graduated more than seven years before the CRA reports it.

I hope that this information will be helpful to you. The views that are expressed herein are those of the Commission's staff and do not necessarily reflect the views of the Commission or any individual Commissioner.

Sincerely,

William Haynes
Attorney
Division of Credit Practices

Enclosure

EXHIBIT 8

✗ ATTN: ADI          3 OF 3

7/9/2009

ADRIAN SINGLETON
Redacted
WALDORF, MD 20602

Dear ADRIAN SINGLETON:

As part of our employment selection process, we require that a consumer report be obtained before employment commences to any applicant being considered for the position for which you applied. You previously should have received a copy of your consumer report and summary of your rights under the federal Fair Credit Reporting Act.

This is to advise you that our offer of employment is being withdrawn and your application for employment is denied. In evaluating your application, the consumer reporting agency listed below provided us with the information which, in whole or in part, influenced our employment decision. This consumer reporting agency played no part in our decision other than providing the information about you, and the agency will not be able to provide you with specific reasons for our denial.

Under the Fair Credit Reporting Act, you are entitled to disclosure of the information contained in your consumer report by contacting the consumer reporting agency directly, within sixty (60) days of this letter. You also have the right to dispute the completeness or accuracy of this report. The name, address and telephone number of the consumer reporting agency appears below.

This letter is provided to you in compliance with the federal Fair Credit Reporting Act.

Sincerely,

Courtney Swayne
Domino's Pizza LLC

Name of Consumer Reporting Agency:
HireRight, Inc.
5151 California
Irvine, CA 92617
Phone: 888-581-5968; 949-428-5804
Fax: 877-797-3442, 949-224-0020
E-mail: customerservice.4@hireright.com

EXHIBIT 9

# Fair Credit Reporting Act (FCRA) Basics

A Primer for U.S. Employers from Littler Mendelson, the
Nation's Largest Workforce Law Practice





# Fair Credit Reporting Act (FCRA) Basics

A Primer for U.S. Employers from Littler Mendelson, the Nation's Largest Workforce Law Practice

## Summary

HireRight and other background screening companies as a consumer reporting agency (CRA) collect and assemble a wide range of information about individuals. This information may include, for example, educational history, employment history, criminal history, and motor vehicle records. HireRight's employer-customers use this information for a variety of employment related purposes permitted by law. The federal Fair Credit Reporting Act (FCRA) and several state statutes regulate employment background screens.

Employers should understand that, even if they may lawfully request a background report from a background screening company, their use of the results in making an employment-related decision must still comply with all applicable requirements for using the report to make an employment decision. Employers should also be mindful that federal and state legislators are actively considering and enacting new legislation in this area.

## Notice

HireRight prepared these materials for informational purposes only. These materials are not a substitute for, and should not be construed as, legal advice. HireRight does not warrant any statements in these materials. Employers should direct questions about federal and state laws regulating the screening process to experienced legal counsel. Some useful resources are also available on-line at the Federal Trade Commission's web site (www.ftc.gov). The Commission has oversight of the federal Fair Credit Reporting Act.

## The Federal Fair Credit Reporting Act

The federal Fair Credit Reporting Act ("FCRA") and several state statutes regulate employment background screens. The FCRA regulates background screens for "employment purposes" if the employer procures records or information on an individual from a background screening company such as HireRight (known in the screening industry and under the FCRA as a "consumer reporting agency").

*A copy of the FCRA is available online at http://www.ftc.gov/os/statutes/fcradoc.pdf.*

The FCRA broadly defines the term "employment purposes" to include the evaluation of a job applicant for employment as well as decisions concerning promotion, reassignment or retention of an employee.

The FCRA's name may be somewhat misleading. While the FCRA does regulate employment credit checks, the scope of the law is broader than credit history information to include what is referred to as consumer report information. For example, the FCRA also regulates requests for criminal, educational, military and driving records from a "consumer reporting agency," such as HireRight.

The FCRA does not regulate purely "in-house" activities, such as reference checks and job interviews conducted directly by the employer, or an



employer's own efforts to obtain information on an applicant or employee such as such as criminal records obtained directly from a public record source. (Some states, such as California, do impose restrictions and requirements on employers who perform "in-house" checks of public records.)

As a practical matter, however, few employers have the resources or expertise needed to conduct their own public records searches and verifications. Instead, employers typically contract for this service with a background screening company, like HireRight, that specializes in, and has expertise concerning, employment screening.

While the FCRA focuses principally on regulating consumer reporting agencies, such as HireRight, it also establishes requirements for employers who procure and use an employment background report from HireRight or other consumer reporting agencies. These requirements prescribe the procedure that an employer must follow before procuring an employment background screening report as well as the steps an employer must take when it relies, in whole or in part, on information contained in a background report to make an adverse decision directed at the applicant such as to reject an applicant for employment, reassignment, promotion, etc. These materials describe the steps that employers must follow.

Before turning to those steps, however, employers should be aware that other laws may have an impact on their use of employment background reports. Some states, such as California, have enacted their own fair credit reporting laws. Notably, some state laws, such as California's, afford more substantial penalties than the FCRA affords for violations of what is required in the law. Employers therefore should become familiar with the various state laws. The laws may vary somewhat from state to state.

Employers also should be mindful that federal and state legislators are actively considering and enacting new legislation in this area. Employers should consult with legal counsel before taking action based in whole or in part on a background report to confirm that no

legislative changes have altered the procedures that must be followed.

## Others Laws Regulate the Hiring Process

Other federal and state laws regulate the hiring process, including applicable state labor laws as well as anti-discrimination laws, such as Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans With Disabilities Act ("ADA"). Employers should understand that, even if they lawfully can request a background report from a background screening company, their use of the results in making an employment-related decision must still comply with all applicable restrictions for using the report.

*Employers should understand that, even if they lawfully can request a background report from a background screening company, their use of the results in making an employment-related decision must still comply with all applicable restrictions for using the report.*

To be perfectly clear, just because information is lawfully disclosed in a background report by the background screening company, that does not mean the employer necessarily is free to make a hiring decision based in whole or in part on that information. The employer must comply with all state and federal laws (including the FCRA) applicable to the employer's use of that information for the particular employment-related decision or action.

For example, some state laws restrict the employer's use of arrest records and even convictions. Hawaii, Pennsylvania, Wisconsin and New York, for example, have statutes requiring that the applicant's criminal record in question have a rational relationship to the job in question.

Please also note that whereas all convictions are now reportable under the FCRA, the federal Equal Employment Opportunity Commission (EEOC) – the agency with oversight of Title VII – takes the position in its advisory compliance materials that employers may not automatically disqualify job applicants with convictions from consideration for employment.

Instead, each applicant must be evaluated with regard to (1) the nature of the underlying crime, (2) the date of the conviction, and (3) the relationship between the crime and the job duties for the position in question.

These materials address only the FCRA, not these other laws. For additional information about these other laws, employers should consult their legal counsel.

## STEP 1: Certification

Under the FCRA, HireRight may provide a pre-employment background report to an employer only if the employer intends to use the report to make an employment-related decision.  By law, HireRight is required to confirm that the employer will use the reports provided only for this "permissible purpose," by asking the employer to certify that it will obtain the applicant's written authorization before requesting a background report be furnished by HireRight.

By completing this certification, the employer agrees to comply with the FCRA and all federal and state equal employment opportunity laws and regulations (discussed above) related to the procurement and use of consumer background reports.   An authorized representative of the employer is required sign the certification form.

## STEP 2: Disclosure and Authorization

Before requesting that HireRight provide an employment background report, the employer is required to provide certain disclosures to the consumer (i.e., job applicant or current employee), inform them that it will be procuring a background report on them for employment purposes,  and obtain the consumer's written authorization to do so. The disclosure form typically includes the following information:

1.  The fact that the employer will be requesting a background report from a background screening company;

2.  The name and contact information of the background screening company that will provide the background report;

3.  The types of information that will be provided in the background report; and

4.  If the background screening report will be an "investigative consumer report" (defined below), the consumer's rights to request additional information regarding the nature and scope of the report.

Employers must satisfy additional requirements if they request medical information in a background check report. In addition, some states, such as California, New York, Minnesota, Oklahoma and Washington, require the inclusion of additional information in the notice.

The authorization consists of a statement, signed by the applicant, permitting the background screening company, such as HireRight, to provide the background report to the employer. The authorization might also include space for the applicant to provide personal identifying information needed to conduct the background screen (for example, the applicant's Social Security number), but is not required per the FCRA or applicable state law.-.

The disclosure and authorization must be a stand-alone document that must not be part of an employment application or any other pre-employment document. HireRight can provide a sample disclosure and authorization form upon request.

Background reports fall into two categories: "consumer reports" and "investigative consumer reports." A "consumer report" contains only information taken from public and private records sources. An "investigative consumer report" may include those types of records but also includes information obtained through personal interviews with neighbors, friends, or associates of the applicant reported on, or with others with whom the applicant is acquainted, or who may have knowledge concerning any such items of information. (Please note that CA state law does not make this distinction and all background reports procured for employment purposes are considered "investigative consumer reports".

If, for example, an employer asks HireRight to obtain information in addition to an applicant's job title and dates of employment from former employers, such as information about the applicant's job performance or the reasons for termination, then the report that HireRight provides the employer would be an investigative consumer report.

Because investigative consumer reports can contain especially sensitive information, the FCRA affords additional protections to the applicant when the prospective employer requests one. These protections include the following:

1. Within three (3) days after requesting an investigative consumer report, the prospective employer must clearly and accurately disclose to the applicant in writing, by mail or otherwise delivered, that (a) an investigative consumer report may be obtained, and (b) the applicant has the right to request additional information concerning the nature and scope of the consumer report. This disclosure can be made in the disclosure and authorization form described above.

2. With the disclosure and authorization form, the prospective employer should consider providing the applicant with a document prepared by the Federal Trade Commission (FTC), entitled "A Summary Of Your Rights Under The FCRA." Employers can obtain this document form HireRight or from the FTC's Web site.

3. Upon request to the prospective employer, the applicant is entitled to a statement explaining the nature and scope of the investigation underlying the investigative consumer report. This disclosure must be made in writing, mailed or otherwise delivered to the applicant, not later than five (5) days after (a) the date on which the applicant's request for disclosure is received, or (b) the prospective employer requests the report, whichever is later.

*A copy of the FTC's Summary of Rights form is available online at http://www.ftc.gov/bcp/conline/pubs/credit/fcrasummary.pdf.*

Employers in the transportation industry regulated by the Department of Transportation (DOT) may benefit from one significant variation on the procedures described above. For certain truck driving positions, the prospective employer is not required to obtain a written signature on the authorization form. This exception recognizes that truck drivers frequently apply for trucking jobs while on the road, making it difficult for the prospective employer to obtain the driver's signature.

The exception is a narrow one: prospective employers still are required to provide the notice described above orally, electronically, or in writing and are still required to obtain the applicant's consent to procure a background screening report, albeit the consent can be oral – over the telephone, for example. Employers in the transportation industry should consult their legal counsel to determine whether they can take advantage of this exception.

## STEP 3: Pre-Adverse Action Notice

The FCRA establishes a procedure that employers are required to follow when taking "adverse action" on a job applicant (or employee) based in whole or in part on information contained in a background report. "Adverse action" means a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee.

For example, this would apply if an employer rejects a job applicant based upon a felony conviction reported in a pre-employment background report and determines not to hire even if the employer also relied on other factors, such as lack of educational qualifications, in deciding to reject the applicant.

When an employer intends to take an adverse action based in whole or in part on information contained in the applicant's background report, the employer first

must provide the applicant with a "pre-adverse action" notice that includes a copy of the background report. This notice allows the applicant to review the information that may result in rejection of the application to determine if the information is correct and to be able to contact HireRight to dispute information in the report that the applicant believes to be inaccurate or incomplete.

