IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ADRIAN SINGLETON, et al.      :

                           :

    v.                     :   Civil Action No. DKC 11-1823

                           :

DOMINO'S PIZZA, LLC      :

                           :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this class action arising under the Fair Credit Reporting Act ("FCRA") are unopposed motions filed by Plaintiffs (ECF Nos. 73, 74) seeking an order that: (1) grants final approval of the Amended Class Action Settlement Agreement ("Amended Settlement Agreement") (ECF No. 67-1) between Plaintiffs and Defendant Domino's Pizza LLC ("Domino's" or "Defendant"); (2) grants final certification of the Settlement Classes pursuant to Federal Rule of Civil Procedure 23; (3) approves a payment of $750,000.00 to class counsel for their attorneys' fees; (4) approves a payment of $13,339.84 to class counsel for litigation expenses; (5) approves a payment of $89,208.63 in administrative expenses to Kurtzman Carson Consultants, LLC ("KCC" or "Settlement Administrator"), an independent third party that will administer the Settlement Agreement; (6) approves incentive payments to Adrian Singleton and Justin D'Heilly ("Named Plaintiffs") in the

amount of $2,500 each; and (7) dismisses this action with prejudice, with the court to retain jurisdiction over the interpretation, enforcement, and implementation of the settlement agreement and the final order. For the following reasons, the motions will be granted, although the attorneys' fees will be reduced.

## I. Background

The Named Plaintiffs are former employees of Domino's. On July 1, 2011, Mr. Singleton filed this FCRA lawsuit against Domino's as a putative class action. (ECF No. 1). After Domino's moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on August 15, 2011 (ECF No. 13), the Named Plaintiffs filed an amended complaint as of right on September 3, 2011 (ECF No. 19). The amended complaint alleges that Domino's willfully violated the FCRA in two ways: (1) by using a "Background Investigation and Consent" form ("BIIC Form") containing a liability release to procure consumer reports on existing and prospective employees; and (2) by taking adverse employment actions against existing and prospective employees based, in whole or in part, on information contained in a consumer report without first providing the individuals with notice and a copy of the report. (*Id.* ¶¶ 16-32). Based on these allegations, the amended complaint asserts the following three counts under the FCRA: (1) failure to provide a copy of

consumer report in violation of the FCRA; (2) failure to make proper disclosure in violation of the FCRA; and (3) failure to obtain proper authorization in violation of the FCRA. (*Id.* ¶¶ 62-78). On behalf of themselves and a putative class of Domino's employees and job applicants, the Named Plaintiffs sought a declaration that Domino's committed multiple willful violations of the FCRA; an award of statutory damages pursuant to the FCRA; and reasonable attorneys' fees and costs. (*Id.* ¶¶ 52-61, 79).

On September 26, 2011, Domino's again moved to dismiss (ECF No. 22), but the motion was denied on January 25, 2012. (ECF Nos. 25 & 26). After Domino's answered on February 8, 2012 (ECF No. 34) and following the denial of the Named Plaintiffs' motion for class certification without prejudice (ECF No. 39), the parties jointly moved to stay the action pending mediation (ECF No. 44). Prior to the entry of the stay on August 13, 2012 (ECF No. 45), the parties had engaged in limited written discovery, including the exchange of initial disclosures and the issuance of interrogatories and requests for production (*see* ECF No. 61-1, at 3).

On September 24, 2012, after Domino's produced additional documents, the parties engaged in all-day arms-length settlement negotiations with the aid of a private mediator. (*Id.*). After several extensions of the stay and further negotiations, the

parties prepared a Settlement Agreement on March 11, 2013 to resolve this action on a class basis, subject to approval by the court. (ECF No. 61-3). On that same day, the Named Plaintiffs filed an unopposed motion seeking an order that: (1) preliminarily approved the Settlement Agreement; (2) conditionally certified the three settlement classes proposed in the Settlement Agreement; (3) appointed the Named Plaintiffs as class representatives; (4) appointed Nichols Kaster, PLLP, as class counsel; (5) approved the form and method of notice proposed in the Settlement Agreement; and (6) scheduled a final fairness hearing. (ECF No. 61).

On May 7, 2013, counsel for the parties appeared for a hearing on Plaintiffs' unopposed motion to address certain areas of concern with the proposed Settlement, including: the periods of time encompassed by the proposed settlement classes; the claims submission process; the readability of the proposed short- and long-form notices; the need for the proposed notices to distinguish between statutory and actual damages under the FCRA; the documentation that will be needed to support any award of attorneys' fees and incentive awards for the Named Plaintiffs; the estimated costs of notice and settlement administration; the likelihood that the settlement funds will be depleted depending on estimated response rates; the *cy pres* beneficiaries selected by the parties; and the timeline for

distributing notice, submitting claims, raising objections, and granting final approval and final certification. (ECF No. 65).

After the May 7, 2013 hearing, the parties submitted an Amended Settlement Agreement and renewed their motion for preliminary approval of the settlement. (ECF. No. 67-1).[1] In very basic terms, the Amended Settlement Agreement proposes three settlement classes: an "Applicant Class," a "Multiple MVR Check Class," and an "Adverse Action Class" (collectively, "Settlement Classes") (*Id.* ¶ 1). The Amended Settlement Agreement further provides that Domino's will contribute $2.5 million to a "Settlement Fund" to be distributed – after deductions for a court-approved award of attorneys' fees in an amount up to thirty (30) percent of the total Settlement Fund, litigation expenses, and settlement administration costs – in *pro rata* amounts among the members of the three proposed settlement classes who submit a timely claim, subject to certain caps. (*Id.* ¶¶ 21-26). In exchange, the members of the proposed Settlement Classes who do not exclude themselves from the

---

[1] The Amended Settlement Agreement includes the same key terms as the original Settlement Agreement, except that it (1) contains revised definitions of the three proposed Settlement Classes that establish a definite end date for closure of the classes; and (2) attaches amended versions of the short- and long-form notices that address the court's concerns regarding readability and the need to distinguish between actual and statutory damages under the FCRA. (*See* ECF No. 67-1).

settlement in a timely manner agree to release Domino's from any and all claims that relate directly or indirectly to the facts that are, or could have been, alleged in the amended complaint, including but not limited to any and all claims under the FCRA. (*Id.* ¶ 29). In consideration for a $2,500 incentive award to each Named Plaintiff that is subject to court approval, the Named Plaintiffs agree to a general release of Domino's. (*Id.* ¶ 30). Any amounts remaining in the Settlement Fund after these distributions shall be divided equally between Domino's and a *cy pres* charitable donation, half of which will be given to the Center for Employment Opportunities and the other half to St. Jude Children's Research Hospital. (*Id.* ¶ 28).[2]

On May 13, 2013, the court issued a memorandum opinion and order ("the Preliminary Approval Order") preliminarily approving the Settlement Agreement as fair, reasonable, and adequate within the meaning of Fed.R.Civ.P. Rule 23(e), subject to further consideration at the final fairness hearing. (ECF No. 69). The Preliminary Approval Order conditionally certified the three Settlement Classes, appointed Nichols Kaster, PLLP, as class counsel and KCC as Settlement Administrator, and provided

---

[2] "[A] *cy pres* distribution is designed to be a way for a court to put any unclaimed settlement funds to their 'next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class.'" *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (*quoting Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2nd Cir. 2007)).

that completed Claim Forms must be postmarked on or before August 26, 2013 and Opt-Out requests must be postmarked by July 27, 2013. (ECF No. 67-1, at 51-52).