The reality of background screening is that while every reasonable effort can be made by the background screening company to provide accurate information, cases of identity theft, instances of multiple individuals having the same personal "identifiers" (e.g., name, date of birth, county of residence, etc.), and instances of inaccurate public records do occur, which could lead to inaccurate information inadvertently being included in a background report.

This notice is called a "pre-adverse action" notice because the employer must provide it prior to rejecting the applicant (or taking adverse action against an employee). This pre-adverse action notice informs the applicant that the employer may take adverse action based in whole or in part on the results of the pre-employment background report obtained from the background screening company. The employer must include two documents with this notice:

1. A copy of the applicant's background report; and
2. The "Summary of Rights" form prepared by the FTC.

An employer is not required to document proof of delivery to, or receipt by, the applicant. Doing so, however, will assist the employer if a dispute ever arises over whether the employer provided to the applicant the pre-adverse action notice.

Employers in the transportation industry who are regulated by the Department of Transportation and are permitted to take advantage of the exception described in Step 2, above, are not required to provide a pre-adverse action notice. These employers

are required to provide an adverse action notice as described in Step 4, below.

## STEP 4: Adverse Action Notice

If the employer decides to take adverse action with respect to the applicant based in whole or in part on the background screening report, the employer must inform the applicant of such action in an adverse action notice. The employer must provide the applicant "reasonable time" to dispute information contained in the background report before taking adverse action.

The text of the FCRA itself does not state the precise amount of time that must pass after supplying the pre-adverse action notice before taking the adverse action. However, the available legal authorities suggest a minimum of five (5) business days.

The adverse action notice must include the following information:

1. A description of the adverse action being taken, e.g., rejection of the application, and that the action has been taken based in whole or in part on information contained in the background report;
2. The name, address and toll-free telephone number for HireRight;
3. A statement that the background screening company did not make the decision to take adverse action and is unable to provide the reason for such decision; and
4. A notice of the applicant's rights to obtain a free copy of the background report from the background screening company and to dispute information contained in it with the background screening company.

An employer is not required to document proof of delivery to, or receipt of, the adverse action notice. Doing so, however, will assist the employer if a dispute ever arises over whether the employer provided to the applicant the adverse action notice.

While employers in the transportation industry are not required to provide the pre-adverse action notice to applicants for positions that qualify for the exception described in Step 2, above, these employers are required to provide the same adverse action notice that all other employers are required to provide.

The transportation employer must provide the notice within three (3) days of making its adverse action decision. The notice may be provided orally, electronically, or in writing. As noted above, providing the notice in a from that can be documented will assist the employer if a dispute ever arises over whether the employer provided to the applicant the adverse action notice

### Learning More

For additional information about the FCRA and other laws applicable to employment background screening, employers should consult their legal counsel.

### About the Author

Rod Fliegel, Shareholder -- Littler Mendelson

Mr. Fliegel has extensive experience defending national and local employers in state, federal and administrative litigation, including high-stakes class actions. He regularly works with unionized and non-union employers to develop and implement lawful policies and compliance programs. Mr. Fliegel has special expertise in class action defense, the interrelationship between the ADA, FMLA and state leave of absence laws, and the intersection of the federal and state background check laws.

Mr. Fliegel is a prolific author and lectures on employment law topics around the Country. He has been quoted in many publications, including U.S. News and World Reports, the Los Angeles Times, the Wall Street Journal, the San Jose Mercury News and numerous HR periodicals. Mr. Fliegel is also a member of the Editorial Advisory Boards for Thompson Publishing Group's Family and Medical Leave Handbook and the Employer Resource Institute's California Wage & Hour Advisor and California Employer Advisors publications.

With more than 750 attorneys, 47 locations and a practice that extends into every area of workplace law, Littler Mendelson's employment practice is the nation's largest, and they regularly advise and defend many of the world's leading corporations.

Mr. Fliegel can be reached at (415) 439-6253 or by email at RFliegel@littler.com.

## Frequently Asked Questions

*May employers request background screens before making a conditional job offer?*

The FCRA does not prevent employers from requesting background screens before making conditional job offers. Presently, Hawaii is the only state that prevents employers from inquiring into an applicant's criminal background before making conditional job offers, although legislation is pending in other states.

*May employers ask job applicants to state their date of birth in order to process background screens?*

The FCRA and related state laws do not prevent employers from asking job applicants to state their date of birth in order to process background reports. In fact, background screening companies generally need date of birth information to process background reports that include criminal records. Because most criminal records are indexed at the criminal courthouse based on name and date of birth "identifiers," without date of birth information the background screening company may not be able to accurately report criminal records.

On the other hand, the federal Age Discrimination in Employment Act ("ADEA"), as interpreted by the EEOC, prohibits employers from directly or indirectly eliciting information about a job applicant's age without a "permissible purpose." Asking job applicants to disclose their date of birth in a background report authorization form (preferably one that is kept inaccessible to the individuals making the employment decision, so that they do not have access to date of birth information) arguably does not run afoul of the ADEA. However, without a "permissible purpose" within the meaning of the ADEA, employers should not otherwise elicit age-related information.

*May employers incorporate into an employment application language authorizing a background report?*

No, a separate authorization form is required by the FCRA and some state fair credit reporting laws. Using a separate authorization form from an employment application also makes sense from the standpoint of minimizing the risk of age discrimination claims. As noted in Q3, the ADEA prohibits employers from eliciting information about a job applicant's age without a "permissible purpose."

*Should background reports be stored in separate, confidential files?*

Yes. Background reports and related documentation (e.g., completed applicant authorization forms) should be made available only to personnel with a need to access the information, and should be stored in a secure location, preferably under lock and key and/or password protected.

*How long must employers retain background reports?*

While the FCRA regulates the method of destruction of background reports (see Q6), the FCRA does not require a specific retention period for background reports. The statute of limitations for actions arising under the FCRA is the earlier of either: (i) five (5) years from the date of the alleged violation, or (ii) two (2) years after the violation was known or should have been known to the plaintiff. Arguably, therefore, it is prudent for employers to retain background screening reports, applicant authorization forms, and pre-adverse and adverse action notices for the five (5) year statute of limitations period.

*How must employers destroy background reports once they decide to do so?*

If and when an employer decides to dispose of background reports, regulations published by the FTC mandate certain procedures to protect against improper use of the discarded background reports. These regulations require that any person who receives and maintains a background report, or other documents containing information derived from the background report, for a business purpose must take reasonable measures to protect against unauthorized access to, or use of, the information during or in connection with its disposal. Examples of "reasonable measures" include the burning, pulverizing or shredding of papers containing such information so that they cannot practicably be read or reconstructed, and the destruction (e.g., by "simply smashing the material with a hammer") or erasure (or "wiping") of electronic media containing consumer information.

An employer may want to consider, among others, the following data security measures in connection with its use, storage and destruction of background reports:

1. Developing a written information security program that contains administrative, technical, and physical safeguards;

2. Developing reasonable measures to protect against unauthorized access to, or use of, background screening information;

3. Implementing, and monitoring compliance with, policies and procedures that require the destruction and shredding of papers containing background information when no longer needed so that the information cannot practicably be read or reconstructed;

4. Implementing, and monitoring compliance with, policies and procedures that require the destruction or erasure of electronic media containing background screening information when no longer needed so that the information cannot practicably be read or reconstructed;

5. Utilization of services of a reputable disposal company;

6. Implementing, and monitoring compliance with, policies and procedures that protect against unauthorized or unintentional disposal of consumer information; and

7. Personnel education and training.

*If the law prohibits an employer from asking job applicants certain questions, may the employer seek the information indirectly through a background screening company?*

The provision of the FCRA relating to "investigative consumer reports" (i.e., reports involving in-person interviews) and some state fair credit reporting laws, such as California's, prohibit a background screening company from providing information in violation of any fair employment laws, such as Title VII and the ADA.

## Contact Us

Discover why many of the world's most respected organizations trust HireRight as their employment screening provider of choice. Simply call us at **800.400.2761** in the United States and Canada or +1 949.428.5800 worldwide, or visit us online at **www.hireright.com** today.





Copyright © 2010 HireRight, Inc. HireRight is a trademark of HireRight, Inc.
For a listing of state Private Investigation licensing information for Altegrity Group companies, go to www.altegrity.com/compliance

EXHIBIT 10



# 65 MILLION "NEED NOT APPLY"

## The Case for Reforming Criminal Background Checks for Employment

**Michelle Natividad Rodriguez | Maurice Emsellem**

The National Employment Law Project

March 2011

# Table of Contents

1. Introduction ................................................................................................................................ 1

2. Shutting Workers with Criminal Records Out of the Job Market Compromises the ............................... 3
   Economy and Public Safety

3. Overbroad Hiring Restrictions Run Afoul of Federal Laws Regulating Criminal ................................. 5
   Background Checks for Employment

4. Wave of Lawsuits Documents Routine Civil Rights and Consumer Protection Violations ................. 9

5. Craigslist Survey Reveals Flagrant Abuses by Nation's Largest Companies ................................. 13

6. Recommendations ..................................................................................................................... 19

   Endnotes ................................................................................................................................... 27

**Authors**

Michelle Natividad Rodriguez
Maurice Emsellem

**Acknowledgements**

This report was made possible with the generous support of the Open Society Institute, the Public Welfare Foundation, and the Rosenberg Foundation. NELP is a non-profit research and advocacy organization that partners with local communities to secure the promise of economic opportunity for today's workers. This paper is the product of NELP's Second Chance Labor Project, which promotes the employment rights of people with criminal records and fairer and more accurate criminal background checks for employment.

The authors are grateful to Séla Steiger, the research assistant who patiently and skillfully gathered the Craigslist postings featured in this report, as well as to our NELP colleagues Madeline Neighly, Chris Owens, and Norman Eng, who contributed their valuable expertise and vision to this project.

# 1 Introduction

In recent years, the criminal background check industry has grown exponentially. Particularly in the wake of 9/11, the ready availability of inexpensive commercial background checks has made them a popular employee screening tool. In one survey, more than 90 percent of companies reported using criminal background checks for their hiring decisions.[1] At the same time that the background check industry has expanded, the share of the U.S. population with criminal records has soared to over one in four adults.

In the right situations, criminal background checks promote safety and security at the workplace. However, imposing a background check that denies *any* type of employment for people with criminal records is not only unreasonable, but it can also be illegal under civil rights laws. Employers that adopt these and other blanket exclusions fail to take into account critical information, including the nature of an offense, the age of the offense, or even its relationship to the job.

Yet, as this report documents, based on a survey of online job ads posted on Craigslist, major companies as well as smaller employers routinely deny people with criminal records any opportunity to establish their job qualifications. For any number of entry-level jobs, ranging from warehouse workers to delivery drivers to sales clerks, employers and staffing agencies post these and other job ads that unambiguously close the doors on applicants with criminal records:

> "You must not have any felony or misdemeanor convictions on your record. Period."

> "No Exceptions! . . . No Misdemeanors and/or Felonies of any type ever in background,"

> *"DO NOT APPLY WITH ANY MISDEMEANORS / FELONIES"*

> "You must not have any felony or misdemeanor convictions on your record. Period."

Even some of the nation's largest companies have imposed overbroad background check requirements, including Bank of



















America (283,000 employees worldwide), Aramark (250,000 employees worldwide), Lowe's (approximately 238,000 employees), Accenture (180,000 employees), Domino's Pizza (170,000 employees worldwide), Adecco USA (70,000 staff on assignment), Burlington Northern Santa Fe Railroad Co. (BNSF) (38,000 employees, not including contractors working on its railroad facilities), RadioShack (35,000 employees), and Omni Hotel (11,000 employees in North America).