On June 27, 2013, KCC mailed 45,668 postcards to potential class members, after removing duplicative entries in the member list Domino's provided. (ECF No. 80 ¶ 6). By the time for filing claims and opting out expired, 6,739 individuals submitted Claim Forms and seven (7) individuals opted-out. (*Id.* ¶ 19; *see also* ECF No. 78, at 19).

On September 16, 2013, Plaintiffs filed an unopposed motion seeking final approval of the Amended Settlement Agreement (ECF No. 73) and an unopposed motion for attorneys' fees, litigation expenses, administrator costs, and incentive awards for the Named Plaintiffs (ECF No. 74). Although Domino's continues to deny vigorously the allegations of the amended complaint and any liability under the FCRA, it agreed to the Amended Settlement Agreement based on, *inter alia*, the expense and disruption posed by further litigation. Class counsel, in turn, represents that the Amended Settlement Agreement is in the best interests of the Named Plaintiffs and the members of the Settlement Classes, considering the substantial risks associated with continued litigation, including the possibility that Domino's might prevail.

## II. Analysis

The following issues remain: whether the Rule 23 Settlement Classes should receive final certification; whether the Amended Settlement Agreement is fair, reasonable, and adequate; and whether class counsel's request for attorneys' fees and litigation expenses, as well as payment for administrative costs to KCC and incentive payments to the Named Plaintiffs, should be granted.

### A. Rule 23 Class Certification

A class action will be certified only if it meets the four prerequisites identified in Rule 23(a) and also fits within one of the three subdivisions of Rule 23(b). The United States Supreme Court has held that district courts must pay "undiluted, even heightened attention" to class certification requirements in the settlement context. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (internal quotation marks omitted); *see also Grice v. PNC Mortg. Corp. of Am.*, No. CIV.A.PJM-97-3084, 1998 WL 350581, at *2 (D.Md. May 21, 1998) ("Despite the parties' agreement, class certification must be carefully scrutinized.").

### 1. Rule 23(a) Prerequisites

Rule 23(a) provides as follows:

> (a)Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of

all members is impracticable; (2) there are
questions of law or fact common to the
class; (3) the claims or defenses of the
representative parties are typical of the
claims or defenses of the class; and (4) the
representative parties will fairly and
adequately protect the interests of the
class.

Based on a review of the parties' submissions, the Rule 23
Settlement Classes meet the numerosity, commonality, typicality,
and adequacy requirements.

**a. Numerosity**

Although there is no precise threshold for determining
numerosity, *see Gen. Tel Co. v. E.E.O.C.*, 446 U.S. 318, 330
(1980), the Rule 23 Settlement Classes, which consist of more
than 45,000 individuals (ECF No. 80 ¶ 10), is substantially
larger than other classes that have been certified in the Fourth
Circuit. *See, e.g., In re Kirschner Med. Corp. Sec. Litig.*, 139
F.R.D. 74, 78 (D.Md. 1997) (observing that a class size of 25 to
30 members raises a presumption that the numerosity requirement
is met). Moreover, numerosity is satisfied where joinder of all
putative class members would prove to be "impracticable."
*Hewlett v. Premier Salons Int'l Inc.*, 185 F.R.D. 211, 215 (D.Md.
1997) (explaining that practicability of joinder depends on a
variety of factors, including the geographic dispersion of
putative class members and the size of their claims). When a
class is large - as is the case here - the numbers alone may

allow the court to presume impracticability of joinder. *Id.;*
*see also Stanley v. Central Garden and Pet Corp.*, 891 F.Supp.2d
757, 770 (D.Md. 2012) ("Classes of as few as 25 to 30 have been
found to 'raise[] the presumption that joinder would be
impracticable.'" (*quoting In re Kirschner Med. Corp. Sec.
Litig.*, 139 F.R.D. at 78)). Finally, the fact that Settlement
Class members are dispersed throughout the country (ECF No. 73-
1, at 16) further militates against joinder.

### b. Commonality

To establish commonality, the party seeking certification
must "demonstrate that the class members have suffered the same
injury" and that their claims "depend upon a common contention."
*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011)
(internal quotation marks omitted). "That common contention,
moreover must be of such a nature that it is capable of
classwide resolution – which means that determination of its
truth or falsity will resolve an issue that is central to the
validity of each one of the claims in one stroke." *Id.*
"Factual differences among class members will not necessarily
preclude certification 'if the class members share the same
legal theory.'" *Stanley*, 891 F.Supp.2d at 771 (*quoting
Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551,
556 (D.Md. 2006)).

Here, there are numerous questions of law and fact common to the Settlement Classes. These include, but are not limited to the following:[3] (1) whether Domino's violated the FCRA by using the BIIC Form to obtain consent from prospective and/or current employees to procure consumer reports for employment purposes, which BIIC form was allegedly not a "stand-alone document" and included a liability release;[4] (2) whether Domino's violated the FCRA by failing to provide employees with copies of their consumer reports and pre-adverse action notice; (3)

_____

[3] The relevant time period for the alleged violations is July 1, 2009 through April 30, 2013, inclusive. (ECF No. 67-1, at 4, Amended Settlement Agreement). The conduct at issue, however, ceased by October 25, 2009 for job applicants and by April 9, 2012 for current employees, when Domino's reprogrammed the software which automated the process for sending the adverse action notices. (*See* ECF No. 70, at 4, 7, Hr'g. Tr.).

[4] 15 U.S.C. § 1681b(b)(2)(A)(i) provides that:

> [e]xcept as provided in subparagraph (B), [which covers application by mail, telephone, computer, or other similar means,] a person may not procure a consumer report, or cause a consumer report to be procured for employment purposes with respect to any consumer, unless -- (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists *solely* of the disclosure, that a consumer report may be obtained for employment purposes.

(emphasis added). Plaintiffs allege that the BIIC form did not actually qualify as a "standalone document" because it was part of the company's employment application and contained a liability release. (ECF No. 19 ¶ 71).

whether Domino's violated the FCRA by procuring or causing to be procured employees' motor vehicle records based on a BIIC form containing a liability release; and (4) whether Domino's acted willfully. The legal issue common to all class members is whether Domino's willfully violated the FCRA by the alleged conduct. *See Serrano v. Sterling Testing Systems, Inc.*, 711 F.Supp.2d 402, 411 (E.D.Pa. 2010) (finding commonality where class members sought statutory damages under the FCRA and the case turned on whether Defendant's alleged conduct was willful). Based on the foregoing, the Rule 23(a)(2) commonality requirement is satisfied.

### c. Typicality

The United States Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 158 n.13 (1982). To "show typicality the claims of class members must be fairly encompassed by the class representative's claims." *Stanley*, 891 F.Supp. 2d at 770. The typicality requirement focuses on "whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 217 (D.Md. 1997). As discussed in *Hewlett*, a plaintiff's claim may factually differ and still be "typical" of

class member claims, if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Id.* (quotations omitted). The representative's claim need not "be perfectly identical [to] or perfectly aligned" with the claims of class members, so long as any variation does not "strike[] at the heart of the respective causes of actions." *Id.* at 467.