Across the nation there is a consistent theme: people with criminal records "need not apply" for available jobs. Combine today's tight job market, the upsurge in background checks, and the growing number of people with criminal records, and the results are untenable. In the end, workers are not the only ones who suffer. Employers are also disadvantaged as blanket hiring restrictions undermine the integrity of criminal background checks and artificially limit the employers' pool of qualified candidates.

While this report explores the exclusion of people with criminal records from work, which severely impacts communities of color, it also reveals a promising shift in policy and practice. Indeed, this is an opportune moment to capitalize on a recent wave of impact litigation and model state and local reforms to develop fairer and more accurate criminal background checks for employment.

If adopted, the following reforms featured in this report would significantly advance the employment rights of people with criminal records and promote safety and security at the workplace:

- The federal government should aggressively enforce civil rights and consumer protections that apply to criminal background checks for employment in the public and private sectors.

- The federal government should adopt fair hiring policies regulating federal employment and contracting that serve as a model for all employers.

- State and local governments should certify that their hiring policies fully comply with federal civil rights standards and launch employer outreach and education campaigns.

- The employer community, together with Craigslist, should play a leadership role in raising the profile of this critical issue and promoting best practices that properly balance the mutual interest of workers and employers in fairer and more accurate criminal background checks for employment.

# 2 Shutting Workers with Criminal Records Out of the Job Market Compromises the Economy and Public Safety

American workers are treading water in the worst labor market since the Great Depression. To keep afloat, U.S. workers need strong policies and protections to support their ability to find work—their lifeline to economic and social stability. Yet an estimated 65 million U.S. adults who have criminal records often confront barriers that prevent even the most qualified from securing employment.[2]

For many companies, criminal background checks are a means to determine the safety and security risk a prospective or current employee poses on the job.[3] Yet even the assumption that the existence of a criminal record accurately predicts negative work behavior is subject to some debate; one limited study questions whether the two are, in fact, empirically related.[4] The irony is that employers' attempts to safeguard the workplace are not only barring many people who pose little to no risk,[5] but they also are compromising public safety. As studies have shown, providing individuals the opportunity for stable employment actually lowers crime recidivism rates and thus increases public safety.[6]

Not only is it a matter of public safety to ensure that all workers have job opportunities, but it is also critical for the struggling economy. No healthy economy can sustain such a large and growing population of unemployable workers, especially in those communities already hard hit by joblessness. Indeed, the impact on the economy is staggering. The cost of corrections at each level of government has increased 660 percent from 1982 to 2006, consuming $68 billion a year,[7] and the reduced output of goods and services of people with felonies and prison records is estimated at between $57 and $65 billion in losses.[8]



Sixty-five million U.S. adults, over one in four adults, have a criminal record.

## Johnny Magee | Livermore, California
### *Garden Center Attendant at Lowe's*

In September 1999, 40-year-old Johnny Magee, who is developmentally disabled, picked up a package for his uncle that, unknown to him, contained drugs. Johnny was arrested and convicted of misdemeanor conspiracy to commit a drug offense. He had never used drugs and has never been convicted of any other offense. Johnny held a landscaping job at the Lawrence Livermore National Laboratory for six years until budget cuts forced him to look for a new job in 2008. He applied to Lowe's Home Improvement store in Dublin, California, for a garden center attendant position. Despite his related prior work experience, Lowe's refused to hire Johnny because of his conviction. "Lowe's policy is unfair to me and lots of other good people," said Johnny. "It's unfair because they only see something that happened to me many years ago, even though I've never been in trouble since." Later in 2008, Johnny petitioned the court for a dismissal of his conviction. It was granted and his "finding of guilt . . . [was] set aside."[107] In 2009, Johnny filed Title VII charges with the EEOC against Lowe's.[108]



The concurrent losses to the individual are devastating. A person's interaction with the criminal justice system extends beyond what may be a minor arrest or conviction to a lifetime of social and economic disadvantage. One prominent researcher has found that a criminal record reduces the likelihood of a job callback or offer by nearly 50 percent, an effect even more pronounced for African American men than for white men.[9] Not surprisingly, the U.S. Equal Employment Opportunity Commission (EEOC) has recognized that employer reliance on proxies for race—such as having a criminal record—is "an important civil rights issue."[10]

Although greatly impacted by arrest and conviction records, people of color are not the only ones burdened with the indelible mark of a criminal record. The reality that over one in four U.S. adults has a criminal record brings this issue and its public safety and economic consequences to the doorstep of every home in America. As U.S. Secretary of Labor Hilda L. Solis recently stated, "Stable employment helps ex-offenders stay out of the legal system. Focusing on that end is the right thing to do for these individuals, and it makes sense for local communities and our economy as a whole."[11]

# 3 Overbroad Hiring Restrictions Run Afoul of Federal Laws Regulating Criminal Background Checks for Employment

Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment based on race, gender, national origin, and other protected categories.[12] Enforced by the EEOC, Title VII has long been recognized as prohibiting not only overt, intentional discrimination, but also disallowing those facially neutral policies and practices that have a disproportionate impact on certain groups. Using arrest and conviction records to screen for employment is an example of the kind of "neutral" selection criteria that invites Title VII scrutiny.

The EEOC's policy guidance on conviction records, issued in 1987, recognized that barring people from employment based on their criminal records disproportionately excludes African Americans and Latinos because they are overrepresented in the criminal justice system.[13] For example, African Americans account for 28.3 percent of all arrests in the United States,[14] although they represent just 12.9 percent of the population; that arrest rate is more than double their share of the population.[15] In contrast, the arrest rate for whites actually falls below their share.[16]

Screening out job applicants with criminal records thus excludes a much larger share of African American candidates. Hence, as the EEOC guidance makes clear, such a policy has a "disparate impact" on African Americans (and Latinos). The disparate impact approach ensures that practices that appear to be "race-neutral" on their face—such as no-hire policies against people with criminal records—are prohibited. Just as it is unlawful and immoral to refuse to hire someone because of skin color, it is also a violation of Title VII for an employer to use non-job-related selection criteria that have the effect of differentiating along racial lines.



The number one represents when the arrest rate of a racial category is equal to its population share.

The share of African Americans arrested is 2.2 times their portion of the population, while the percentage of whites arrested falls below their corresponding population share.

Definitively establishing when criminal background checks for employment cross the line, the EEOC has stated that "an absolute bar to employment based on the mere fact that an individual has a conviction record is unlawful under Title VII."[17] Thus, blanket hiring prohibitions of the type documented in this report violate this fundamental mandate. Yet Title VII does not wholly bar the use of criminal records in employment decisions. Instead, the EEOC has provided a strong and clear framework for assessing criminal records when making an employment decision. An employer's consideration of criminal records may pass muster under Title VII if an individualized assessment is made taking into account:



**Years Since First Felony Arrest**

**Type of Felony Arrest**

- Burglary
- Aggravated Assault
- Robbery

A major study found that 18-year-olds who were arrested had the same risk of being arrested as someone with no record after 3.8 years had passed since a burglary arrest, 4.3 years for aggravated assault, and 7.7 years for robbery.

1. The nature and gravity of the offense or offenses;

2. The time that has passed since the conviction and/or completion of the sentence; and

3. The nature of the job held or sought.[18]

The EEOC's case-by-case approach ensures that people with criminal records are not barred from employment for youthful indiscretions, minor run-ins with the law, or more serious offenses from the distant past. Although the EEOC developed this framework more than 20 years ago, subsequent research has underscored its wisdom.

Buttressing one of the core EEOC factors regulating the use of criminal background checks, research indicates that lifetime employment bans on people with criminal records are not correlated to risk. For example, a major study of people with felony convictions found that 18-year-olds arrested for burglary had the same risk of being arrested as same-aged individuals with no record after 3.8 years had passed since the first arrest (for aggravated assault it was 4.3 years, and for robbery it was 7.7 years).[19] If the individual was arrested initially for robbery at age 20 instead of at age 18, then it takes the person three fewer years to have the same arrest rate as a non-offender.[20] Notably, those individuals convicted of property crimes are especially likely to stay clear of the criminal justice system compared to other offenders.

This groundbreaking research has major implications for how employers evaluate the criminal records of workers. Professor Alfred Blumstein, one of the nation's leading criminologists, and his colleague Kiminori Nakamura, conclude that within a narrow period of time, an individual's "criminal record empirically may be shown to be irrelevant as a factor in a hiring decision."[21] Furthermore, these studies evaluate

the risk of committing an offense without distinguishing whether it took place on the job or if it was job-related. The probability of committing an offense at the workplace, which is a significantly smaller subset of offenses, would likely be even more remote.

A criminal record alone is an inadequate measure of an individual's risk of creating a safety or security threat for other reasons as well. A record may include a wide swath of misleading information; not only is a criminal record difficult to interpret, it may include arrests that were dropped because of factual innocence. Even worse, commercially prepared background checks have been found to be rife with inaccuracies.[22] FBI background checks, which one would expect to have a higher level of accuracy, are shockingly out of date 50 percent of the time, thus routinely failing to reflect whether an arrest actually led to a conviction.[23] The bottom line is that a criminal record can be a blunt, misleading tool to determine whether a worker poses a risk on the job.

Illegality and inaccuracy aside, the consequences to job seekers when employers refuse to hire most people with criminal records cannot be overstated. As the former acting chair of the EEOC explained:

> Fears, myths and such stereotypes and biases against those with criminal records continue to be part of the . . . decision making for many employers. Business and industry suffers as a result because it is not able to benefit fully from the skills of every potential worker. For our economy to be successful, we cannot afford to waste any available talent.[24]

"an absolute bar to employment based on the mere fact that an individual has a conviction record is unlawful under Title VII."

(EEOC)

# 4 Wave of Lawsuits Documents Routine Civil Rights and Consumer Protection Violations

After years of dormancy, the basic civil rights and consumer protection laws restricting the use of criminal records are catching a second wind. In just the past few years, private lawyers, public interest and civil rights groups, and government agencies have initiated lawsuits challenging exclusionary practices. Reflecting a trend that is expected to continue, at least five major civil rights lawsuits against large employers were filed in 2010 alone.