Both of the Named Plaintiffs' claims are typical. Mr. D'Heilly, who worked as a delivery driver in one of Domino's Minnesota stores, completed the BIIC form as part of the application packet. (ECF No. 19 ¶ 34). Domino's terminated him in October 2009; Mr. D'Heilly's general manager advised him that he could no longer work as a delivery driver "because something had come up on a background check relating to his motor vehicle history." (*Id.* ¶ 48). Mr. D'Heilly received no additional information regarding his termination, and Domino's never provided him with a copy of the background check. Similarly, Mr. Singleton applied to work as a delivery driver at one of the company's Maryland stores and completed the BIIC form as part of the application package. Mr. Singleton then began work, but several weeks into his employment, he learned that a "potential issue" had arisen with his employment application and that he had not been scheduled to work any additional hours. (*Id.* ¶

28). Mr. Singleton subsequently submitted a second employment application, but did not receive any work. Instead, several days later, Mr. Singleton received a letter from Domino's, entitled "FCRA Letter 2," withdrawing the employment offer based, at least in part, on information Domino's obtained from Mr. Singleton's consumer report. (*Id.* at 50). Although the letter indicated that Mr. Singleton "previously should have received a copy of [his] consumer report," Mr. Singleton had not previously received a copy of the referenced report and Domino's never provided him with the information from the consumer report that influenced its employment decision. The Named Plaintiffs' allegations that Defendant willfully violated the FCRA arise from a unified practice or course of conduct by Domino's, and like the other class members, Named Plaintiffs seek statutory damages for the alleged violations. Ultimately, "as goes the claim of the [Named Plaintiffs,] so go the claims of" the Rule 23 Settlement Classes. *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).

### d. Adequacy

Finally, Rule 23(a)(4) requires "representative parties [who] will fairly and adequately protect the interests of the class." Representation is adequate if: (1) the named plaintiff's interests are not opposed to those of other class members, and (2) the plaintiff's attorneys are qualified,

14

experienced, and capable. *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 558 (D.Md. 2006).

Here, the Named Plaintiffs' interests are aligned with those of the class members. Specifically, the Named Plaintiffs share an interest with class members in establishing Domino's policies during the relevant period and showing that Domino's willfully violated the FCRA by using the BIIC form that included both disclosure and authorization information related to retrieval of consumer reports and a liability release. Further, Named Plaintiffs seek to show that Domino's willfully violated the FCRA by failing to provide employees with copies of their consumer reports and pre-adverse action notices. Finally, as noted in the Preliminary Approval Order (ECF No. 69, at 11), the attorneys at Nichols Kaster, PLLP are qualified, experienced, and competent, as evidenced by their background in litigating class-action cases involving FCRA violations. (*see* ECF No. 75-1).

Accordingly, the Rule 23 Settlement Class satisfies each of the Rule 23(a) prerequisites.

### 2. Rule 23(b) Requirements

Plaintiffs invoke Rule 23(b)(3), which permits a class action to be maintained only if it can be concluded that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2)

"a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

The predominance inquiry focuses on whether liability issues are subject to class-wide proof or require individualized and fact-intensive determinations. *Cuthie v. Fleet Reserve Ass'n*, 743 F.Supp.2d 486, 499 (D.Md. 2010). Deciding whether common questions predominate over individual ones involves a qualitative, rather than quantitative, inquiry. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003).

As set forth above, common questions among the Rule 23 Settlement Classes predominate. The "Applicant Class" would have to show that Domino's violated the FCRA by procuring or causing to be procured a consumer report based on a BIIC form that prospective applicants complete, which form contained a liability release. The "Multiple MVR Check Class" would have to show that Domino's procured or caused to be procured during their employment a consumer report containing motor vehicle records based on the BIIC form which contained a liability release. Finally, the "Adverse Action Class" would need to establish that Domino's took an adverse employment action against prospective and current employees without sending a pre-adverse action notice and/or copy of the consumer report on which the adverse action was taken. All class members seek statutory damages for the alleged FCRA violations, and would

need to establish willfulness in order to recover under the FCRA. Thus, the dispositive issue here is whether Domino's alleged conduct constituted willful violations of the FCRA. The predominance requirement is met.

With respect to the superiority prong of Rule 23(b)(3), four factors generally should be considered:

> (i) the strength of the individual class members' interest in controlling the prosecution and defense of a separate action, (ii) the extent and nature of existing litigation already begun by or against class members, (iii) the desirability or undesirability of concentrating the litigation in the single forum selected by the class plaintiffs, and (iv) the likely difficulties in managing the class action.

*Lloyd v. Gen. Motors Corp.*, 275 F.R.D. 224, 228 (D.Md. 2011).

Here, each of these factors weighs in favor of final certification. There is no evidence that class members have separately initiated litigation against Domino's for the same alleged violations. There is also no indication that the absent class members would prefer to prosecute this action individually, particularly in light of the relatively modest amount of statutory damages available under the FCRA. *See Amchem Prods. V. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her

rights."). In any event, if any class members wished to initiate individual lawsuits, they had the choice to opt out, which seven individuals did here after receiving notices of the instant lawsuit. Further, concentrating litigation of the class members' claims in the Southern Division of the District of Maryland is desirable given that Domino's regularly conducts business in Maryland. (ECF No. 19, at 4). Finally, manageability concerns are irrelevant when a class is being certified only for settlement purposes. *See Amchem Prods.,* 521 U.S. at 620. On balance, the superiority requirement is satisfied.

In sum, because the Rule 23 Settlement Classes satisfy the requirements of both Rule 23(a) and 23(b)(3), final certification will be granted.

## B. Final Approval of the Settlement Agreement

Pursuant to Rule 23(e), a settlement agreement that binds members of a class action can only be approved upon a "finding that it is fair, reasonable, and adequate." "The 'fairness' prong is concerned with the procedural propriety of the proposed settlement agreement, while the 'adequacy' prong focuses on the agreement's substantive propriety." *In re Am. Capital S'holder Derivative Litig.*, Civ.Nos.11-2424 PJM, 11-2428 PJM/AW, 11-2459 PJM, 11-2459 RWT, 2013 WL 3322294, at *2 (D.Md. June 28, 2013).

### 1. Fairness

In evaluating the fairness of a proposed settlement, the following factors must be considered: (1) the presence or absence of collusion among the parties; (2) the posture of the case at the time settlement is proposed; (3) the extent of discovery that has been conducted; and (4) the circumstances surrounding the negotiations and the experience of counsel. *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F.Supp. 1379, 1383-84 (D.Md. 1983). The fairness inquiry serves to protect against the danger that counsel might "compromis[e] a suit for an inadequate amount for the sake of insuring a fee." *Id.* at 1383 (internal quotation marks omitted).

Here, each of the fairness factors weighs in favor of final approval. The record indicates that the Amended Settlement Agreement is a product of good faith negotiations following mediation. (*See* ECF No. 75, at 2). In particular, class counsel represents that in the weeks leading up to mediation, "the parties also exchanged lengthy formal mediation briefs setting forth their views on the merits of Plaintiffs' case, including the parties' respective positions on class certification, the merits, and damages." (*Id.*). After an all-day mediation on September 24, 2012, the parties "exchanged approximately 100 emails, 8 drafts of the term sheets, 9 drafts of the settlement agreement, 11 drafts of the notice documents,

and participated in numerous phone calls regarding the settlement terms." (*Id.*). As class counsel represents, "even after the monetary terms of the Settlement were decided, the parties continued to vigorously negotiate all aspects of the settlement, from the language to be included in the notices to the content of the [Interactive Voice Response] script that Settlement Class members would hear when they contacted the administrator." (ECF No. 73-1, at 26).[5] Moreover, nothing in the record hints of collusion.