The lawsuits include *Arroyo v. Accenture*, which alleges that Accenture "rejects job applicants and terminates employees with criminal records, even where the criminal history . . . has no bearing on the . . . fitness or ability to perform the job."[25] Accenture, a global business and technology consulting company, has more than 180,000 employees in the United States[26] and netted $21.55 billion last year.[27] Another major federal lawsuit, *Hudson v. First Transit, Inc.*, charges that First Transit, one of the nation's largest transit service providers with 15,500 employees, has a blanket policy prohibiting individuals from working for the company if they have been convicted of a felony or served so much as a day in jail.[28]

In *Mays v. Burlington Northern Santa Fe Railroad Co. (BNSF)*, BNSF was sued over its "blanket policy prohibiting any person with a felony conviction in the previous [seven] years from being employed at its facilities."[29] BNSF, like most major railways, has been using the commercially run e-RAILSAFE program, which provides periodic background checks on the nation's railroad employees.[30] This case also has the potential to impact tens of thousands of workers. BNSF alone has 38,000 employees, not including the contractors working on its railroad facilities.[31]

> **"Qualified candidates must be able to pass: Background Check (no felonies or misdemeanors) . . .**
>
> (Bank of America)

Private employers are not the only ones coming under fire for their discriminatory policies. In the class action lawsuit *Johnson, et al. v. Locke*,[32] the U.S. Census Bureau was sued under Title VII for discriminating against people with criminal records by excluding them from consideration for temporary positions with the Census.[33] The job applicants' complaint states that "roughly 700,000 people" were eliminated by Census' screening practice, thus "import[ing] acute racial and ethnic disparities in the criminal justice system into the employment process."[34]

The EEOC also has a Title VII criminal records suit pending against the Freeman Companies,[35] a convention and corporate events marketing company accused of rejecting job applicants based on criminal background records and credit histories.[36] In a press release about the lawsuit, the EEOC warned that "[e]mployers . . . should be careful to avoid hiring practices that have unlawful discriminatory effects on workers."[37]

In addition to these recent federal lawsuits, workers across the country have filed numerous charges with the EEOC challenging employers' use of criminal records. Although national data is unavailable from the EEOC, two non-profit organizations—NELP and Community Legal Services of Philadelphia—have filed more than a dozen EEOC charges that are pending against national employers,[38] such as Lowe's (approximately 238,000 employees)[39] and Select Truckers Plus.[40]

The EEOC may also initiate investigations under a special procedure known as a "commissioner's charge." In 2009, NELP and other organizations petitioned the EEOC to file a commissioner's charge against Bank of America, which reported $2.4 trillion in assets and approximately 283,000 employees worldwide,[41] and Manpower, which is one of the nation's largest staffing agencies.[42] The petition called attention to the job announcement circulated by Manpower and Bank of America broadly prohibiting workers with criminal records from applying for 600 clerical positions in 2009.[43] The job announcement distributed by the federally-funded One Stop Career Center in the San Francisco Bay Area stated:

> **"Qualified candidates must be able to pass: Background Check (*no felonies or misdemeanors*) . . ."** (emphasis added).

In 2009, New York Attorney General Andrew Cuomo (now Governor Cuomo) entered the fray by enforcing state protections that regulate criminal background checks for employment.[44] The Office of the Attorney General (OAG) has reached major settlements against three

companies and a private screening firm—agreements that serve as models for background check policies and procedures.

Beginning in November 2008, the OAG investigated the national electronic store chain, RadioShack, and the background check company, ChoicePoint. RadioShack is the second-largest retailer of consumer electronics in the United States, employing approximately 35,000 employees.[45] The OAG found that RadioShack automatically rejected any individual who answered "yes" to the question, "Have you been convicted of a felony in the past 7 years," by not allowing the individual to complete the job application.[46]

ChoicePoint, which accounts for an estimated 20 percent of the U.S. background check industry conducting more than 10 million annually,[47] played an integral role in designing and implementing RadioShack's unlawful practices. It created an online application system that automatically dismissed anyone who self-disclosed a criminal record history.[48] ChoicePoint also conducted background checks for RadioShack that reported sealed and dismissed convictions, in violation of state law.[49]

In another settlement finalized in 2010, the OAG found that ChoicePoint had developed a matrix that rated applicants based on their criminal records for ABM Industries, one of the largest facilities services contractors in the United States with over 90,000 employees nationwide.[50] ABM Industries obtained background checks that reported dismissed charges and infractions, in violation of state law.[51]

In 2009 the OAG also entered into a settlement with Aramark, one of the largest food service providers in the United States with 250,000 employees worldwide.[52] Aramark's job announcement for temporary janitorial and food-service personnel stated:

> "All Applicants must have a *FULLY clean background* for the past seven (7) years." (emphasis added).

The OAG's model settlements with RadioShack, ChoicePoint, ABM Industries, and Aramark are structured for lasting change, including components of policy reform, training of employees, and ongoing independent compliance monitoring.[53]

In addition to this growing list of civil rights lawsuits and EEOC charges, workers have also taken employers and background check companies to court to enforce the Fair Credit Reporting Act (FCRA). FCRA regulates the commercially prepared background reports used by most

> "All Applicants must have a FULLY clean background for the past seven (7) years."
>
> (Aramark)

# Darrell Langdon | Chicago, Illinois

## *Boiler Room Engineer in Chicago Public Schools*

Like many, Darrell Langdon struggled with addiction in his youth. Now 52 and having raised two sons as a single father, Darrell, through his strength of character, has been sober for over twenty years. Although he has moved forward in life through hard-won rehabilitation, his 25-year-old felony conviction for possession of cocaine remains.

Darrell worked as a boiler room fireman in the Chicago Public Schools (CPS) until 1995 and then as a mortgage broker until 2008. After the market crash, Darrell reapplied to CPS to return to his roots as a boiler room engineer, his father's career. With his excellent qualifications, he was hired pending a background check. But the decades-old conviction proved to be the mark against him. Not giving up, he was granted a "certificate of good conduct" by the court. Even with this certificate, which legally lifted the barrier to employment, CPS again rejected him. It took media scrutiny and legal support, but CPS finally reconsidered. Darrell, one of the few lucky ones, now has a job he loves.[109]

private employers that conduct criminal background checks. Under FCRA, if an employer rejects an applicant based on the background report, a copy of it must be provided to the applicant prior to the refusal to hire, which allows the applicant to correct any misinformation.[54] According to one study, employers are routinely violating these fundamental consumer protections.[55]

Mirroring the upsurge in Title VII litigation, a number of FCRA lawsuits have recently been filed. The suits challenge the failure of major screening firms and employers to provide "pre-adverse-action" notices and to ensure accurate reporting.[56] The defendants include HireRight Solutions, an employment screening firm that partners with companies like Monster and Oracle; Prologistix, a staffing firm; and First Transit and First Student, nationwide transit service companies; one such case settled for $20 million in 2008 against LexisNexis.[57] In addition to these lawsuits filed by private parties, the Federal Trade Commission brought FCRA charges against several railroad industry entities, including Quality Terminal Services, LLC and Rail Terminal Services, LLC.[58]

The rise in legal actions highlights both the widespread non-compliance of major companies with federal law, and the growing interest in pursuing legal actions against employers, staffing firms, and background check companies for unlawfully excluding people with criminal records from work.

# 5 Craigslist Survey Reveals Flagrant Abuses by Nation's Largest Companies

To more systematically document employer non-compliance with Title VII's basic protections, in 2010 NELP surveyed employment ads posted on Craigslist, the widely used online community. Craigslist now operates in over 400 geographic areas in the United States and receives more than one million new job ads a month.[59] The project entailed sorting through thousands of ads posted over four months in five major cities.[60] This substantial pool of job listings represents a slice of the national job market, providing more insight into employer hiring policies and practices as experienced by applicants.

Although employers often remain anonymous on Craigslist (as many no-hire ads were), the survey disclosed that some of the nation's largest employers and staffing firms post ads broadly precluding consideration of individuals with criminal records. Among the more than 300 most problematic ads on Craigslist, which represent the tip of iceberg given the limited scope of the survey, there are several major companies represented. They include Domino's Pizza (170,000 employees worldwide), Omni Hotel (11,000 employees in North America), and Adecco USA (70,000 staff on assignment). Numerous smaller companies also excluded people with criminal records from consideration for advertised jobs.

The following sampling of blanket policies illustrates the range of problematic ads routinely posted by employers on Craigslist. They fall into four categories based on the breadth of the employer's no-hire policy: (1) no arrests/clean or clear records; (2) no felony or misdemeanor convictions; (3) no felony convictions; and (4) no convictions within a specified timeframe.

## 1)  No Arrests/Clean or Clear Records

Employers that post "no arrests" or "clean" or "clear" criminal records ads—the first category in the survey—likely are violating the EEOC

directive that "a blanket exclusion of people with arrest records will almost never withstand scrutiny."[61] Nonetheless, the practice is unexceptional; a 2010 survey of employers indicated that over 30 percent consider an arrest that did not lead to conviction to be at least "somewhat influential" in a decision to withhold a job offer.[62] The following ad embodies one of the more flagrant violations:

> "**\* No arrests or convictions of any kind for the past seven years \* No Felony arrests or convictions of any kind for life**," Job ad for Electrician Contractor, Sept. 29, 2010, OMNI Energy Services Corp. (emphasis added).[63]

According to the EEOC, barring candidates based on arrest records can almost never be justified except in the rare case when the employer "evaluate[s] whether the arrest record reflects the applicant's conduct."[64] "[E]ven where there is no direct evidence that an employer used an arrest record in an employment decision,"[65] an employer who inquires about arrest information without giving the candidate an opportunity to explain the underlying conduct violates Title VII.[66] That's because, as the EEOC acknowledges, "arrests alone are not reliable evidence that a person has actually committed a crime."[67]

*Applicant Example:* A highly qualified African American electrician with 30 years' work experience applies for the Electrician Contractor job ad quoted above. He was erroneously arrested 20 years earlier for burglary based on mistaken identity.

Because the OMNI Energy Services Corporation job ad discourages anyone with a felony arrest "of any kind for life" from even applying, the company would exclude this candidate—despite the fact that this applicant has never actually committed an offense.

Within this category of ads are those with the more ambiguous "clean record" requirement. For example:

> "We are looking for people with . . . *spotless background/ criminal history*." Job ad for Warehouse worker or Delivery Drivers, Sept. 2, 2010, CORT Furniture Rental (emphasis added).[68]

A job applicant could easily interpret this employment ad to mean that if she had any arrests, she would not be considered for the job opening. At the very least, this ad has a chilling effect on workers with arrest records and could justifiably trigger an EEOC investigation into the company's hiring practices.

> "We are looking for people with . . . spotless background/ criminal history."
>
> (CORT Furniture Rental)

## 2)  No Felony or Misdemeanor Convictions

The Craigslist survey revealed another sweeping category of blanket exclusions of people with criminal records; this time requiring that job applicants have no felony or misdemeanor convictions. As illustrated below, these job ads, including one by a FedEx Ground contractor, broadly exclude any applicant with any type of conviction over the individual's lifetime, regardless of the relationship of the conviction to the particular job.

> "IN ORDER TO QUALIFY AS A DRIVER FOR FEDEX, YOU MUST HAVE THE FOLLOWING:
>
> . . . Clean criminal record, *no misdemeanors, no felonies*," Job ad for Diesel Mechanic, Delivery Driver, Sept. 24, 2010, Contractor for FedEx Ground (emphasis added).[69]

> "Must have *no previous misdemeanors or felonies*" Job ad for Valet Attendant, May 12, 2010, Corinthian International Parking Services Inc. (emphasis added).[70]

> "*** *DO NOT APPLY WITH ANY MISDEMEANORS / FELONIES* ***" Job ad for Sewer Selling Technician, Feb. 10, 2010, Luskin-Clark Service Company (emphasis added).[71]

*Applicant Example:* A highly qualified applicant was arrested five years earlier because she did not report her income when she was receiving unemployment benefits. Her husband had just died and she was struggling to feed her three young children. She agreed after her misdemeanor unemployment benefit fraud conviction to repay all monies.[72]

Each of these companies would be in violation of Title VII for their rejection of this qualified candidate solely based on her isolated conviction. The commission of fraud in the unemployment system is completely unrelated to the job duties of a mechanic, a forklift operator, a valet attendant, or sewer selling technician, nor is the offense recent, repeated or sufficiently severe to pose a safety or security threat at the workplace.

## 3)  No Felony Convictions

A subset of the prior category of job ads posted on Craigslist is the exclusion of any applicant with a felony conviction, regardless of when the offense took place, the type of felony, or the nature of the job and its relationship to the crime. Ads exemplifying this exclusion included:

> "Applicants must also pass a background investigation showing *no felony convictions*." Job ad for Delivery Driver, Jan. 28, 2010, Domino's Pizza (emphasis added)[73]

"Must have no previous misdemeanors or felonies"

(Corinthian International Parking Services, Inc.)