With respect to the posture of the case, the parties reached the Amended Settlement Agreement after exchanging discovery. For instance, the parties litigated the case since Plaintiffs filed the complaint on July 1, 2011, exchanged initial disclosures, participated in a Rule 16 conference with the court, and "Defendant had responded to Plaintiffs' interrogatories and requests for production and had produced more than 600 pages of documents, which Plaintiffs reviewed." (ECF No. 75 ¶ 2). As noted above, both parties also exchanged briefs before mediation setting forth their respective positions. Furthermore, the parties negotiated settlement in mediation after Defendant filed a motion to dismiss, which was fully briefed, and which the court denied. (ECF No. 25). It

---

[5] By the time the Settlement was negotiated, Domino's was no longer using the allegedly offending forms and practices. (*See* ECF No. 70, at 9, Hr'g. Tr.).

appears that all parties had a clear view of the strengths and weaknesses of their respective positions, and sufficient information about the claims and defenses at the time they began exploring the possibility of settlement. Finally, as has been noted, the declarations and resumes submitted by Plaintiffs' attorneys establish that they are qualified, experienced, and competent. (*See* ECF Nos. 75 & 75-1).

### 2. Adequacy

The adequacy prong requires consideration of: (1) the relative strength of the plaintiff's case on the merits and probability of success at trial; (2) the anticipated duration and expense of additional litigation; (3) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (4) the degree of opposition to the settlement. *In re Mid-Atl. Toyota*, 564 F.Supp. at 1384. The purpose of the adequacy analysis is to "weigh the likelihood of the plaintiff's recovery on the merits against the amount offered in settlement." *Id.* (internal quotation marks omitted).

Here, the adequacy factors, on balance, counsel in favor of final approval of the Settlement Agreement. The court denied Defendant's motion to dismiss (ECF No. 25), but whether Plaintiffs would prevail on the merits if the case were to proceed is uncertain. Genuine disputes exist regarding whether any FCRA violations Plaintiffs allege could be deemed willful

and Plaintiffs' ultimate success on their FCRA claims turns on whether they can show that Domino's acted willfully -- "an onerous task with a highly uncertain outcome." *Domonoske v. Bank of America, N.A.*, 790 F.Supp.2d 466, 474 (W.D.Va. 2011). Defendant continues to deny liability for any alleged FCRA violations; although Plaintiffs may believe that Domino's conduct violated the FCRA, "there is always a risk that the Court or a jury will disagree," and instead determine that Domino's did not act "willfully" within the meaning of the FCRA. *Serrano*, 711 F.Supp.2d at 416.

Even if Plaintiffs were to overcome the liability obstacles, moreover, there are also risks in proving damages at trial. "The determination of damages [in an FCRA case] - like the determination of liability – is a complicated and uncertain process, often involving conflicting opinions." *Id*. at 416. Here, the statutory range for FCRA violations is between $100 to $1,000 per class member. *See* 15 U.S.C. § 1681n(a). Even if the Plaintiffs were to prevail on their FCRA claims at trial, it is far from certain that a jury would award the maximum of $1,000 to each Class member, especially "given the statutory factors that have to be taken into account in making such an award, including frequency and persistence of noncompliance with the statute, nature of the noncompliance, and the extent to which noncompliance was willful or negligent." *Id*. at 417. Further,

this case involves allegations of technical FCRA violations, which creates the risk that even if a jury awarded the minimum requisite statutory damages, *i.e.,* $100 to each of the individual class members, the court may find remitter/reduction appropriate. *See Klingensmith v. Max & Erma's Restaurants, Inc.*, No. 07-0318, 2007 WL 3118505, at *5 (E.D.Pa. 2007).

Furthermore, absent final approval of the Amended Settlement Agreement, litigation of this dispute could prove to be long and expensive. In particular, the likely next steps in this case – *e.g.,* additional discovery and dispositive motions – would require substantial time by the parties' attorneys. Although there is nothing to indicate that Defendant would be unable to satisfy a judgment if one were ultimately entered, it is not clear how long it might take to resolve this lawsuit. On balance, the risks, delays, and costs associated with further litigation weigh in favor of granting final approval of the Amended Settlement Agreement.

Lastly, there has been no opposition to the Amended Settlement Agreement. On June 27, 2013, KCC, the settlement administrator, mailed notice forms to 45,668 individuals, the best notice practicable under the circumstances. *See* Rule 23(c)(2)(B). The notice forms informed each class member, in clear and concise language, of the basis for this lawsuit; the definition of the Rule 23 Settlement Classes; the procedure for

23

receiving payment or opting out of the Amended Settlement
Agreement; the key terms of the Amended Settlement Agreement,
including potential recoveries; the process for objecting to the
Amended Settlement Agreement; and the date, time, and place of
the final fairness hearing. Thus, the forms and method of
notice complied with Fed.R.Civ.P. 23(c)(2) & 23(e). The
postmark deadline for filing objections or opt-out requests was
August 26, 2013. (ECF No. 69, at 15). Neither the court nor
counsel received any objections to the Amended Settlement
Agreement. Seven individuals decided to opt-out. (ECF No. 78,
at 19 - 26). One class member appeared at the September 23,
2013 final fairness hearing, but did not object. The fact that
only seven individuals opted out and no one filed objections
further supports final approval of the Amended Settlement
Agreement as fair, adequate, and reasonable. Furthermore, the
Amended Settlement Agreement is a good result for the class
members when considered in light of the disputed liability, the
difficulty in proving willfulness in an FCRA case, and the
statutory cap on damages.

## C. Attorneys' Fees, Litigation Expenses, Administrative Costs, and Incentive Awards

Finally, Plaintiffs seek attorneys' fees in the amount of
$750,000; reimbursement of litigation expenses in the amount of
$13,339.84; administrative expenses for KCC, the Settlement

Administrator, in the amount of $89,208.63; and incentive awards to each Named Plaintiff in the amount of $2,500. (ECF No. 74). For the following reasons, the court will grant this motion in part.

### 1. Attorneys' Fees

"It is for the district court in the first instance to calculate an appropriate award of attorney's fees." *Carroll v. Wolpoff & Abramson*, 53 F.3d 626, 628 (4th Cir. 1995). Rule 23 permits a court to award "reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h). The court must determine the best method of calculating attorneys' fees to appropriately compensate class counsel. There are two primary methods of calculating attorneys' fees: (1) the "percentage of recovery" or "percentage of the fund" method; and (2) the "lodestar" method. *Whitaker v. Navy Federal Credit Union*, No. RDB 09-cv-2288, 2010 WL 3928616, at *4 (D.Md. Oct. 4, 2010). With either method, the goal is to make sure that counsel is fairly compensated. The United States Court of Appeals for the Fourth Circuit has not decided which of the general approaches to adopt, although the "current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases." *Goldenberg v. Marriott PLP Corporation*, 33 F.Supp.2d 434, 438 (D.Md. 1998); *see also Strang v. JHM Mortgage Sec. Ltd.*

*Partnership*, 890 F.Supp. 499, 503 (E.D.Va. 1995) ("the percentage method is more efficient and less burdensome than the traditional lodestar method, and offers a more reasonable measure of compensation for common fund cases."). "[U]sing the percentage of fund method and supplementing it with the lodestar cross-check . . . take[s] advantage of the benefits of both methods." *In re The Mills Corp. Securities Litig.*, 265 F.R.D. 246, 261 (E.D.Va. 2009).[6] Accordingly, in this case, the "percentage of recovery" method cross-checked by the "lodestar" method is the appropriate method for reviewing the proposed attorneys' fees under Rule 23(h).