COUNTY

> "Applicants must also pass a background investigation showing no felony convictions."
>
> (Domino's Pizza)

"**Must have *no felony convictions***" Job ad for Part-time Valet Attendant, April 21, 2010, Omni Hotel (emphasis added).[74]

"***No felony convictions* on a criminal background check . . . .**" Small Engine Technician, Feb. 2, 2010, Altaquip (emphasis added).[75]

*Applicant Example:* A qualified, motivated job applicant has a drug possession conviction from 30 years ago. As a young man, he made the mistake of holding drugs for a friend. Learning from the mistake, he distanced himself from negative influences. He paid all his fines and penalties, has an extensive positive work record, and his conviction history is spotless other than his sole conviction.

The applicant in the example would be rejected from any of the jobs posted above on Craigslist. Never mind that the conviction was decades old and the worker had rehabilitated himself. The employers highlighted here would ignore these facts, thus underscoring the unreasonableness of lifetime bans—they never allow an individual to overcome his mistake nor do they recognize or encourage the worker's rehabilitation.

## 4)  No Convictions Within a Specified Timeframe

A final category of ads routinely posted on Craigslist limits exclusions to convictions within a specific, albeit protracted timeframe. While less restrictive than a lifetime ban, even these more limited exclusions can be problematic. The ads' specified time period may be excessive, and they fail to address the relationship between the offense and job. The following advertisement exemplifies this type of exclusion:

"**\*Be able to pass a *7 year criminal background check (no felonies, no misdemeanors)*** Job ad for Forklift Operator, Sept. 8, 2010, Adecco USA (70,000 employees in the United States, emphasis added).[76]

An absolute ban of applicants with convictions during the last seven years violates Title VII. For example, a job candidate with an isolated shoplifting or vandalism conviction from five years ago does not have a record that reflects on her ability to safely and effectively operate a forklift as required for this job. Nor is a five- or six-year-old conviction sufficiently recent in all cases to pose a security threat on the job.

Indeed, the leading research on the recurrence of crime conclusively repudiates this approach. As discussed above, even those individuals

convicted of a *felony* property offense are not likely to reoffend if they have not had any contact with the criminal justice system in the past 3.8 years.[77] Thus, a seven-year age limit on disqualifying offenses still poses a substantial barrier that cannot be supported by the weight of the available evidence on the risk of recidivism.

## Staffing Firms

The basic mandate of the nation's civil rights protections is not only directed at employers. It also prohibits employee staffing firms from imposing discriminatory policies on behalf of an employer. Both the employer that made the request and the staffing firm that honored it are liable under Title VII for unlawful screening practices.[78] The Craigslist survey uncovered a generous sampling of particularly egregious no-hire ads by staffing firms:

> "Minimum requirements for Employment Consideration, ***No Exceptions!: 1. No Misdemeanors and/or Felonies of any type ever in background***," Job ad for Warehouse and Manufacturing Jobs, Feb. 18, 2010, Perimeter Staffing (staffing firm operating in Atlanta, emphasis added).[79]

> "ALL CANDIDATES WILL BE E-VERIFIED AND MUST CLEAR A BACKGROUND CHECK (***NO PRIORS***)," Job ad for Manufacturing Jobs, Oct. 5, 2010, Carlisle Staffing (staffing firm operating in Chicago area, emphasis added).[80]

> "Candidates must . . . ***Be clear of felony convictions and criminal history*** (background checks will be done)," Job ad for Manufacturing position, Oct. 12, 2010, Abbott Staffing Group (staffing firm operating in southern California, emphasis added).[81]

> "***You must not have any felony or misdemeanor convictions on your record. Period.***" Passenger Van Driver, Feb. 28, 2010, Crown Services Inc. (staffing firm operating in nine states, emphasis added).[82]

> "All candidates must consent to a drug test and criminal background check (***no felonies or misdemeanors allowed***)," Sales Associate, Sept. 28, 2010, Peak Organization (staffing firm operating in New York City, emphasis added).[83]

The Perimeter Staffing, Carlisle Staffing, and Abbott Staffing ads are for manufacturing or warehouse positions that involve little or no contact with the public and thus pose limited risk to public safety. There is no

> "ALL CANDIDATES WILL BE E-VERIFIED AND MUST CLEAR A BACKGROUND CHECK (NO PRIORS)"
>
> (Carlisle Staffing)

reasonable justification for banning highly qualified candidates from these jobs who have, for example, non-recent misdemeanor or felony convictions. Nor should the candidates for the driver or sales associate positions be rejected by Crown Services and the Peak Organization based on any number of minor misdemeanors, such as trespassing or loitering.

As the preceding examples illustrate, openly exclusionary no-hire bans are commonplace. That employers and staffing firms continue to post such ads notwithstanding the 20-plus-year-old Title VII guidance issued by the EEOC suggests that even the nation's largest employers are either unaware of civil rights and consumer protections for people with criminal records or are indifferent to them.

## Arcadia Murillo | Chicago, Illinois
### Janitor in Chicago Police Station

In 1999, Arcadia Murillo was simply in the wrong place at the wrong time. Working as a bartender, she was swept up in a police drug raid and was charged with possession of a controlled substance and refusal to cooperate with police. Luckily, within a month, the truth became apparent: Arcadia had done nothing wrong and the charges were dismissed for lack of probable cause.

In 2006, Arcadia began working for a cleaning services contractor and was assigned as a janitor at a Chicago Police Department station. Early in 2009, a new company, Triad, took over the contact and the City of Chicago performed a criminal background check. When Arcadia's 10-year-old dismissed charges showed up, the City refused to allow Arcadia to work at the police station. No matter that Arcadia had worked hard at the job for over two years. No matter that her arrest was actually dismissed. After losing her job, without even the ability to explain the circumstances to the City, Arcadia filed a lawsuit against the City and Triad for violating state law.[110]

# 6 Recommendations

While recognizing that criminal background checks fulfill a security function, this report documents the urgent need to protect against arbitrary and discriminatory practices that undermine the integrity of these employment screening procedures. Given the proliferation of criminal background checks, the time has come to implement fairer and more accurate background check policies to balance the demand for employee screening with the basic rights of workers competing for jobs in a struggling economy. The good news is there is already momentum for reform both in the public and private sectors. Building on these advancements, the following measures would serve the interests of qualified workers with a criminal record seeking employment, while also promoting public safety and security at the workplace.

**ONE:** **The federal government should aggressively enforce civil rights and consumer protections that apply to criminal background checks for employment in the public and private sectors.** To vigorously enforce both Title VII and FCRA requires a comprehensive, coordinated enforcement strategy on the part of the EEOC, the FTC, the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), and other federal enforcement agencies. Significantly, many of the large companies identified in this report have contracted with the federal government for millions of taxpayer dollars in goods and services: Accenture (with a total of $931 million in federal contracts in 2009),[84] Bank of America, Aramark, Addeco USA, Lowe's, OMNI Hotel, Burlington Northern Santa Fe Railroad Co., and RadioShack.[85]

Federal contractors, like all private employers, must comply with Title VII, FCRA, and other basic federal civil rights and consumer protection laws. In addition, they are required to comply with the

federal affirmative action and civil rights mandates set forth in Executive Order 11246, which are enforced by OFCCP. This mandate imposes special obligations on federal contractors to comply with civil rights protections subject to strict penalties, including rescission of the federal contract.[86]

*a. Coordinating with the EEOC, the key federal enforcement agencies should prioritize and implement a targeted enforcement strategy.* To prioritize this critical and timely issue, the EEOC and OFCCP local offices must effectively identify criminal records cases when they come through the door and thoroughly investigate them. In turn, the local offices must coordinate nationally through the federal enforcement agencies to jointly pool resources and investigate and prosecute the highest-impact cases. To maximize impact, agencies should focus their enforcement activities on the nation's largest employers that maintain broad employment restrictions of the type detailed in this report. Other targets should include the major staffing firms and the private screening companies, which design and implement criminal background checks for most large employers.

*b. The EEOC should update the criminal background check guidances while initiating a national education campaign of the employer community that also engages other key federal enforcement agencies.* The 20-year-old EEOC guidances provide a thoughtful assessment of the law. However, with the proliferation of background checks in recent years, the guidances should be resituated within today's new realities and challenges. The EEOC should adopt new, robust guidances that reflect the latest empirical research, respond to the current integrated structure of the criminal background check industry, and promote model employer policies and worker protections.

With the support generated by a new EEOC directive, the agency should work with its partners in the federal government to launch an education campaign on criminal background checks for employment targeting both the private and public sectors. To be successful, this outreach and education initiative must also reach down locally (e.g., through the EEOC and OFCCP district offices) to employers large and small and to workers of color hardest hit by the use of criminal background checks for employment.

**TWO:** **The federal government should adopt fair hiring policies regulating federal employment and contracting that serve as a model for all employers.** The U.S. Attorney General recently announced a cabinet-level initiative (the Reentry Council) to coordinate "reentry" policies across the federal government. The initiative aims to improve public safety by reducing barriers that undermine opportunities for people with criminal records to be successfully reintegrated into their communities.[87] As a core component of this effort, the federal government should become a model employer of people with criminal records, leading by example to promote hiring in the private sector and among state and local employers.

Chicago Mayor Richard Daley made a compelling case for this approach when he announced the city's highly acclaimed reentry initiative: "We cannot ask private employers to consider hiring former prisoners unless the City practices what it preaches."[88] If the federal government adopted model employer policies and required its federal contractors[89] to do the same, 20 percent of the U.S. workforce would be subject to fairer and more accurate criminal background checks for employment.[90]

*a. Federal agencies and contractors should certify that their hiring policies fully comply with Title VII.* To move toward a model federal policy that applies to the federal workforce and its contractors— including service providers that receive federal funding to help employ people with criminal records—the first step is for each agency to scrutinize its hiring policies and certify that it complies with the EEOC's criminal records guidances.[91] As illustrated by the lawsuit against the U.S. Census Bureau, some federal agencies are neglecting to implement the basic protections of Title VII.[92]

Equally important, each federal agency should ensure that its contractors strictly conform to Title VII. In practice, that means adopting contract language that incorporates the "job-related" and "business necessity" requirements of Title VII. In addition, federal contractors should be required to provide and maintain documentation of their hiring procedures, including their job announcements and "job-related" criteria that apply to criminal background checks for employment. The leadership of the Office of Personnel Management (OPM) in guiding and centralizing these reform efforts will be critical to developing a consistent and effective hiring policy across all agencies.

**b. Federal agencies and contractors should adopt model hiring policies that defer the criminal background check until the end of the hiring process.** Several federal agencies have adopted policies that reduce barriers to employment for people with criminal records while maintaining public safety.[93] For example, it is not uncommon for federal agencies to wait until the final stages of the hiring process to conduct a criminal background check. This sends the message to applicants that they will be evaluated based on their qualifications for the job, rather than being segregated before they have a fair chance to establish their credentials.

The federal government could also take the next step and adopt the model fair hiring protections in place in six states and thirty cities and counties.[94] These government entities removed from their job applications the question that requires the applicant to report a criminal record.To ensure safety and security on the job, the government employers still conduct criminal background checks in appropriate cases, but not until the final stages of the hiring process. These reforms should be adopted by federal agencies and promoted as best practices for federal contractors by the Office of Management and Budget.

**c. Federal agencies and contractors should adopt more transparent procedures to ensure that workers with criminal records can fairly navigate the hiring process.** While the federal government hiring process includes certain appeal rights for civil service applicants who are denied employment based on criminal records,[95] a large proportion of the federal workforce is exempted from these protections.[96] In addition, many workers face their toughest challenge when their FBI background checks come back with incomplete information. The workers are unclear of how to dispute the information, yet they must quickly produce corrections, often on very old and minor arrests or convictions, in order for their applications to proceed.[97]

To address these obstacles, federal agencies should adopt the following reforms: notification to rejected workers and implementation of an appeal procedure that will allow workers to promptly challenge background check inaccuracies; and a waiver policy that permits a person with a disqualifying criminal record to produce evidence documenting rehabilitation, strong work history, and absence of risk to safety and security. A model waiver and appeal process was incorporated into the post 9/11 terrorism security laws[98] and was recently implemented by the Transportation Security Administration.