### a. "Percentage of Recovery" or "Percentage of the Fund" Method

The United States Supreme Court has "recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Under the "percentage of recovery" or "percentage of the fund"

---

[6] "Using the percentage method, cross-checked by the lodestar method reduces the risk that the amount of the fee award either overcompensates counsel in relation to the class benefits obtained or undercompensates counsel for their work." *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litig.*, 851 F.Supp.2d 1040, 1073 (S.D.Tex. 2012); *see also In re Royal Ahold N.V. Securities & ERISA Litig.*, 461 F.Supp.2d 383, 385 (D.Md. 2006) ("both are useful tools for trial courts to use to inform and calibrate a judgment as to a fair and reasonable . . . fee award.").

method, the court awards attorneys' fees as a percentage of the common fund used to pay class members' damages and claims. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984).[7] An attractive aspect of the "percentage of recovery" method is its results-driven nature which "ties the attorneys' award to the overall result achieved rather than the hours expended by the attorneys." *Jones v. Dominion Res. Servs.*, 601 F.Supp.2d 756, 759 (S.D.W.Va. 2009).

The Fourth Circuit has not yet identified factors for district courts to apply when using the "percentage of recovery" method. District courts in this circuit have analyzed the following seven factors: (1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys involved; (3) the risk of nonpayment; (4) objections by members of the class to the settlement terms and/or fees requested by counsel; (5) awards in similar cases; (6) the complexity and duration of the case; and (7) public policy;. *The Kay Company v. Equitable Production Co.*, 749 F.Supp.2d 455, 464 (S.D.W.Va. 2010); *Jones*, 601 F.Supp.2d at 760; *Domonoske,* 790 F.Supp.2d at 475; *The Mills Corp.*, 265 F.R.D. at 261. Importantly, "fee

---

[7] "The [common-fund] doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *In re Cendant Corp. Securities Litig.*, 404 F.3d 173, 187 (3rd Cir. 2005).

award reasonableness factors 'need not be applied in a formulaic way' because each case is different, 'and in certain cases, one factor may outweigh the rest.'" *In re AT&T Corp.*, 455 F.3d 160, 166 (3d Cir. 2006) (*quoting In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3rd Cir. 2005)).

### i. Results Obtained for the Class

As mentioned above, a major advantage of the "percentage of recovery" method is that it considers the results that class counsel actually obtained for the class as opposed to the number of hours they expended. *See Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *see also McKnight v. Circuit City Stores, Inc.*, 14 Fed.Appx. 147, 149 (4th Cir. 2001) ("the most critical factor in calculating a reasonable fee award is the degree of success obtained."); Fed.R.Civ.P. 23(h) advisory committee notes to 2003 amendments (explaining that the "fundamental focus" in determining a common fund attorneys' fee award "is the result actually achieved for class members").

As class counsel highlights in the memorandum supporting its request for attorneys' fees, the Settlement Classes obtained considerable value and benefit from the settlement. Domino's has consented to a common fund of $2.5 million to be distributed *pro rata* (on a per-claim basis) by check to the 6,739 Settlement Class members who timely submitted claims. (ECF No. 74-1, at

11; *see also* ECF No. 80 ¶ 19).[8]  While this is not a "megafund" case, class counsel nevertheless achieved a substantial value on behalf of the classes.  *See, e.g., Serrano*, 711 F.Supp.2d at 408 (finding that class counsel in an FCRA case - where claimants also sought statutory damages - achieved a substantial value in establishing a settlement fund of $975,000, for a maximum recovery of $1,000 to each claiming class member).  Pursuant to the Amended Settlement Agreement, recovery for members of the "Applicant Class" and "Adverse Action Class" is capped at $250 per Plaintiff, and recovery for members of the "Multiple MVR Check Class" is capped at $200 per Claimable MVR Check.  (ECF No. 67-1 ¶ 22).[9]  Without discounting for the requested attorneys' fees, litigation expenses, administrator costs, and incentive awards, each "Applicant Class" and "Adverse Action Class" claim will be worth approximately $204.63, each "Multiple MVR Class" claim will be worth approximately $163.70, and the average gross recovery per claimant is approximately $370.97. (ECF No. 80 ¶ 20).  Assuming the court grants all of the

---

[8] The Amended Settlement Agreement provides that shares of the "Applicant Class" and "Adverse Action Class" shall be weighted at 1.25 times each share of the "Multiple MVR Check Class" for purposes of calculating individuals' recoveries. (ECF No. 67-1, at 16).

[9] The Amended Settlement Agreement provides that these amounts cannot be exceeded regardless of the amounts awarded for attorneys' fees, litigation expenses, incentive awards, and administration costs.

requested fees, on the other hand, the potential recovery declines by approximately thirty-four (34) percent. (*Id.* ¶ 21). Specifically, each "Applicant Class" claim and "Adverse Action Class" claim will then be worth approximately $134.43, and each "Multiple MVR Class" claim will then be worth approximately $107.55, for an average gross recovery per claimant of approximately $243.72. (*Id.*). As class counsel notes, however, this is still an impressive result considering settlements in comparable cases. *See, e.g., LaValle v. Chexsystems*, No. 8:08cv01283, ECF. No. 58, Stipulation and Agreement of Settlement (C.D.Cal. Oct. 5, 2011) ("Settlement Class Members who submit a Valid Claim will be eligible to receive a one-time payment of $82.00 per [claim]"); *Phillips v. Accredited Home Lenders Holding Co.*, No. 2:06cv00057, ECF No. 51, ¶ 4, Judgment and Order of Dismissal (C.D.Cal. July 17, 2008) ("[t]he relief negotiated by the Parties includes a payment of $10.00" on a claims-made basis). The fact that no objections have been filed further suggests that the result achieved is a desirable one.

### ii. Quality, Skill, and Efficiency of the Attorneys Involved

As noted above, Plaintiffs' attorneys are experienced and skilled consumer class action litigators who achieved a favorable result for the Settlement Classes. Counsel exchanged initial disclosures with Defendant; participated in mediation;

served interrogatories and requests for production of documents on Defendant; fully briefed a motion to dismiss; reviewed approximately 600 pages of documents; prepared mediation briefs; and participated in an all-day mediation with a private mediator. (ECF No. 75 ¶ 2, Drake Decl.). Plaintiffs' attorneys also reached a favorable settlement after evaluating the strengths and weaknesses of the respective positions and negotiating with sophisticated defense attorneys. *See In Re Warner Commc'ns Sec. Litig.*, 618 F.Supp. 735, 749 (S.D.N.Y. 1985) (quality of opposing counsel is a factor to be considered in evaluating Lead Counsel's performance). Class counsel clearly expended considerable time on this matter, reportedly working approximately 627.52 hours on this case. (ECF. No. 75-3). The considerable hours counsel spent on this case appear to have been essential to the favorable result obtained. The fact that settlement was reached relatively quickly – short of two years from the filing of the complaint on July 1, 2011 – further indicates the attorneys' skills and efficiency.

### iii. Risk of Nonpayment

"In determining the reasonableness of an attorneys' fee award, courts consider the relative risk involved in litigating the specific matter compared to the general risks incurred by attorneys taking on class actions on a contingency basis." *Jones*, 601 F.Supp.2d at 762. The risk undertaken by class

counsel is evaluated by, among other things, the presence of government action preceding the suit, the ease of proving claims and damages, and, if the case resulted in settlement, the relative speed at which the case was settled. *Id.; see also Strang*, 890 F.Supp. at 503 (finding that risks to plaintiffs' counsel were minimized by settlement within six-months from the filing of the complaint and consequently reducing the percentage award from 30% to 25% of the Settlement Fund).