This model process applied to nearly two million port workers and more than one million truck drivers across the United States, which greatly minimized the negative impact of criminal background checks on African American and Latino workers.[99]

Similar procedures should be implemented for the federal workforce and its contractors. Currently, companies that receive federal contracts are not even mandated to provide any specific notice or appeal rights to workers when they are denied employment or removed from their jobs based on criminal background checks.[100] Thus, these workers are often blindsided and are left with no effective remedies to keep their jobs or compete fairly for available job openings.

**THREE:** **State and local governments should certify that their hiring policies fully comply with federal civil rights standards and launch employer outreach and education campaigns.** Few state and local governments have recently reviewed the worker protections that apply to criminal background checks for employment, despite the growing impact of background checks on the nation's workforce. As a first step, it is critical that the human resources departments of state and local government entities evaluate their relevant policies and ensure they are in compliance with the EEOC's criminal records guidances and require that their contractors do the same.

*a. State and local enforcement agencies should play a leading role in developing a strategic plan to reform employer screening policies.*
Appropriate state and local enforcement agencies, including the state attorneys general offices and the fair employment and consumer protection agencies, should engage in an active education and impact litigation strategy targeting employers, staffing firms, and the background check companies. As described above, the New York Attorney General's recent enforcement actions offer an impressive model. For example, in the RadioShack settlement, the company agreed to revise its screening policies to provide individualized assessment of convictions and the reason for disqualification to rejected applicants, and to maintain documentation of its hiring processes.[101] In addition, because the nation's largest screening firms account for the vast majority of criminal background checks, states' attorneys general and other appropriate enforcement agencies should engage in joint and coordinated national enforcement actions against these firms with the FTC.

***b. State and local governments should adopt model fair hiring policies regulating public and private sector hiring.*** After incorporating the EEOC's guidances into their hiring processes, local and state governments should adopt the reforms that have been sweeping the country.[102] As described above, this may include removing the job application question regarding criminal history and delaying the background check until the final hiring stage. To promote model policies in the private sector, several cities have also required employers that receive government contracts to adopt the same fair hiring practices.[103] Some states have taken the critical next step of requiring all private sector employers to adopt specific fair hiring policies.[104] For example, in Massachusetts, all employers with more than six employees are now prohibited from asking a job applicant to provide any criminal history information on a written application prior to the interview.[105]

**FOUR: The employer community, together with Craigslist, should play a leadership role in raising the profile of this critical issue and promoting best practices that properly balance the mutual interest of workers and employers in fairer and more accurate criminal background checks for employment.** Ultimately, it is up to the employer community, the staffing firms, and the background check companies to step up to this national challenge. Like the model government employers described above, most companies should recognize it is in their best interest to not unreasonably limit the applicant pool in order to compete for the best-qualified workers. In turn, by promoting a fairer and open hiring process, they are sending a powerful message that they are committed to the community and diversity.

In addition, Craigslist should accept responsibility for ensuring fair employment practices in this new era when the Internet is the leading source of job postings for millions of unemployed workers. Craigslist could be a leader among online job forums by posting a disclaimer of the type of discriminatory practice described in this report and by publicizing information on its website about the EEOC's standards regulating criminal background checks for employment. The practice has precedent as Craigslist has taken similar steps for its housing ads.[106]

## Conclusion

As both the population of people with criminal records and the demand for background checks have grown, enforcement of civil rights and consumer protections for people with criminal records has not kept pace, to the detriment of millions of workers.

Although the Title VII standards provide a fair and effective framework to evaluate criminal records for employment, the problem of unregulated criminal background checks remains endemic. Too often, employers, staffing firms, and screening firms continue to disregard civil rights and consumer protections, categorically banning people with criminal records from employment.

The recent wave of criminal records litigation and public policy advances is encouraging, but leveraging these developments to strengthen worker protections requires bold, new leadership. By taking the critical next steps—which begins by recognizing the scope of this historic national challenge and then adopting the type of corrective measures proposed in this report—millions of deserving workers will have a fairer shot at employment, allowing them to contribute to their communities and help rebuild America's economy.

# Endnotes

1   According to a recently published survey of the Society of Human Resources Management—the largest association of human resources personnel—92 percent of their members, which were mostly large employers, perform criminal background checks on some or all job candidates. *See* Society for Human Resources Management, *Background Checking: Conducting Criminal Background Checks* (Jan. 22, 2010), at 3.

2   NELP based the estimate of U.S. adults with criminal records on the following methodology. According to a 2008 survey of states, there were 92.3 million people with criminal records on file with states, including those individuals fingerprinted for serious misdemeanors and felony arrests. U.S. Bureau of Justice Statistics, *Survey of State Criminal History Information Systems, 2008* (Oct. 2009), at Table 1. In some states, misdemeanor arrests for less serious crimes do not require fingerprinting, thus this figure is likely an undercount of people with criminal records. To account for individuals who may have records in multiple states and other factors, and to arrive at a conservative national estimate, the 92.3 million figure was reduced by 30 percent (64.6 million). Thus, as a percentage of the U.S. population over the age of 18 (232,458,335 in 2009 according to the U.S. Census Bureau, Population Division, *available at* http://www.census.gov/popest/national/asrh/NC-EST2009-sa.html), an estimated 27.8 percent of the U.S. adult population has a criminal record on file with states. This estimate is consistent with a Department of Justice finding that about "30 percent of the Nation's adult population" has a state rap sheet. U.S. Dept. of Justice Office of the Attorney General, *The Attorney General's Report on Criminal History Background Checks* (June 2006), at 51. The rise in people with criminal records may significantly be attributed to the increased arrests associated with the "War on Drugs." *See* Ryan S. King, *Disparity By Geography: The War on Drugs in America's Cities*, The Sentencing Project (May 2008).

3   Employers often perform criminal background checks to limit their potential liability if an employee commits an unlawful act on the job. However, following the EEOC guidance and performing an individualized assessment of the conviction will generally satisfy the legal requirements and eliminate the risk of liability on the employer's part. *See* National H.I.R.E. Network, *Negligent Hiring Concerns*, *available at* http://www.hirenetwork.org/negligent_hiring.html.

4   *See* Brent W. Roberts, *et al.*, *Predicting the Counterproductive Employee in a Child-to-Adult Prospective Study*, 92 Journal of Applied Psychology 1427, 1430 (2007). There is little research examining the correlation between the existence of a criminal record and the propensity to commit crimes at the workplace. However, in this study of New Zealand residents from birth to age 26, researchers found that the existence of a criminal record for 13- to 16-years-old was unrelated to engaging in "counterproductive activities at work" at age 26, including tardiness, absenteeism, disciplinary problems, violence, theft, property destruction, and substance abuse. *Id.* at 1427, 1429–1430.

5   Many people who have a criminal record that shows up on a background check have never been convicted of a crime; in fact, one-third of felony arrests never lead to conviction. U.S. Bureau of Justice Statistics, *Felony Defendants in Large Urban Counties*, 2004 (April 2008).

6   According to a study in Illinois that followed 1,600 individuals recently released from state prison, only 8 percent of those who were employed for a year committed another crime, compared to the state's 54-percent average recidivism rate. American Correctional Assoc., 135thCongress of Correction, *Presentation by Dr. Art Lurigio (Loyola University) Safer Foundation Recidivism Study* (August 8, 2005).

7   The U.S. Bureau of Justice Statistics estimates that in 2006, the federal, state and local governments combined spent over $68 billion on corrections; in 1982, that figure was $9 billion. U.S. Bureau of Justice Statistics, *Employment and Expenditure, available at* http://bjs.ojp.usdoj.gov/content/glance/tables/exptyptab.cfm.

8   The reduction of employment rates of people with felonies and prison records results in a loss of the output of goods and services to the economy. *See* John Schmitt & Kris Warner, *Ex-offenders and the Labor Market*, Center for Economic and Policy Research (Nov. 2010), at 14.

9   Devah Pager, Bruce Western & Naomi Sugie, *Sequencing Disadvantage: Barriers to Employment Facing Young Black and White Men with Criminal Records*, 623 The Annals of the American Academy, 195, 199 (2009).

10   Commissioner Earp, *Transcript of November 20, 2008 EEOC Meeting on Employment Discrimination Faced by Individuals with Arrest and Conviction Records*, at 2.

11   Press Release, *US Department of Labor announces grant competition to help former offenders gain career skills and rejoin community life* (Feb. 10, 2011), *available at* http://www.dol.gov/opa/media/press/eta/ETA20110185.htm.

12   *See* 42 U.S.C. § 2000e et seq., *available at* http://www.eeoc.gov/laws/statutes/titlevii.cfm.

13   *See The U.S. Equal Employment Opportunity Commission, Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (1982)*, Feb. 4, 1987. *See also The U.S. Equal Employment Opportunity Commission, Policy Guidance on the Consideration of Arrest Records in Employment Decisions under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., 1982*, Sept. 7, 1990. Research has shown that people of color are subject to greater scrutiny and harsher treatment at decision points throughout the criminal justice system. For example, a study showed that drivers of color were stopped by police and searched for contraband at higher rates than whites and another study indicated that people of color charged with felonies were more likely to be detained than whites. The Sentencing Project, *Reducing Racial Disparity in the Criminal Justice System: A Manual for Practitioners and Policymaker* (2008) at 2. In a recent study controlling for important legal factors and judicial district, African-Americans and Latinos were found to receive longer sentences than white defendants. Jill K. Doerner & Stephen Demuth, *The Independent and Joint Effects of Race/Ethnicity, Gender, and Age on Sentencing Outcomes in U.S. Federal Courts*, Justice Quarterly, 27: 1, 1–27 (2010), at 14.

14   U.S. Dept. of Justice, Federal Bureau of Investigation, *Crime in the United States, 2009*, at Table 43.

15   Blacks account for over 39 million of the U.S. population of 307 million. *See* U.S. Census Bureau, Population Division, Table 3, *Annual Estimates of the Resident Population by Sex, Race, and Hispanic Origin for the United States: April 1, 2000 to July 1, 2009* (NC-EST2009-03), *available at* http://www.census.gov/popest/national/asrh/NC-EST2009-srh.html.

16   Whites account for 69.1 percent of all arrests in the United States. *See supra* note 14. Whites account for over 244 million of the U.S. population of 307 million (79.6 percent of the population). *See supra* note 15.

17   *The U.S. Equal Employment Opportunity Commission, Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (1982)*, Feb. 4, 1987.

18   *Id.*

19   The researchers calculated the number of years it took for individuals who were arrested for certain felony offenses at 16, 18, and 20 years old to have the same risk of arrest as same-aged non-offenders in the general population. Alfred Blumstein & Kiminori Nakamura, *"Redemption" in an Era of Widespread Criminal Background Checks*, National Institute of Justice Journal, Issue No. 263 (June 2009) at 12-13. *See also* Alfred Blumstein & Kiminori Nakamura, *"Redemption" in the Presence of Widespread Criminal Background Checks*, Criminology, Volume 47, Issue 2: 327–357 (May 2009). In another study, 18-year-olds with criminal records had a substantially similar probability of being arrested as non-offenders after not having contact with the criminal justice system for six to

seven years. Megan Kurleychek, Robert Brame & Shawn Bushway, *Scarlet Letters and Recidivism: Does An Old Criminal Record Predict Future Recidivism?* Criminology and Public Policy, Vol. 5. No.3 (2006).