Despite the attorneys' skill and experience in litigating FCRA class actions, there existed some risk of non-recovery here, although this is a reality in the vast majority of litigation. Class counsel contends that the case may not have been profitable at all, given that counsel took it on a contingency basis and the difficulties of proving willfulness in an FCRA case. (ECF No. 74-1, at 18-19). Counsel further argues that the risk of nonpayment was amplified by the lack of controlling legal authority concerning the relevant FCRA provision governing "stand-alone" documents. The court recognizes that attorneys undertaking class actions bear substantial risks, but there is no evidence that class counsel undertook greater risk in this case than in any typical class action where plaintiffs seeking damages for unlawful conduct have the burden of establishing statutory violations. *See Lyle v. Food Lion, Inc.*, 954 F.2d 984, 989 (4th Cir. 1992) (finding

that the risk of counsel not being compensated in a case taken on a contingent fee basis, standing alone, was not a sufficient ground for enhancing the lodestar fee). "As any judge or experienced attorney realizes, the vast majority of cases, even extremely complicated ones, settle . . . [because] parties are rational actors who will settle when they feel that it is in their own economic best interest." *Loudermilk Services, Inc. v. Marathon Petroleum Co. LLC*, 623 F.Supp.2d 713, 722 (S.D.W.Va. 2009). In *Jones v. Dominion Resources Services, Inc.*, the court found that "the usual risks of nonpayment associated with class actions were largely dissipated once the parties entered settlement negotiations." 601 F.Supp.2d at 763. Here too, on August 10, 2012, just over a year after Plaintiffs initiated this lawsuit, the parties filed a joint motion to stay pending settlement negotiations. (ECF No. 44); *see also Loudermilk Services*, 623 F.Supp.2d at 723 ("Plaintiffs' counsel could always maintain some leverage in settlement negotiations because of the high potential verdict and Defendants' corresponding value of the case."). Although the risk of no recovery was certainly present here, the likelihood of settlement and the initiation of settlement negotiations relatively early in the litigation process greatly reduced the risk of nonpayment experienced by class counsel. Accordingly, it appears that

class counsel experienced lower risk in the pursuit of this case than the risk present in other class actions.

### iv. Objections

As noted above, class members were notified directly of the proposed settlement terms in the Amended Settlement Agreement, including an explanation of the attorneys' fee request. (*See* ECF No. 71-2, at 8). No one filed objections to either the settlement terms or the proposed attorneys' fees. Furthermore, no class member objected at the final fairness hearing on September 23, 2013. The lack of objections tends to show that at least from the class members' perspective, the requested fee is reasonable for the services provided and the benefits achieved by class counsel. Nevertheless, the court must still determine the reasonableness of the requested fee applying the remaining factors.

### v. Awards in Similar Cases

Attorneys' fees awarded under the "percentage of recovery" method are generally between twenty-five (25) percent and thirty (30) percent of the fund. Manual for Complex Litigation ("MCL"), § 14.121; *see also*, *e.g., In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (25% with adjustments up to 33% for complexity, risk, and nonmonetary results). While the Fourth Circuit has not yet addressed this issue, several courts have established benchmarks, subject to upward or

downward adjustment depending on the facts of the class actions. "The Ninth and Eleventh Circuit generally use a 25% benchmark for common-fund cases." *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litig.*, 851 F.Supp.2d 1040, 1080 (S.D.Tex. 2012). The Second and Third Circuits, on the other hand, have not relied on rigid benchmarks, and instead consider the specific circumstances of each case based on factors enunciated in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). *See, e.g., Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 51-52 (2d Cir. 2000); Third Circuit 2001 Task Force Report on Selection of Class Counsel, 74 Temp.L.Rev. 689, 705 (2001) (recommending that courts "avoid rigid adherence to a 'benchmark'" and concluding that "a percentage fee, tailored to the realities of the particular case, remains superior to any other means of determining a reasonable fee for class counsel."). "In fact, cases generating comparatively smaller funds can require a higher percentage fee award, due to the perception that large percentages of very large settlements lead to windfalls for attorneys." *Serrano,* 711 F.Supp.2d at 420; *see also In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 339 (3d Cir. 1998) (noting inverse relationship of large settlement to smaller percentage award).

In considering awards in similar cases, courts look to cases of similar size, rather than similar subject matter. *See In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 737 (3rd Cir. 2001); *The Mills Corp.*, 265 F.R.D. at 263-64 ("comparing the size of the fund and percentage of the award in other cases to the present case . . . provides a valuable point of reference."). Fees awarded under "the percentage-of-recovery" method in settlements under $100 million have ranged from 15% to 40%. *See Stoner v. CBA Information Services,* 352 F.Supp.2d 549, 553 (E.D.Pa. 2005). Cases involving comparable funds to the $2.5 million settlement fund here have resulted in awards of attorneys' fees in the ranges of 25% to 28% of the common fund. *See In re SPX Corp. ERISA Litig.* (W.D.N.C. 2007) (28% of the fund awarded, where the fund was $3.6 million); *Smith v. Krispy Kreme Doughnut Corp.*, 2007 WL 119157, at *3 (M.D.N.C. 2007) (26% of the fund awarded where the fund was $4,750,000); *Mason v. Abbot Labs.* (N.D.W.Va. 2001) (25% of the fund awarded where the fund was $1,705,200); *Braun v. Culp, Inc.* (M.D.N.C. 1985) (25% of the fund awarded where the fund was $1.5 million). *See The Mills Corp.*, 265 F.R.D. at 264. Furthermore, a recent study in the *Journal of Empirical Studies* found that for class recoveries in the range of $1.1 and $2.8 million, the mean attorneys' fee percentage award from 1993-2008 was approximately 27.1%, and the median was 26.4%. *See* Theodore Eisenberg & Geoffrey P. Miller,

*Attorney Fees and Expenses in Class Action Settlements: 1993–2008,* 7 J.Emp.L.Studies 248, 265 T.7 (June 2008); *see also Loudermilk Services,* 623 F.Supp.2d at 723 (recognizing that a one-third attorneys' fee is presumptively reasonable, but considering that class counsel "has far more control of litigation in the class action context than when litigating for an individual" and that the "potential reward for plaintiffs' counsel in class action litigation is much higher than when an attorney litigates for an individual," a twenty-five percent fee was more appropriate and near the average awarded by courts in similar litigation).

Thus, an award of twenty-five (25) percent falls within the range of awards deemed fair and reasonable by courts within the Fourth Circuit in recent similar cases involving settlement funds of comparable sizes.[10]

---

[10] Class counsel offers a number of cases to support its request for attorneys' fees in the amount of thirty (30) percent of the common fund, but on balance, a twenty-five (25) percent reward is more appropriate here. Notably, class counsel's suggestion to use a thirty (30) percent benchmark exceeds what other circuit courts applying the "percentage of the recovery method" have found appropriate. *See Goldenberg v. Marriott PLP Corporation*, 33 F.Supp.2d 434, 438 (D.Md. 1998) ("[t]he Ninth Circuit, for example, has established a 25% benchmark for such awards."); *see also In re Bluetooth Headset prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011) ("Where a settlement produces a common fund for the benefit of the entire class, . . . courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record for any 'special circumstances' justifying a departure."). In any event, as indicated above, fee awards in

### vi. The Complexity and Duration of the Litigation

The 'complexity and duration' element suggests that recovery in the amount of twenty-five (25) percent of the common fund is more appropriate here. "In evaluating the complexity and duration of the litigation, courts consider not only the time between filing the complaint and reaching settlement, but also the amount of motions practice prior to settlement, and the amount and nature of discovery." *Jones*, 601 F.Supp.2d at 761; *see also In re Cendant*, 243 F.3d at 736-36. Cases such as this one where discovery is informal and does not involve conflicts over privilege or access to documents are considered less complex and time consuming. *Id.; see also In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 137-38 (S.D.N.Y. 2008). Cases are considered more complex when the applicable laws are new, changing, or unclear. *See Goldenberg*, 33 F.Supp.2d at 439 (finding that the case was "fairly complex, requiring analysis of several complicated financing arrangements and tax shelter opportunities in the context of a business and regulatory climate in flux."). In a settlement context, courts consider whether negotiations were "hard fought," "complex," or "arduous." *In re Merrill Lynch*, 249 F.R.D. at 138.