20   A 20-year-old arrested for robbery had the same risk of arrest as a same-aged non-offender after 4.4 years. Blumstein & Nakamura, *supra* note 19.

21   *See "Redemption" in an Era of Widespread Criminal Background Checks, supra* note 19, at 14.

22   Examples of inaccuracies commonly found in commercially prepared background checks include records being wrongly attributed to individuals, multiple reporting of the same incidents, and uncorrected identity theft. *See* NELP & Community Legal Services of Philadelphia, *Comments to Federal Trade Commission regarding FACTA Notices* (Sept. 20, 2010), *available at* http://www.nelp.org/page/-/SCLP/2010/NELPandCLSFCRANewNoticesComments.pdf?nocdn=1. *See also*, Shawn Bushway, et al., *Private Providers of Criminal History Records: Do You Get What You Pay For?* in *Barriers to Reentry? The Labor Market for Released Prisoners in Post-Industrial America* (2007) (Based on a survey of on-line providers of criminal background checks, the study finds routine non-compliance with the worker protections of the Fair Credit Reporting Act.) *See e.g.*, *Leonardo Molina v. Roskam Baking Company*, Case No. 09-cv-475 (filed May 26, 2009, W.D. Mich.) at First Amended Complaint. The plaintiff class represented by Lyngklip & Associates, Consumer Law Center, sued the Roskam Baking Company in Michigan. Lead plaintiff, Leonardo Molina, was terminated from his job after a background check erroneously reported a conviction and two charges. Although Molina's record was actually clear, he was not given the opportunity to explain the mistakes on his background report.

23   U.S. Dept. of Justice Office of the Attorney General, *The Attorney General's Report on Criminal History Background Checks* (June 2006) at 3.

24   *See supra* note 10, Commissioner Ishimaru at 3.

25   *Arroyo v. Accenture*, Case No. 10-civ-3013 (S.D.N.Y., filed April 8, 2010), at Complaint at 1.

26   *Id.* at 7.

27   Netted $21.55 billion in revenue for fiscal year 2010. *Accenture Fact Sheet, available at* http://newsroom.accenture.com/fact+sheet/.

28   *See Hudson v. First Transit, Inc.*, Case No. C10-03158 (N.D.Cal., filed July 20, 2010), at Complaint at 1, 2, 4. The class of workers are represented by NELP and the law firms of Goldstein, Demchak, Baller, Borgen & Dardarian and Hughes Socol Piers Resnick & Dym.

29   *Mays v. BNSF*, Case No. 1:10-cv-00153 (N.D. Ill., filed Jan. 11, 2010), at Complaint at 3.

30   E-RAILSAFE, the private screening firm that operates the railroad industry's background checks, has also been the subject of a Congressional inquiry. On February 16, 2007, the U.S. House of Representatives, Committee on Homeland Security, Subcommittee on Transportation Security and Infrastructure Protections held a hearing on the impact of background checks and security clearances on the transportation workforce focused specifically on the e-RAILSAFE program. Written testimony *available at* http://homeland.house.gov/Hearings/index.asp?ID=11&subcommittee=10Subcommittee members. NELP sent a memo on this matter to the House Subcommittee on Transportation Security and Infrastructure Protections, *available at* http://www.nelp.org/page/-/SCLP/2010/Memoone-RailsafeBackgroundChecks.pdf?nocdn=1.

31   *BNSF Factsheet, available at* http://www.bnsf.com/about-bnsf/pdf/fact_sheet.pdf.

32   *Johnson, et al. v. Locke*, Case No. 10-cv-3105 (S.D.N.Y., filed April 13, 2010).

33   *Id.* at First Amended Complaint at 2. The U.S. Census "required nearly all job applicants who have ever been arrested to produce within 30 days the 'official court documentation' for any and all of their arrests . . . This requirement eliminated 93 percent of these applicants . . . [L]ess than 5 percent of applicants required to submit official court documentation ultimately were deemed eligible for hire." This policy operated in practice as very nearly a "no arrest or conviction history allowed" policy. Census hired more than one million temporary workers and 3.8 million applied for the temporary work. *Id.* at 1–2. *See also* Plaintiffs' website *available at* http://www.censusdiscriminationlawsuit.com/index.php?option=com_content&view=frontpage&Itemid=1.

34   *Id.* at 1, 26.

35   *EEOC v. Freeman*, Case No. 8:09-cv-02573 (D. Md., filed Sept. 30, 2009). Another suit, *EEOC v. Peoplemark*, Case No. 1:08-cv-907 (W.D. Mich., filed Sept. 29, 2008) was voluntarily dismissed.

36   *See* Press Release, *EEOC Files Nationwide Hiring Discrimination Lawsuit Against Freeman* (Oct. 1, 2009), *available at* http://www.eeoc.gov/eeoc/newsroom/release/10-1-09b.cfm.

37   *Id.*

38   There are several EEOC charges filed by workers against large employers across the nation, but because of pending negotiations and settlements, these employers are not named in this report.

39   NELP represents Johnny Magee, profiled in this report, who filed an EEOC charge against Lowe's. Lowe's operates more than 1,725 stores in the United States, Canada and Mexico and has approximately 238,000 employees. *See* Lowe's website, *available at* http://media.lowes.com/company+overview/.

40   NELP represents a client who filed an EEOC charge against Select Truckers Plus, a truck driver staffing company. Select Truckers Plus posted a job announcement on October 28, 2009 listing job requirements as including "No DUI/DWI in previous 5 years[,] No Felony Convictions or time served in the previous 7 years [and] No drug related or violence related misdemeanor Charges." Job ad on file with NELP. *See* Select Truckers Plus website, *available at* http://www.truckersplus.com/main.cfm?nlvl1=1.

41   Bank of America is one of the world's largest financial institutions and reported these figures in June 2010. *See* Bank of America Mid-Year Report 2010 at 6, *available at* http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9NjI0Mjd8Q2hpbGRJRD0tMXxUeXBlPTM=&t=1.

42   NELP Letter to Acting Chairman Stuart J. Ishimaru, (dated June 9, 2009), *available at* http://nelp.3cdn.net/aa8a86751197fa03ef_z2m6b5abc.pdf.

43   Figures are not specific to the U.S. *See* Manpower website, *available at* http://www.manpower.com/about/about.cfm.

44   *See* New York Correction Law §§ 752-53.

45   RadioShack operates approximately 4,000 stores. *In the Matter of the Investigation of Andrew M. Cuomo, Attorney General of the State of New York, of RadioShack Corporation, Assurance of Discontinuance*, AOD No. 09-148, at 5, *available at* http://www.ag.ny.gov/bureaus/civil_rights/pdfs/Radio%20Shack%20Executed%20AOD.pdf.

46   *Id.*

47   Chad Terhune, *The Trouble With Background Checks, Business Week* (May 29, 2008), at 4, *available at* http://www.businessweek.com/magazine/content/08_23/b4087054129334_page_4.htm.

48   *See In the Matter of the Investigation of Andrew M. Cuomo, Attorney General of the State of New York, of ChoicePoint Workplace Solutions Inc., et al., Assurance of Discontinuance*, AOD No. 09-165, at 6, *available at* http://www.ag.ny.gov/bureaus/civil_rights/pdfs/ChoicePoint%20AOD.pdf.

49   *Id. See also* New York Executive Law §§ 296 (15), (16); New York Correction Law §§ 752-53.

50   *See In the Matter of the Investigation of Andrew M. Cuomo, Attorney General of the State of New York, of ABM Industries Inc., Assurance of Discontinuance*, AOD No. 10-173, at 4.

51   *Id.* at 5.

52   *See In the Matter of the Investigation of Andrew M. Cuomo, Attorney General of the State of New York, of Aramark Corporation, Assurance of Discontinuance*, AOD No. 09-164, at 5.

53   *See supra* notes 45, 48, 50, and 52.

54   15 U.S.C. § 1681b(b)(3).

55   *See* Bushway, *et al.*, *supra* note 22.

56   *See Williams v. Prologistix*, Case No. 1:10-cv-00956 (N.D. Ill., filed Feb. 11, 2010); *Smith v. HireRight Solutions, et al.*, Case No. 4:10-cv-444 (N.D. Okla., filed July 7, 2010); *Henderson v. HireRight Solutions, et al.*, Case No. 10-cv-443 (N.D. Okla., filed July 7, 2010); *Hunter v. First Transit*, Case No. 1:09-cv-06178 (N.D. Ill.; filed Oct. 5, 2009); *Joshaway v. First Student*, Case No. 2:09-cv-02244 (C.D. Ill., filed Oct. 5, 2009); *Ryals v. HireRight Solutions, et al.* Case No. 3:09-cv-00625-RLW (E.D. Va., filed Oct. 5, 2009).

57   *See id.; see also Williams v. LexisNexis Risk Mgmt.*, Case No. 3:06cv241 (E.D. Va., filed April 10, 2006).

58   The two lawsuits produced settlements requiring civil penalties of $53,000 and $24,000, respectively. See Press Release, *Two Companies Pay Civil Penalties to Settle FTC Charges; Failed to Give Required Notices to Fired Workers and Rejected Job Applicants* (Aug. 11, 2009), *available at* http://www.ftc.gov/opa/2009/08/qts.shtm.

59   Cities, counties, or areas listed in the United States are *available at* http://www.craigslist.org/about/sites#US. Craigslist Factsheet, *available at* http://www.craigslist.org/about/factsheet.

60   NELP's survey focused on five low-wage and/or low-skill industries in five major cities across the United States. The job categories surveyed on Craigslist included: (1) Customer Service; (2) Food/Beverage/Hospitality; (3) Manufacturing; (4) Retail/Wholesale; and (5) Skilled Trade/Craft. *See e.g.*, Craigslist website for list of job categories, *available at* http://sfbay.craigslist.org/.The five major cities were the San Francisco Bay Area, Los Angeles, Chicago, New York City, and Atlanta. Sampling four random month-long time periods during 2010, the survey found over 2500 job ads that referenced a criminal background check requirement. Among these approximately 2500 ads, over 300 included the most overt and problematic type of screening criteria featured in this report. (Job ads on file with NELP.) If this survey were expanded to include all U.S. geographic areas where Craigslist operates and all the listed occupations over a more extended time period, there would certainly be thousands of postings by employers and staffing firms communicating blanket policies against hiring people with criminal records. Further, these findings do not take into account that many employers have such policies in place but do not communicate their hiring restrictions in their job postings. Thus, the results of this survey represent just the tip of the iceberg among the thousands of employers each year that have a blatant—even documented in writing—blanket, no-hire policy.

61   *See* EEOC Arrest Record Guidance, *supra* note 13.

62   *See supra* note 1, at 5.

63   OMNI Energy Services Corp. specializes in providing services and rental equipment to geophysical companies and offshore operations. In 2009, the total revenue was $122.4 million and they have approximately 625 employees. *See* OMNI Energy Services Corp. website, *available at* http://www.omnienergy.com/uploads/AnnualReport2009.pdf.

64   *See* EEOC Arrest Record Guidance, *supra* note 13.

65   This is because it "is generally presumed that an employer only asks questions which he/she deems relevant to the employment decision." *See id.*

66   As noted in the EEOC Arrest Record Guidance, *see id.*, numerous states have either prohibited or advised against pre-employment inquiries regarding arrest information, including New York, Hawaii, Oregon, Wisconsin, New Jersey, Ohio, Virginia, District of Columbia, California, Maryland, Minnesota, Utah, Washington, West Virginia, Arizona, Colorado, Idaho, Massachusetts, Michigan, and Mississippi.

67   *See id.*

68   CORT is the world's largest provider of rental furniture and has more than 2,000 employees. *See* CORT rental furniture website, *available at* http://www.cort.com/about-cort.