---

similar cases is but one factor courts consider in determining the reasonableness of the requested fees.

The instant litigation was not especially protracted, nor was it overly complex. Class counsel argues that this case was complex because it implicated novel legal issues and required proof of willful conduct, which is a difficult threshold to overcome under the FCRA to recover statutory damages. (ECF No. 74-1, at 25-26). But importantly, class counsel did not actually have to litigate these potentially difficult legal issues through trial, as the parties entered settlement negotiations just over a year after this suit was filed. Moreover, this case may not be as complex as class counsel contends. For instance, in *Domonoske v. Bank of America, N.A.*, also a class action lawsuit arising under the FCRA, plaintiffs alleged that defendant willfully failed to prepare and mail credit score disclosures to plaintiffs "as soon as reasonably practicable" pursuant to Section 1681g(g) of the FCRA. 790 F.Supp.2d at 469. Notably, the court rejected plaintiff's request for an award of twenty-five (25) percent of the common fund, *despite* finding that the settlement produced a favorable result for the class, there were relatively few objections, class counsel was experienced in consumer advocacy, and that there was substantial risk of nonpayment given the difficulty of proving willfulness in an FCRA case. *Id.* at 475. The court found an eighteen (18) percent of the common fund award to be more appropriate despite recognizing that it was at the low end

of recoveries in attorney's fees, "due to the lack of complexity and the brevity of discovery in [the] case." *Id.* at 476; *see also Carroll,* 53 F.3d at 630 (finding no abuse of discretion in the court's conclusion that the fees awarded in a consumer case should bear some rational relationship to the nature of the defendant's violation).

Furthermore, discovery in this case was relatively straightforward. Class counsel highlights that the parties exchanged initial disclosures, and Defendant produced 600 pages of documents which Plaintiff reviewed, (ECF No. 75 ¶ 2), but there is no evidence that discovery was particularly challenging or that class counsel had to fight for access to these documents. *See Jones*, 601 F.Supp.2d at 762 (finding that discovery was straightforward where class counsel reviewed over 118,000 pages of documents); *see also Domonoske*, 790 F.Supp.2d at 476 (noting that discovery was brief where class counsel obtained fewer than 10,000 pages of written discovery). This case also involved limited motions practice. *See Jones,* 601 F.Supp.2d at 762 (finding motions practice to be minimal where the parties only briefed two motions over the course of one year). Accordingly, the foregoing considerations weigh in favor of reducing the attorneys' fees amount to twenty-five (25) percent of the common fund.

### vi. Public Policy

"The most frequent complaint surrounding class action fees is that they are artificially high, with the result (among others) that plaintiffs' lawyers receive too much of the funds set aside to compensate victims." Report on Contingent Fees in Class Action Litigation, 25 Rev.Litig. 459, 466 (2006). Thus, in assessing the reasonableness of the requested attorneys' fees, the court must strike the appropriate balance between promoting the important public policy that attorneys continue litigating class action cases that "vindicate rights that might otherwise go unprotected," and perpetuating the public perception that "class action plaintiffs' lawyers are overcompensated for the work that they do." Third Circuit Task Force Report, 208 F.R.D. 340, 342, 344 (Jan. 15, 2002). Courts in this circuit have recognized that "[t]his concern is not a trivial one and requires attentiveness . . . in awarding fees." *The Mills Corp.*, 265 F.R.D. at 263; *see also Domonoske*, 790 F.Supp.2d at 476 ("the court notes the need to 'properly balance[ ] the policy goals of encouraging counsel to pursue meritorious [litigation in the relevant legal field, consumer litigation here,] . . . while [also] protecting against excessive fees.'" (*quoting In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2nd Cir. 2008)); *The Kay Company*, 749 F.Supp.2d at 469 ("[b]ecause of the damage caused by the

perception of overcompensation of attorneys in class action suits, lawyers requesting attorneys' fees and judges reviewing those requests must exercise heightened vigilance to ensure the fees are in fact reasonable beyond reproach and worthy of our justice system.").

Here, a reduction of the attorneys' fees award to twenty-five (25) percent of the common fund would be more reasonable in light of these competing public policy concerns. *See, e.g., Carroll v. Wolpoff & Abramson*, 53 F.3d 626, 630 (4th Cir. 1995) (finding a lower attorneys' fee award appropriate in a case involving a technical violation of the Fair Debt Collection Practices Act ("FDCPA"), because a higher award would "over-encourage litigation alleging technical violations of [FDCPA] and other statutes aimed principally at collecting attorney's fees."). Although no class member objected to the proposed attorneys' fee of up to thirty (30) percent of the common fund, the court is cognizant of the fact that after discounting for the requested fees, the class members' potential recovery declines by approximately thirty-four (34) percent. Plaintiffs argue that "public policy and important consumer rights at stake justify an exceptional risk enhancement" considering the *potential* risks that counsel undertook in deciding to initiate this action. (*See* ECF No. 74-1, at 28 ("Named Plaintiffs *could have* rejected this good settlement offer . . . [o]r the

Defendant *could have* sought to moot the case by buying off the class representatives through a Rule 68 offer . . . [or] Defendant *might have* argued Plaintiffs had not alleged sufficient injuries in fact to have Article III standing.") (emphasis added)). Based on the foregoing, however a nominal reduction in the requested fee award is sufficient to account for the risks class counsel identifies while continuing to promote the policy goals of enforcing consumer goals and protecting against excessive fees. *See The Kay Company*, 749 F.Supp.2d at 468-69 ("It is not at all clear . . . that the increased risk to class counsel of investing time and resources to prosecute class actions justifies the treatment of such cases as entirely analogous to individual claims for fee award purposes. Increasing the number of class action plaintiffs does not necessarily increase the amount of time class counsel spends on a case").

**b. Lodestar Cross-Check**

Under the "lodestar" method, a district court identifies a lodestar figure by multiplying the number of hours expended by class counsel by a reasonable hourly rate. *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008).[11] The court may then

---

[11] Maryland courts use the "lodestar" approach when determining attorneys' fees under fee-shifting statutes. *See, e.g., Friolo v. Frankel*, 373 Md. 501, 504-05 (2003). In *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010), the Supreme

adjust the lodestar figure using a "multiplier" derived from a number of factors, including the benefit obtained for the settlement class, the complexity of the case, and the quality of the representation. *See The Kay Company,* 749 F.Supp.2d at 462; *see also In re Microstrategy, Inc. Sec. Litig.*, 172 F.Supp.2d 778, 786-87 (E.D.Va. 2001).

The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 306 ("The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method"); *Viscaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("[T]he lodestar may provide a useful perspective on the reasonableness of a given percentage award."). Importantly, "where the lodestar fee is used 'as a mere cross-check' to the percentage method of determining reasonable attorneys' fees, 'the hours documented by counsel need not be exhaustively scrutinized by the district court.'" *In re Royal Ahold N.V. Securities*, 461 F.Supp.2d at 385 (*quoting Goldberger*, 209 F.3d at 50).

_____

Court reaffirmed the use of the "lodestar" method in federal fee-shifting cases.