69   Fiscal year 2010 indicated $7.4 billion in revenue and a workforce of more than 67,000; however, these figures are not U.S. specific. *See* FedEx Ground Facts, *available at* http://about.fedex.designcdt.com/our_company/company_information/fedex_ground.

70   Corinthian International Parking Services Inc. is a full-service parking management company employing more than 400 people from San Jose to Sacramento. *See* Corinthian International Parking Services website, *available at* http://www.corinthianparking.com/home.html.

71   Luskin-Clark Service Company is a provider of plumbing, heating, air conditioning, electrical and home improvement in Los Angeles County. *See* Luskin-Clark Service company website, *available at* http://www.luskinservicecompany.com/. The website LinkedIn indicated that there were approximately 100 employees, *available at* http://www.linkedin.com/companies/luskin--clark-service-company.

72   This example is based on one discussed in the EEOC guidance to illustrate the evaluation of records. *See* EEOC Arrest Record Guidance, *supra* note 13, at *Example 2*.

73   Domino's Pizza has nearly 600 corporate-owned stores and a system of more than 5,000 domestic franchise-owned stores; the company has approximately 170,000 employees worldwide. *See* Domino's Pizza Financial Tearsheet, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=135383&p=tearsheet.

74   Omni Hotels has 45 luxury hotels and resorts across North America and 11,000 employees. *See* Omni Hotels website, *available at* http://www.omnihotels.com/AboutOmniHotels/OmniHotels.aspx. The ad was for Omni Los Angeles.

75   Altaquip is a service company for powered equipment and tool repairs and has 27 locations. The website for the company does not list the number of employees. *See* Altaquip website, *available at* http://www.altaquip.com/About-Us/CareerOpportunities.aspx. One website reported that Altaquip has 500 employees. *See* http://www.insideview.com/directory/altaquip-llc.

76   Adecco USA is a recruiting and staffing company. *See* Adecco USA website, *available at* http://www.adeccousa.com/Pages/Welcome.aspx.

77   *See* Blumstein & Nakamura, *supra* note 19.

78   *See* Enforcement Guidance: *Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms*, at Question 7 (Dec. 1997), *available at* http://www.eeoc.gov/policy/docs/conting.html. *See also* 42 U.S.C. § 2000e-2.

79   Perimeter Staffing is a staffing agency based in Atlanta. *See* Perimeter Staffing website, *available at* http://www.perimeterstaffing.com/.

80   Carlisle Staffing, Ltd. is a temporary, temp-to-hire and direct hire staffing agency in the Chicago-land area and suburbs. *See* Carlisle Staffing, Ltd. website, *available at* http://www.carlislestaffing.com/pdfs/Carlisle%20Staffing%20Summary%20of%20Services.pdf.

81   Abbott Staffing Group serves the Orange County, Los Angeles and the Inland Empire. *See* Abbott Staffing Group website, *available at* http://www.abigailabbott.com/Home.aspx.

82   Crown Services Inc. is a staffing firm operating in 9 Midwestern states with more than 35 offices. *See* Crown Services Inc. website, *available at* http://www.crownservices.com/about.html.

83   Peak Organization is a staffing firm in New York City. *See* Peak Organization website, *available at* http://www.peakorg.com/index.html.

84   *See* Federal Procurement Data System - Next Generation Top 100 Contractors Report (2009), *available at* https://www.fpds.gov/fpdsng_cms/index.php/reports.

85   These companies were identified as having contracts with the federal government through the online database the Federal Procurement Data System – Next Generation (FPDS-NG). FPDS-NG data provides details on the procurement activities of more than 60 federal departments, *available at* https://www.fpds.gov/fpdsng_cms/index.php.

86   Executive Order 11246 prohibits federal contractors and federally-assisted construction contractors and subcontractors who have over $10,000 in government business (in one year) from discriminating in employment decisions on the basis of race, color, religion, sex, or national origin. *See Facts on Executive Order 11246—Affirmative Action* (Jan. 4, 2002), *available at* http://www.dol.gov/ofccp/regs/compliance/aa.htm.

87   Press Release, *Attorney General Eric Holder Convenes Inaugural Cabinet-Level Reentry Council* (Jan. 5, 2011), *available at* http://www.justice.gov/opa/pr/2011/January/11-ag-010.html.

88   Press Release, *Mayoral Task Force Releases Recommendations on Prisoner Reentry*, (Jan. 24, 2006), *available at* http://www.chicagometropolis2020.org/documents/prisonerreentrypressrelease.pdf. *See also Breaking The Cycle of Incarceration and Building Brighter Futures In Chicago: Final Report of The Mayoral Policy Caucus on Prisoner Reentry* (Jan. 2006).

89   A "federal contractor" includes companies that provide goods or services to a federal agency, receives federal funds for a construction project, or provides goods or services to another company that supplies a federal agency or receives construction funds. U.S. Dept. of Labor, OFCCP, *New Contractors' Guide* (Aug. 2009) at 4, *available at* http://www.dol.gov/ofccp/TAguides/New_Contractors_Guide.pdf.

90   "Nearly one in four American workers is employed by an establishment that receives federal funds for contracted work. That's nearly 200,000 businesses with contracts totaling almost $700 billion." Keynote Address by Patricia A. Shiu, Director of the Office of Federal Contract Compliance Programs at the U.S. Dept. of Labor (Sept. 30, 2010), *available at* http://www.dol.gov/ofccp/addresses/Hard_Hatted_Women.htm.

91   *See* NELP Presentation to EEOC, *Criminal Background Checks for Employment: Promoting Model Federal Hiring & Contractor Policies that Protect Civil Rights & Public Safety* (April 21, 2010), *available at* http://www.nelp.org/page/-/SCLP/2010/PresentationNationalEEO.pdf?nocdn=1.

92   Currently, federal government hiring is proscribed by "suitability" standards established by the Office of Personnel Management (5 C.F.R. part 731), which provides individual federal agencies with guidelines and discretion to adopt their own criminal background check policies and procedures. In addition, federal employers are regulated by Title VII and by post 9/11 security procedures (Homeland Security Presidential Directive/HSPD-12) requiring a criminal background check on anyone who works on a regular basis on federal premises. *Homeland Security Presidential Directive/HSPD–12—Policy for a Common Identification Standard for Federal Employees and Contractors*, Public Papers of the President, George W. Bush, Vol. 2, Aug. 27, 2007, p. 1765 (2007). *See also NASA, et al., v. Nelson, et al.*, 131 S. Ct. 746

(2011) for discussion of federal employer security procedures. Opinion *available at* http://www.supremecourt.gov/opinions/10pdf/09-530.pdf. Within broad guidelines established by the Office of Management and Budget, each federal agency also establishes its own screening standards and protections that apply to their contractors.

93   *See* NELP Presentation at National EEO Directors' Meeting (April 2010), at 8–10, *available at* http://www.nelp.org/page/-/SCLP/2010/PresentationNationalEEO.pdf?nocdn=1. In fact, the federal government's Office of Personnel Management regulation states, "[b]ecause suitability issues may not arise until late in the application/appointment process, it is generally more practical and cost-effective to first ensure that the applicant is eligible for the position." 7 C.F.R. § 731.103.

94   *See* National League of Cities & NELP, *Cities Pave the Way: Promising Reentry Policies that Promote Local Hiring of People with Criminal Records*, (July 2010) at Appendix, *available at* http://www.nelp.org/page/-/SCLP/2010/ CitiesPavetheWay.pdf?nocdn=1 (hereinafter Cities Pave the Way); *see also* NELP, *New State Initiatives Adopt Model Hiring Policies Reducing Barriers to Employment of People with Criminal Record* (Sept. 2010), *available at* http://www.nelp.org/ page/-/SCLP/ ModelStateHiringInitiatives.pdf?nocdn=1 (hereinafter *State Initiatives*).

95   5 C.F.R. §731.301.

96   The growing numbers of designated "exempt" workers employed by the federal government now exceeds the number of workers classified as "civil service" workers. Compared to civil service employees, the federal agencies that employ "exempt" workers are not bound by the OPM's procedural protections that apply to criminal background checks for employment.

97   The FBI should work with federal agencies and contractors to improve the accuracy of the FBI rap sheets that are generated in response to criminal background check requests. As documented by the U.S. Attorney General, 50 percent of these records are incomplete because the states fail to regularly update the arrest information submitted to the FBI. *See supra* note 23. As a result, the entire burden of correcting the records falls on the workers, which significantly delays the hiring process and has a disparate impact on workers of color. *See* NELP, *A Scorecard on the Post-9/11 Port Worker Background Checks: Model Worker Protections Provide a Lifeline for People of Color, While Major TSA Delays Leave Thousands Jobless During the Recession* (July 2009), *available at* http://nelp.3cdn.net/0714d0826f3e cf7a15_70m6i6fwb.pdf (hereinafter *A Scorecard*). As proposed by the Fair and Accurate Criminal Background Checks Act (H.R. 5300), the FBI should update these records before they are released to the federal agencies. *See* NELP, *Fairness & Accuracy in Employment Background Checks Act (H.R. 5300) Factsheet, available at* http://nelp.3cdn.net/2458609645a577413b_dum6ii6rb.pdf.

98   *See* 46 U.S.C. §70105.

99   *See A Scorecard, supra* note 97.

100  *See* NELP Presentation to EEOC, *Federal Hiring & Contractor Policies that Protect Civil Rights & Public Safety* (April 21, 2010), *available at* http://www.nelp.org/ page/-/SCLP/2010/PresentationNationalEEO. pdf?nocdn=1.

101  *See supra* note 45, at 8–13.

102  *See Cities Pave the Way, supra* note 94.

103  Cities that require vendors to adhere to fair hiring policies include: Boston, MA; Cambridge, MA; Worchester, MA; New Haven, CT; and Hartford, CT; and Battle Creek, MI. *See id.*, at Appendix.

104  Massachusetts, Wisconsin, Hawaii, Pennsylvania, and New York require private employers to adhere to various fair hiring measures. *See State Initiatives, supra* note 94.

105  *See* FactSheet distributed by the Massachusetts Commission Against Discrimination (MCAD), *available at* http://www.mass.gov/mcad/documents/Criminal%20 Records%20Fact%20Sheet.pdf.

106  The Craigslist disclaimer in the housing context indicates that "stating a discriminatory preference in a housing post is illegal" and provides a link to a factsheet describing basic information about the Fair Housing Act, *available at* http://sfbay.craigslist.org/about/FHA.

107  Order for Release from Penalties and Dismissal Under P.C. 1203.4 (filed July 22, 2008).

108  *See* NELP Press Release (dated Nov. 20, 2008), *available at* http://www.nelp.org/page/-/SCLP/MaGeeEEOCRelease. pdf.

109  *See* Dawn Turner Trice, *CPS: Good Conduct certificate not good enough*, Chicago Times (July 29, 2010), *available at* http://articles.chicagotribune.com/2010-07-29/news/ ct-met-trice-cps-0728-20100728_1_cps-boiler-room-second-chance; Dawn Turner Trice, *CPS reverses itself, gives job candidate a 2nd chance: Worker was haunted by 25-year-old conviction*, Chicago Times (Sept. 26, 2010), *available at* http://articles.chicagotribune.com/2010-09-26/news/ ct-met-trice-langdon-0926-20100926_1_cps-for-four-years-darrell-langdon-cps-spokeswoman-monique-bond.

110  *See Arcadia Murillo v. City of Chicago and Triad Consulting Services, Inc.*, Case No. 10CH36826 (Cir. Ct. Cook County, filed Aug. 25, 2010). Plaintiff is represented by Hughes Socol Piers Resnick & Dym.

design: www.isondesign.com



75 Maiden Lane, Suite 601, New York, NY 10038 | 212-285-3025 | **www.nelp.org**