A lodestar cross-check confirms that twenty-five (25) percent of the $2.5 million settlement fund is a reasonable fee award for class counsel here. Class counsel claims a lodestar of approximately $200,136, which represents 627.52 hours billed by twelve (12) attorneys at various rates ranging from $250.00 to $550.00 per hour and thirteen (13) professional support staff, including law clerks, paralegals, legal assistants, litigation support staff, and class action clerks, at a $175.00 hourly rate. (ECF No. 75-2 & 75-3).[12] Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee. *See Goldenberg*, 33 F.Supp.2d at 439 n.6; *see also In re Microstrategy, Inc.*, 172 F.Supp.2d at 789 (reducing fee award from a requested percentage, which would have resulted in an award approximately four times the lodestar figure, to a percentage that resulted in an award 2.6 times the lodestar figure); *In re Cendant*, 243 F.3d at 742 ("[M]ultiples ranging from one to four are frequently

---

[12] These hourly rates, while somewhat high for this district, are within a reasonable range for firms with national class action practices. *See, e.g, DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 325 (W.D.Tex. 2007) (finding reasonable hourly rates of between $500 and $550 for lead class counsel, and between $350.00 and $475.00 for other counsel and associate attorneys). In any event, as noted above, the court need not engage in an intensive analysis of the rates charged when applying the lodestar analysis merely as a cross-check, in contrast to employing the lodestar method in full. *See In re World Com Sec. Litig.*, 388 F.Supp.2d 319, 355 (S.D.N.Y. 2005).

awarded in common fund cases when the lodestar method is applied.").

Here, class counsel suggests a lodestar multiplier of approximately 3.8. (ECF No. 74-1, at 34). The range of multipliers on large and complicated class actions have ranged from at least 2.26 to 4.5, but a fee resulting in such a high relative multiplier is unreasonable in light of the lesser complexity and risk of this action. *See Retiree Med. Benefits ERISA Litig.*, 886 F.Supp. 445, 481-82 (E.D.Pa. 1995); *see also The Kay Company*, 749 F.Supp.2d at 471 ("[a]lthough the technical and administrative details of the case were surely complicated by the large number of plaintiffs, the legal theory underlying the case did not change."). Considering the nature of this litigation, the "technical" violations involved, and the limited discovery, a multiplier closer to 3 is more reasonable under the circumstances and well within the normal range of lodestar multipliers. *See Jones*, 601 F.Supp.2d at 766.

Accordingly, a percentage award of twenty-five (25) percent in this case is perfectly reasonable when cross-checked under the lodestar method.

### 2. Reimbursement for Litigation Expenses

In addition to attorneys' fees, Plaintiffs' attorneys seek $13,339.84 in out-of-pocket expenses incurred throughout the litigation. (ECF No. 74-1, at 36; *see also* ECF No. 75-4, at 20-

21). "It is well-established that plaintiffs who are entitled to recover attorneys' fees are also entitled to recover reasonable litigation-related expenses as part of their overall award." *Kabore v. Anchor Staffing, Inc.*, No. L-10-3204, 2012 WL 5077636, at *10 (D.Md. Oct. 17, 2012). The Fourth Circuit has stated that such costs may include "those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Spell v. McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988) (internal quotations omitted). Examples of costs that have been charged include necessary travel, depositions and transcripts, computer research, postage, court costs, and photocopying. *Almendarez v. J.T.T. Enters. Corp.*, No. JKS 06-68, 2010 WL 3385362, at *7 (D.Md. Aug. 25, 2010) (*citing Vaughns v. Bd. of Educ. of Prince George's Cnty.*, 598 F.Supp. 1262, 1289-90 (D.Md. 1984)).

The court has reviewed the itemization submitted by class counsel of the incurred costs and expenses. The itemization included filing fees, travel costs, copies, and other miscellaneous costs. (ECF No. 75-4, at 20-21). The requested reimbursement for expenses appears to be reasonable and typical. Accordingly, the request for $13,339.84 in expenses will be approved.

### 3. Claims Administration Fee

KCC, the Settlement Administrator in this case, provided an itemized list of expenses already incurred in connection with administering the Amended Settlement Agreement and remaining costs. (ECF No. 78, at 28-30). It appears that KCC has already performed substantial work by facilitating the claims and opt-out process, giving notice to the proposed Settlement Classes, and reviewing the claims; KCC appears to have performed its tasks in an efficient manner. KCC requests fees in the amount of $89,208.63 to complete the administration of this settlement, which will involve distributing the respective amounts to approved claimants. (ECF No. 78 ¶ 23). The fee requested here comports with other claims administration fees in similar class-action settlements, particularly in light of the number of Notice Forms that the Claims Administrator was required to process – over 45,000. (ECF No. 80 ¶ 10). *See e.g., Garcia v. Gordon Trucking*, No. 1:10-CV-0324-AWI-SKO, 2012 WL 5364575, at *3 (E.D.Cal. Oct. 31, 2012) (approving $25,000 administrator fee awarded in wage and hour case involving 1,868 potential class members); *Harris v. Vector Marketing Corp.*, No. C-08-5198 EMC, 2012 WL 3812012, at *6 (N.D.Cal. Feb. 6, 2012) (awarding $250,000 in administration costs where claims administrator sent out 68,487 notices). Furthermore, class members were notified that administrative costs would be deducted from the fund, and

no one objected.  (*See* ECF No. 67-1, at 51 ("[i]f any settlement funds, remain after all checks have been distributed, and after all . . . administrative costs have been paid, half of any remaining amounts will revert to Domino's and the remainder will be divided between the Center for Employment Opportunities and St. Judge Children's Research Hospital.").

Based on KCC's submission and administration costs approved in comparable cases, the proposed claims administration fee of $89,208.63 appears fair and reasonable.

### 4. Reasonableness of the Incentive Payments

As a last step in granting final approval of the Settlement Agreement, the court must assess the reasonableness of the $2,500 incentive payments to each Named Plaintiff, Justin D'Heilly and Adrian Singleton.

Incentive payments to class representatives have been awarded in Rule 23 class actions.  *See, e.g., In re Tyson Foods, Inc.*, No. RDB-08-1982, 2010 WL 1924012, at *4 (D.Md. May 11, 2010).  "Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit."  *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).  To determine whether an incentive payment is warranted, a court should consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has

benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1016.

Here, the Amended Settlement Agreement – to which no one has objected - contemplates an incentive payment of $2,500 to each Named Plaintiff, in addition to their receipt of a settlement payment. (ECF No. 67-1, at 53). In the final approval motion, Plaintiffs represent that this award is justified because both Named Plaintiffs spent a considerable amount of time "meeting and communicating with counsel, reviewing pleadings and correspondence, gathering documents" and participating in the mediation, all done in furtherance of the interests of the Settlement Classes. (ECF No. 74-1, at 37; *see also* ECF Nos. 76 & 77 (Declarations of Justin D'Heilly and Adrian Singleton)). These efforts have resulted in the Second Amended Settlement Agreement, which is now before the court. Additionally, Named Plaintiffs have undertaken personal risk in furtherance of this lawsuit. Specifically, both Singleton and D'Heilly express concern that their decision to litigate against Domino's, their former employer, will adversely affect their future job prospects. As Plaintiffs point out, "this lawsuit appears on the first page of Google's search result" when a search for Named Plaintiffs is conducted on the Internet. (ECF No. 74-1, at 37).

In light of the Named Plaintiffs' role in initiating this lawsuit and in helping to achieve a favorable resolution despite the potential future risks, the relatively modest incentive payment of $2,500 to each Named Plaintiff is reasonable.

## III. Conclusion

For the foregoing reasons, the unopposed motion for final approval of the Amended Settlement Agreement will be granted, with the change in the amount for attorneys' fees. A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
